## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JOSEPH FEHL,

        Plaintiff,

vs.

BOROUGH OF WALLINGTON, et al.

        Defendants.

Civ. Action No.: 2:17-cv-11462 (KSH-CLW)


**FINAL PRETRIAL ORDER**

Jason A. Rindosh, Esq.
Prabhkaran S. Bedi, Esq.
**BEDI RINDOSH**
1605 John Street, #305
Fort Lee, NJ 07024
(201) 775-4222
*Attorneys for Plaintiff, Joseph Fehl*

Mary C. McDonnell, Esq.
**PFUND MCDONNELL, P.C.**
139 Prospect Street, 2nd Floor
Ridgewood, NJ 07450
(201) 857-5040
*Attorneys for Defendants, Borough of Wallington and Sean Kudlacik*

Christopher C. Botta, Esq.
**BOTTA ANGELI, LLC**
50 South Franklin Turnpike
Ramsey, NJ 07446
(201) 818-6500
*Attorneys for Defendant, Witold Baginski*

INSTRUCTIONS

FINAL PRETRIAL ORDER

HON. KATHERINE S. HAYDEN

1. THE ATTACHED FORM IS TO BE RETYPED IN FULL (INCLUDING ALL INSUTRCTIONS) AND ALL MATERIAL INSERTED IN **PROPER SEQUENCE** AND NOT BY MEANS OF ATTACHED RIDERS EXCEPT AS SPECFICALLY SET FORTH.

2. **NUMBER** ALL PAGES.

3. AN ORIGINAL AND ONE COPY OF THE **COMPLETED** FINAL PRETRIAL ORDER MUST BE DELIVERED TO THE CHAMBERS OF MAGISTRATE JUDGE WALDOR.

4. THE COPY, WHEN EXECUTED, WILL BE GIVEN TO JUDGE HAYDEN. THE COPY MUST BE IN A **THREE-RING BINDER**.

5. EACH SECTION OF THE FINAL PRETRIAL ORDER MUST BEGIN ON A SEPARATE PAGE.

6. ALL NUMBERED SECTIONS OF THIS FINAL PRETRIAL ORDER MUST BE PRECEDED BY A CORRESPONDINGLY NUMBERED DIVIDER.

7. EACH WITNESS SHALL HAVE A SEPARATE SECTION OR SEPARATE BINDER, A PHOTOGRAPH OF THAT WITNESS SHALL BE PROVIDED IN THE WITNESS SECTION.

# SECTION  1 - JURISDICTION

1.  JURISDICTION (set forth specifically):  Plaintiff Joseph Fehl's (hereinafter "Plaintiff")
Complaint against Defendants Borough of Wallington and Shawn Kudlacik (hereinafter
"Wallington Defendants" or "Defendant Kudlacik" individually) and Defendant Witold Baginski
(hereinafter "Defendant Baginski") alleges nine claims: (1) false arrest against Defendant
Kudlacik (N.J.S.A. § 10:6-2); (2) false arrest against Defendant Kudlacik (42 U.S.C. § 1983); (3)
malicious prosecution against Defendant Kudlacik and Defendant Baginski (N.J.S.A. § 10:6-2);
(4) malicious prosecution against Defendant Kudlacik  and Defendant Baginski (42 U.S.C. §
1983); (5) municipal policy of inadequate training or supervision against the Bergen County
Prosecutor's Office (42 U.S.C. § 1983)[1]; (6) abuse of process against the Wallington Defendants
and Defendant Baginski (42 U.S.C. § 1983); (7) free speech and First Amendment retaliation and
intimidation against the Wallington Defendants and Defendant Baginski (42 U.S.C. § 1983); and
(8) free speech and First Amendment retaliation and intimidation against the Wallington
Defendants and Defendant Baginski (N.J.S.A. § 10:6-2); and (9)[2] municipal liability against
Defendant Borough of Wallington and Defendant Baginski (42 U.S.C. § 1983).  This Court has
subject matter jurisdiction over the claims contained in Counts (2), (4-7), and (9) of Plaintiff's
Complaint made under Section 1983 pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  This
Court has subject matter jurisdiction over the claims contained in Counts (1), (3), and (8) of
Plaintiff's Complaint made under the New Jersey Civil Rights Act (N.J.S.A. § 10:6-2, et seq.)
and common law pursuant to 28 U.S.C. § 1367 because these claims form part of the same case
or controversy underpinning this Court's original jurisdiction.  Plaintiff requests trial by jury.

---

[1] The Bergen County Prosecutor's Office was dismissed from the case.  Therefore, Plaintiff will
voluntarily dismiss this claim.
[2] This is referenced as "Count VIII" in the Complaint, but this was mistakenly duplicative of the
prior Count VIII.

# SECTION 2 – PENDING CONTEMPLATED MOTIONS

2. PENDING/CONTEMPLATED MOTIONS (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar. Also set forth the nature of the motion. If the Court indicated that it would rule on any matter at pretrial, summarize that matter. Each party's contemplated in limine motions should also be set forth.).

**Plaintiff's pending/contemplated motions**:

1. Motion to bar the Wallington Defendants expert testimony of Glenn M. Miller

   because his expert report is a net opinion.

**Defendants Borough of Wallington, Baginski and Kudlacik's pending/contemplated motions**:

1. Defendant Borough of Wallington and Baginski intend to file a Motion for

   Summary Judgment as the undisputed facts will show, the Borough of Wallington

   and Baginski are entitled to have all counts in the Complaint against it dismissed

   as a matter of law.

2. Motion to Bar Evidence of Economic Damages related to Plaintiff's Towing

   Business and Landscaping business

3. Motion to Bar Evidence of Heroic Acts

4. Motion to Bar Baginski investigation

5. Motion to admit statement of witness Michael Chermak (deceased)

6. Motion to bar Plaintiff's expert testimony of Joseph Blaettler because his expert

   report is a net opinion.

# SECTION 3 – STIPULATION OF FACTS

3.  STIPULATION OF FACTS (Set forth numbered paragraphs all uncontested facts, including all answers to interrogatories and admission to which the parties agree.):

1.      Plaintiff joined the Borough of Wallington Fire Department ("WFD") as a volunteer firefighter in January 2009.

2.      Plaintiff served as a volunteer Emergency Medical Technician ("EMT") for the Borough of Wallington also beginning in 2009.

3.      Plaintiff left the Park Avenue WFD station by foot to drive his car to the scene of the emergency.

4.      Plaintiff was admitted to Hackensack University Medical Center on July 3, 2014 and released on July 6, 2014.

5.      Plaintiff was charged with tampering with public records or information (N.J.S.A. § 2C:28-7(a)).

6.      Plaintiff gave a sworn statement regarding his version of events.

7.      Plaintiff was released from custody on August 5, 2014 after bail was posted on his behalf.

8.      On March 17, 2015, a grand jury in Bergen County indicted Plaintiff for insurance fraud (N.J.S.A. § 2C:21-4(b)(6)(a)) and tampering with public records or information (N.J.S.A. § 2C:28-7(a)).

9.      On January 9, 2018, the Honorable Christopher R. Kazlau, J.S.C. presided over a trial in the Superior Court of New Jersey, Bergen Vicinage, Criminal Part, where the jury found Plaintiff to be not guilty, and the charges were dismissed.

# SECTION 4 – CONTESTED FACTS

4. CONTESTED FACTS (Proofs shall be limited at trial to the contested facts set forth. Failure to set forth any contested facts shall be deemed a waiver thereof.).

### A. Plaintiff:

1. Plaintiff Joseph Fehl (hereinafter "Plaintiff") is a graduate of Bergen Tech High School located in Teterboro.

2. Plaintiff did not attend college after graduating high school.

3. Plaintiff has specialized training in firefighting and first responder training.

4. Plaintiff received his certification as a firefighter around 1999, and then first served as a firefighter in Ridgefield Park.

5. Plaintiff is a resident of Hasbrouck Heights. Plaintiff became a firefighter in Hasbrouck Heights after serving in Ridgefield Park, and he also served as a first responder.

6. Plaintiff served as a volunteer firefighter in in Hasbrouck Heights for 11 years.

7. During the time Plaintiff was a firefighter in Hasbrouck Heights, he filed a claim through an attorney seeking damages based on false complaint against him that occurred in the scope of his position as a volunteer firefighter.

8. Hasbrouck Heights was a member of the South Bergen Joint Insurance Fund at the time of Plaintiff's claim.

9. The South Bergen Joint Insurance Fund is funded by pooled taxpayer dollars that are used to pay claims in lieu of obtaining private insurance policies.

10. Bergen Risk Managers is the third-party claims administrator of the South Bergen Joint Insurance Fund during the time Plaintiff was a firefighter/first responder in Wallington.

11. Defendant Baginski was a member of the South Bergen Joint Insurance Fund's nine member executive board serving on behalf of the Borough of Wallington.

12. Defendant Baginski was aware of the insurance claims Plaintiff filed during the time he was a volunteer in Hasbrouck Heights.

13. Defendant Kudlacik also "heard through the grapevine of a lawsuit with Joey Fehl before [against Hasbrouck Heights]."

14. Plaintiff became a volunteer firefighter in the Wallington Fire Department in January of 2009.

15. At the time Plaintiff was hired as a volunteer firefighter in the Wallington Fire Department, he was employed as a tow truck driver.

16. In 2014, Plaintiff also had a landscaping business at this time called Paradise Lawn-Care.

17. Defendant Baginski was aware Plaintiff was in the tow truck business from his conversations with other members of the volunteer squad.

18. Plaintiff also became a volunteer first responder for the Borough of Wallington's EMS squad during the time he was a firefighter in Wallington.

19. Plaintiff was already certified as a firefighter and first responder at the time he became a volunteer in Wallington, though he received additional firefighting and first responder training at the academy in Bergen County after becoming a volunteer in Wallington.

20. There are three firehouses and three fire companies in Wallington.

21. Plaintiff was a member of Engine Company 203 during the time he served as a volunteer firefighter in Wallington.

22. The Wallington Fire Department held regular meetings for firefighters in Wallington. Individual company meetings are held once a month, and department meetings are held once per quarter.

11

23. Wallington's emergency medical squad also had separate meetings held once per month during the time Plaintiff served as a volunteer member.

24. Plaintiff would attend approximately three out of every four meetings scheduled for the Wallington Fire Department and Wallington Emergency Squad.

25. Defendant Baginski was a volunteer firefighter in Wallington when Plaintiff became a volunteer firefighter.

26. Defendant Baginski was not a member of Engine Company 203, however, and instead was a member of Engine Company 202.

27. Defendant Baginski, aware of Plaintiff's claim while a firefighter at Hasbrouck Heights, wanted Plaintiff off of the Wallington Fire Department because of the prior claim.

28. Engine Company 202 has a different firehouse than Engine Company 203, but Plaintiff and Defendant Baginski would be in Plaintiff's fire company's firehouse for meetings.

29. Plaintiff was a vocal critic of certain aspects of the administration of budgets items by Defendant Baginski, who was involved in the administration of the budgets of the departments of Wallington in his capacity as Borough Administrator including, but not limited to, the Wallington Fire Department and EMS Squad and their purchasing of, *inter alia*, equipment.

30. Plaintiff did not attend mayor and council meetings, but voiced his vocal criticisms at Wallington Fire Company and emergency squad meetings.

31. Defendant Baginski was aware of Plaintiff's complaints about how he was running Wallington in his capacity as Borough Administrator.

32. When Plaintiff first joined the Wallington Fire Department after leaving Hasbrouck Heights, Defendant Baginski did not know Plaintiff's physical appearance when he said to other

12

members of the Wallington Fire Department in Plaintiff's presence "[w]e shouldn't have a child molester, whatever, on this company. [W]e need to get rid of him."

33. Defendant Baginski was aware of Plaintiff's claim in Hasbrouck Heights because he was on the joint insurance fund board.

34. On another subsequent occasion, Plaintiff heard Defendant Baginski state to other members of the Wallington Fire Department that he could not believe Plaintiff was still a member of a Wallington fire company.

35. Plaintiff reported both incidents of Defendant Baginski's comments to his supervising officers.

36. In 2012, the dive suits used by Wallington Fire Department's dive team were destroyed by Super Storm Sandy.

37. Plaintiff was on the dive team, but he did not do any scuba diving and was not required to wear a dive suit. Plaintiff was the dive team's boat operator.

38. The destruction of the dive suits and the fact an insurance claim was made in relation to the loss was discussed at the department meetings.

39. Members of the dive team had been fitted for their dive suits after the suits were destroyed in the storm, and that the dive suits ordered to their fittings were available waiting for payment and pickup.

40. After the dive suits were not replaced, Plaintiff continued to complain in public at meetings about the failure to pick the dive suit order and also raised the issue with the department's treasurer.

41. FEMA money from Superstorm Sandy was used to pay overtime to police, as well as Defendant Baginski's wages.

13

42. Plaintiff called the State of New Jersey and learned the money allocated to equipment could not be spent for another purpose.

43. The State of New Jersey determined Defendant Baginski, as an executive employee, improperly received wages.

44. Plaintiff went to the Wallington police department where he asked Defendant Kudlacik to look into what happened with the dive suits because nobody knew where the money went.

45. Defendant Baginski was aware of the complaints about the dive suits.

46. Defendant Baginski is the first Borough Administrator in the history of Wallington, which position he held until 2019.

47. As Borough Manager, Defendant Baginski coordinated day-to-day intradepartmental operation and he exercised broad authority over operations.

48. Defendant Baginski's approval was required for any purchasing by the departments of Wallington, including the EMS and fire departments.

49. During the time Plaintiff was a volunteer in Wallington, Defendant Baginski's approvals were required for purchases by the fire company submitted through purchase orders subject to Defendant Baginski discretion for approval.

50. No fire company in Wallington submitted insurances claims in its own behalf during the time Plaintiff was a member. Purchase orders for the departments of Wallington, including the fire department, were submitted through Defendant Baginski's office when he was Borough Administrator.

51. Presently, the Borough of Wallington has changed its purchasing practices including, but not limited to, requiring the heads of departments to approve purchase order along with the Borough Administrator.

14

52. Plaintiff engaged in conversations with other citizens of Wallington about other public improprieties committed by Defendant Baginski including, but not limited to, stealing fuel for his personal use, failing to pay taxes on a business in town called Bobby O, the dive suits, and his failure to prevent illegal dumping on Centennial Field when Baginski knew the dumping was occurring.

53. Defendant Baginski would see Plaintiff as public events in Wallington every now and then.

54. Defendant Baginski, when serving as Borough Manager, made it his ordinary business to make sure a First Report of Injury (hereinafter "FROI") was submitted to the South Bergen Joint Insurance.

55. Defendant Baginski has filed paperwork directly with the South Bergen Joint Insurance Fund on behalf of volunteers of Wallington injured in the line of duty, including an individual who died and thus could not submit the paperwork himself.

56. Defendant Baginski has submitted FROI forms to the South Bergen Joint Insurance Fund on behalf of other volunteers.

57. The FROI initiates a claim with the South Bergen Joint Insurance Fund.

58. Bergen Risk Managers works for the South Bergen Joint Insurance Fund and was their claims administrator during the time Plaintiff was a volunteer in Wallington.

59. Bergen Risk Managers handles the claims petitions and administrates the claims, but does not physically go out and investigate claims.

60. In 2012, while responding to a house fire, Plaintiff was sent to medical after he had difficulty breathing.

61. Upon examination, Plaintiff was sent to the hospital via ambulance to the hospital as a result of smoke inhalation.

62. Plaintiff later went to fill out paperwork regarding this injury in Wallington's borough hall where he was confronted by Defendant Baginski, then the acting Borough Administrator of Wallington.

63. Defendant Baginski told Plaintiff that he was not going to give him the form required to be submitted to the South Bergen Joint Insurance Fund and Plaintiff walked out.

64. The South Bergen Joint Insurance Fund refunds premiums to member towns based on a number of factors, including their performance with prior claims.

65. Plaintiff was never contacted by anyone from Bergen Risk Managers regarding his hospitalization in 2012, and his medical bills remain outstanding in collection.

66. Defendant Baginski intentionally interfered with Plaintiff's ability to file a claim for injuries sustained from smoke inhalation in 2012.

67. Firefighters in Wallington are eligible for limited annual financial remuneration through the Length of Services Award Program ("LOSAP").

68. Plaintiff was eligible for the LOSAP award.

69. Although Plaintiff filled out the required paperwork, it would get lost every time it was supposed to be processed by Defendant Baginski.

70. Plaintiff never received a LOSAP award from Wallington.

71. Plaintiff complained to his fire chief and the mayor about his failure to receive a LOSAP allocation.

72. Plaintiff never received any financial remuneration for any services he performed, medical bills, or any form of compensation as a volunteer firefighter and first responder for Wallington.

73. Plaintiff also submitted paperwork for a public bid of the hydro-seeding of Centennial Field through Defendant Baginski's office as Borough Administrator of Wallington.

74. Plaintiff's bid never made it to council as it was never placed on the agenda.

75. Defendant Baginski is aware Plaintiff publicly complained how the hydroseeding contract was handled.

76. From 2012 through 2014 Plaintiff was the owner and operator of a towing company called Paradise Towing.

77. Paradise Towing did work for a company called Copart.

78. In 2013, the Borough of Wallington put the borough's police towing contract to bid.

79. Plaintiff put in for the tow, but was denied by Defendant Baginski.

80. Defendant Baginski had final approval over the Wallington police towing contract.

81. The Borough of Wallington awarded the contract to Nick's Towing.

82. When Plaintiff did not receive the towing contract, he publicly complained to Defendant Baginski in his office that it was against the Borough of Wallington's municipal law to award the contract to Nick's Towing because the vehicles were being towed to a location in East Rutherford in violation of ordinance.

83. In response to Plaintiff complaining about the police towing contract, Defendant Baginski directed Plaintiff "[g]et out of my office."

84. Defendant Baginski was asked by other citizens in Wallington what he was going to do with Plaintiff.

17

85. Defendant Baginski heard other people in Wallington saying Plaintiff was a "rebel [rabble] rouser."

86. Plaintiff was assigned a single pager from Wallington for responding to calls. Although there was only one pager assigned to Plaintiff, he could nonetheless determine whether he was responding for the fire or EMS department by the difference in sound of the pager's tone.

87. If the tone is for a fire call, the procedure is to get in your car and go to the firehouse to put on gear and respond to the call.

88. If the tone is for an EMS call, the procedure is to get in your car and go to the emergency squad building.

89. Wallington's Engine Company 203 is not located at the same location as Wallington's EMS building.

90. Engine Company 203 is located on Park Row.

91. During the 4th of July holiday the Wallington Fire Department tries to ensure some members are available to serve in the event of any emergencies.

92. The ambulances are at a different location that the fire department. The emergency squad building is located on Maple Avenue in Wallington.

93. On July 3, 2014, the reason Plaintiff went to the firehouse was to hang around in case there were any emergency calls to respond to for fire or EMS.

94. Plaintiff drove to the firehouse in his black truck used in his towing business at the time, Paradise Towing, which he parked across the street from the firehouse on Adams Street facing towards Stein.

18

95. Plaintiff was present with Dylan Hanley, a member of the Wallington Fire Department, and two friends of his whom served as volunteer firefighters as well, Corey Mustac and John Orme.

96. On the night of July 3, 2014, Plaintiff was injured in the line of duty while responding to a first responder call.

97. Before Plaintiff was injured on the night of July 3, 2014, Plaintiff left the Wallington firehouse to go to 7/11 for chips.

98. As Plaintiff was parking his vehicle on Park Avenue returning from 7/11 with chips, he got a tone on his pager to respond to a Wallington EMS call.

99. If there is no response to the first tone, the Wallington EMS will usually wait about a minute or two before putting a second tone requesting a response.

100. Plaintiff ran into the Wallington firehouse, left the chips, and told Mustac and Orme that he was leaving for an EMS squad call he just received.

101. Plaintiff generally walks fast or runs when he is responding to an EMS call.

102. When a first responder is responding to an emergency call noticed via pager tone, it is the customary protocol to walk fast or run when responding to the call.

103. As Plaintiff was responding to the call and moving towards his car, he believes he was struck by a dark-colored vehicle and blacked out.

104. Plaintiff did not consume any alcohol on July 3, 2014 prior to being struck.

105. After Plaintiff woke up, he remained on the ground but called 911 using his cellphone.

106. A Wallington police officer, Kasper, was the first to arrive where he found Plaintiff on the ground a distance of approximately 20 feet from his parked truck.

19

107. Kasper asked Plaintiff medical questions and began administering medical care where Plaintiff was bleeding.

108. Doug Krause, a lieutenant on the Wallington volunteer EMS squad, was the next to arrive at the scene in his personal vehicle.

109. Another volunteer member of the Wallington fire department and EMS squad, Andy Kullaf, subsequently arrived on the scene.  Kullaf walked to the scene because he lived around the block from where Plaintiff was injured.

110. An ambulance from the Wallington EMS driven by Michael Chermak arrived.

111. A separate paramedic truck from Hackensack Medical Center also arrived to the scene staffed by two paramedics.

112. Plaintiff was taken by ambulance to Hackensack Medical Center where he was admitted and received treatment.

113. Plaintiff received morphine while in the hospital and was discharged in crutches and a right leg brace.

114. There was never a dispute Plaintiff was hurt while responding to the EMS squad call, and that his medical bills should be paid.

115. Krause believed Plaintiff was injured and seemed like he was out of it, as if dazed.

116. Within a week after Plaintiff was released from Hackensack Medical Center, he spoke with Doug Krause.

117. Krause told Plaintiff that he needed to go to Defendant Baginski's office to fill out paperwork about the injury because it occurred in the line of duty as a volunteer.

118. As per Krause, Plaintiff was required to fill out the form as per Defendant Baginski's request.

119. Plaintiff went to Wallington's Borough Hall where Defendant Baginski's office was located to fill out the required paperwork, as requested by Krause.

120. Plaintiff's friend who also served as a volunteer firefighter in East Rutherford, John Orme, accompanied Plaintiff to Wallington's Borough Hall.

121. When Plaintiff went to Borough Hall no one was present except Defendant Baginski. Defendant Baginski retrieved a file from some other office, gave Plaintiff a form and told him to fill it out.

122. Plaintiff filled out the handwritten form provided to him by Defendant Baginski.

123. The form provided by Defendant Baginski to Plaintiff was a notice of claim form that he was required to submit because he was injured while acting in the line of duty in his capacity as an EMS squad member.

124. Plaintiff left numerous fields on the form blank, including fields where boxes were checked pertaining to status of the employee (i.e. full-time or part-time) and areas for wage claims because he was a volunteer.

125. Plaintiff's admission form to Hackensack University Medical Center shows he elected to use his business insurance.

126. The hospital billing staff told Plaintiff the medical needed to be submitted through the town's insurance because he was hurt on a call.

127. According to Bergen Risk Manager, volunteers, though unpaid, are entitled to a wage if they miss time due to an injury in the line of duty as a volunteer.

128. In addition to a wage, volunteers of Wallington injured in the line of duty are entitled to payment of their medical expenses.

129. Plaintiff left the fields blank in the FROI form because he was a volunteer that was not seeking any insurance reimbursement.

130. The handwritten form was altered by Wallington to the extent new information that was never supplied by Plaintiff was added to the blank, unanswered fields on the form Plaintiff submitted.

131. Plaintiff was unaware whether the new information added to the form submitted to the joint insurance fund came from Defendant Baginski or someone else.

132. After Defendant Baginski's office transmitted the form to the joint insurance fund, Defendant Baginski told Defendant Kudlacik that Plaintiff submitted the form.

133. Plaintiff was never provided with a copy of the form that was submitted prior to his arrest.

134. Defendant Kudlacik told Defendant Baginski that he suspected insurance fraud, and that he was performing an investigation.

135. The Borough of Wallington does not have an investigator assigned to insurance fraud in its police department.

136. Defendant Kudlacik is not familiar with the New Jersey Office of the Insurance Fraud Prosecutor.

137. At the time he performed the investigation, Defendant Kudlacik did not know there were different types of insurance fraud, though he had heard of worker's compensation fraud.

138. Defendant Baginski has known Defendant Kudlacik for more than twenty (20) years.

139. Defendant Kudlacik has been working in Wallington approximately twenty-three (23) years, during which time Defendant Baginski had always been employed in Wallington.

22

140. In July of 2014, Defendant Kudlacik contacted Bergen Risk Managers and informed them Plaintiff's was under investigation.

141. Bergen Risk Managers requested that Defendant Kudlacik memorialize the fact the claim was under investigation in writing.

142. Bergen Risk Managers was not involved in the investigation of Plaintiff's claim and deferred to the Borough of Wallington.

143. Plaintiff's supervisor on Wallington EMS at the time of his injury, David Kaczor, was also required to fill out of supervisor's FROI regarding the incident.

144. Kaczor reported the incident occurred as reported by Plaintiff.

145. In early August of 2014, Plaintiff received a phone call from the Hasbrouck Heights police department informing him that he needed to get in touch with Defendant Kudlacik because he had put in a call to Hasbrouck Heights police to request them to have Plaintiff contact him.

146. This prompted Plaintiff to call Defendant Kudlacik, who asked Plaintiff if he was available to come in to the police station. Plaintiff was not available the day he called because he was attending a family barbeque, but agreed to come to the Wallington police station on August 5, 2014 at 4 pm.

147. On August 5th, 2014, Plaintiff went to the Wallington police station as requested by Defendant Kudlacik where he was taken into an office by Defendant Kudlacik.

148. Before the interview, Defendant Kudlacik engaged in conversation prior to turning on any recording.

149. During this conversation, Defendant Kudlacik told Plaintiff he did not believe he was really hit to which Plaintiff replied that he believed that he was struck.

23

150. Defendant Kudlacik told Plaintiff he needed to receive Miranda rights because he was recording the conversation.

151. Defendant Kudlacik did not inform Plaintiff that he was under arrest, or otherwise a suspect of an investigation before he read his Miranda rights.

152. Plaintiff reasonably did not believe he was a suspect for insurance fraud at the time of his questioning by Defendant Kudlacik on August 5, 2014.

153. Defendant Kudlacik asked Plaintiff during the interview if it is possible that he fell instead of being struck by a vehicle during the interview.

154. Defendant Kudlacik asked Plaintiff if he had been drinking that night, even though he had no evidence in his investigation at any point that Plaintiff was drinking.

155. Plaintiff truthfully answer all questions to the best of his recollection asked by Defendant Kudlacik during the interview.

156. Defendant Kudlacik nonetheless concluded Plaintiff made knowing misrepresentations.

157. Plaintiff testified he woke up unconscious while responding to the EMS squad call and, though admitting it is possible he fell while responding to the EMS call, his recollection and belief was he was struck by a motor vehicle and he never changed his story.

158. Defendant Kudlacik accused Plaintiff of changing his story during his interview with Plaintiff.

159. Defendant Kudlacik falsely interpreted the testimony of Doug Krause to the extent he failed to appreciate Plaintiff seemed injured, dazed, and confused when Krause arrived at the scene.

160. Defendant Kudlacik ignored that Krause reported Fehl told him the car came from the left [Stein Avenue].

24

161. If the car that struck Plaintiff came down Stein Avenue, it would not have been visible from the angles of the video recordings reviewed by Defendant Kudlacik.

162. Krause also told Defendant Kudlacik that he did not believe Plaintiff was lying.

163. Kullaf, who also responded to the scene, also believed Plaintiff was not lying and had been hurt responding to an EMS call.

164. At the conclusion, of Plaintiff's interview with Defendant Kudlacik, he tried to leave the police station but was told by Defendant Kudlacik that he was under arrest for insurance fraud.

165. Based in his investigation, Defendant Kudlacik conclude that although Plaintiff could have been injured, there was no way he was injured by a vehicle.

166. Defendant Kudlacik also concluded he was not sure whether Plaintiff was injured while responding to a call.

167. Defendant Kudlacik has arrested thousands of individuals in his career, but cannot recollect any other arrests for insurance fraud aside from Plaintiff.

168. If Plaintiff fell while running to his car responding to the EMS call, then he actions would not have constituted insurance fraud.

169. Defendant Kudlacik did not have the medical records from Plaintiff's hospitalization in his possession at the time he arrested him for insurance fraud.

170. Plaintiff's medical records reflected "self pay code 619".

171. Defendant Kudlacik concluded Plaintiff was lying, and the "he lied a few times."

172. Plaintiff was in the same room with Defendant Kudlacik the whole time except when he left the room to shut off the tape recording, after which point he came immediately back to the same room he left Plaintiff after the interview.

173. Defendant Kudlacik did not seek a judicial finding of probable cause before deciding to arrest Plaintiff.

174. Defendant Kudlacik made the decision on his own to arrest Plaintiff.

175. After Defendant Kudlacik advised Plaintiff he was under arrest, Plaintiff said to Defendant Kudlacik "This is bull shit . . . [y]ou know this is bull shit and you're doing this for a political fucking stunt."

176. Defendant Kudlacik conspired with Defendant Baginski to retaliate against Plaintiff and intimidate him for exercising his First Amendment rights.

177. As a quid pro quo, Defendant Baginski helped Defendant Kudlacik become police captain in conjunction with his political supporters with influence in Wallington.

178. Defendant Kudlacik called a judge to get the bail, which amount was set at $2000 with a 10 percent option.

179. Plaintiff's business partner in his towing business at the time came and posted the bail.

180. Plaintiff was cuffed to the bench for two and a half to three hours while he waited for the bail to be posted.

181. Defendant Kudlacik walked Plaintiff out of the police station after the bail was posted and said to him near the soda machine, "[i]t will all work out. Don't worry about it."

182. The morning after Plaintiff was arrested by Defendant Kudlacik, his mug shot and news stories of his arrest for insurance fraud were published in the public media.

183. Defendant Kudlacik was Wallington's public information officer, and he gave comments to the newspaper about Plaintiff after he arrested him.

184. Plaintiff received phone calls from people after they read the public media about his arrest and Defendant Kudlacik's public comments.

185. Plaintiff was humiliated and embarrassed by the public shaming, which led him to shut off all of his phones and quarantine himself in his home.

186. After Plaintiff was arrested, in August of 2014, Plaintiff received a phone call from the hospital informing him the clothes he was wearing on July 3, 2014 that were cut off of his body during the administration of emergency care needed to be picked up from the hospital.

187. After retrieving the bag of his clothes, Plaintiff brought the clothes to the Wallington police department and spoke with Defendant Kudlacik during which conversation he told Kudlacik he should start looking into the evidence. Defendant Kudlacik refused to accept the clothes and ordered Plaintiff to get out of the police department.

188. Plaintiff spoke with Sharon McCaffrey from the joint insurance fund processing, handling and/or otherwise administrating the "claim" submitted by Defendant Baginski's office.

189. Ms. McCaffrey has denied claims submitted to the joint insurance fund because they were not related to workplace injuries.

190. Even though claims submitted from Wallington to the joint insurance fund were denied, no one aside from Plaintiff has been charged or indicted for insurance fraud.

191. After Plaintiff's FROI was submitted to the joint insurance fund, Defendant Baginski initially informed Ms. McCaffrey to put the claim on hold because they were doing an investigation.

192. Ms. McCaffrey told Plaintiff "Victor [Baginski] said do not put the claim through" when he called the joint insurance fund.

193. Defendant Baginski does not have any training related to insurance claim.

27

194. Bergen Risk Managers was informed of the charges being brought against Plaintiff for insurance fraud, and Defendant Baginski directed Bergen Risk Managers to deny Plaintiff's claim.

195. Defendant Baginski's assistant during the time he was Borough Administrator, was employed in the Borough of Wallington, Dorothy Siek, has never seen Defendant Baginski contact Bergen Risk in connection with a worker's compensation claim, and she has processed approximately 150 claims during that timeframe.

196. When Plaintiff's claim was denied by Bergen Risk Managers, Bergen Risk was not taking a position whether Plaintiff committed insurance fraud and Bergen Risk performed no investigation of their own.

197. Plaintiff's first court date in connection with his arrest by Defendant Kudlacik was scheduled in Wallington Municipal Court.

198. After Plaintiff had attended Wallington Municipal Court and complained to Defendant Kudlacik, additional criminal charges related to the filing of police reports were added to the charges against Plaintiff by Defendant Kudlacik.

199. Defendant Baginski was serving as the Borough Manager of Wallington during the time Plaintiff was criminally charged, and he was aware of the criminal charges against Fehl.

200. Since Plaintiff was going after Defendant Baginski all the time for things he was doing in Wallington Plaintiff believed were illegal, Defendant Baginski wanted to get rid of him.

201. Defendant Kudlacik had an agenda to become police captain, which Defendant Baginski could influence because this promotion needed to go through the Borough Manager's office.

202. Defendant Kudlacik was rewarded for silencing Plaintiff by being promoted to the rank of captain in the Wallington police department.

28

203. Defendant Kudlacik's promotion to captain is the first time in the history of Wallington the police department has had two captains.

204. Plaintiff complained about his arrest and the resulting criminal complaint for insurance fraud against him to other residents of Bergen County including his fellow brothers in his fire company in Wallington.

205. Plaintiff complained through comments made in Facebook posts that were publicly available about the failure of Wallington, its departments, and his mistreatment subsequent to his arrest.

206. Defendant Baginski does not have Facebook, but he became aware of public Facebook comments about him posted by Plaintiff through shots of threads provided to him.

207. Defendant Baginski turned over photographs of the Facebook posts to Defendant Kudlacik hoping he would take some type of action.

208. Defendant Kudlacik told Defendant Baginski he would refer the public postings to the prosecutor's office.

209. Public officials in the Borough of Wallington retaliate against people for saying their opinions about the town.

210. A fellow member of Plaintiff's company, David Pinto, told Plaintiff while the investigation was still ongoing that Defendant Baginski told him that he was doing everything in his power to screw Plaintiff.

211. The criminal complaint against Plaintiff was elevated from the municipal court level to the county level because the crime of insurance fraud is an indictable offense.

212. A Bergen County Grand Jury returned a two-count indictment against Plaintiff based solely on the testimony of Defendant Kudlacik.

213. Defendant Kudlacik told Defendant Baginski Plaintiff was indicted.

214. Plaintiff never spoke with anyone from the Bergen County Prosecutor's Office.

215. Plaintiff lost the Copart contract because of the 2014 arrest in Wallington.

216. Copart found out about Plaintiff's arrest and charges of insurance fraud after it was tagged in a Facebook post.

217. Plaintiff was terminated by Copart over the phone effective immediately due to his arrest and the resulting charges of insurance fraud.

218. From 2014 through 2016, the Borough of Wallington did not allow Plaintiff to serve as a volunteer firefighter by suspending him after he was arrested in 2014 and subsequent indictment.

219. Plaintiff was voted off of his fire company in April of 2015, but he was not notified of the vote beforehand or provided with any notice from Wallington afterwards. Plaintiff learned he was thrown off the fire company from a department in another town.

220. Plaintiff was told his suspension was pending the outcome but the Borough of Wallington never brought him back as a member.

221. Plaintiff was removed by the Borough of Wallington without provided notice to defend his integrity publicly as required by law.

222. Plaintiff voiced his opinion publicly on a public Facebook message that he was going to expose illegal activities in the firehouse since he was "going down".

223. Plaintiff complained via letter to the mayor and council of Wallington asking to be reinstated immediately after he was found not guilty.

224. The mayor told Plaintiff that he should be reinstated immediately because he was found not guilty.

30

225. The Borough of Wallington has not paid any of Plaintiff's medical bills incurred from his hospitalization at Hackensack Medical Center from July 3, 2014 through July 6, 2014.

226. Plaintiff's outstanding medical bills from his hospitalization exceed $60,000.

227. Defendant Baginski was placed on administration leave on February 5, 2019, and then removed by the town council of Wallington due to improprieties in his capacity as Borough Administrator.

228. Plaintiff continues to serve as a volunteer firefighter, though not in Wallington.  Plaintiff is currently a volunteer firefighter in Palisades Park.

229. The Borough of Wallington refused to allow Plaintiff back onto fire company 203 or the EMS squad.

230. Plaintiff saved a suicidal woman during the time he was a volunteer firefighter in Palisades Park while he was off-duty.  Plaintiff saw a woman in distress about to jump to her fate and convinced her to change her direction.

### B.  Defendants

1.      On July 3, 2014, Plaintiff was at the Park Avenue WFD station at approximately 1:00 A.M. when he received a call to respond to an emergency services call as an EMT.

2.      Plaintiff asserts that he was involved in a "hit and run" incident thereafter in which Plaintiff sustained injuries to his right leg, right hip, head, and back.

3.      First responders and police who arrived at the scene of the incident found no evidence of a collision, as there was no debris, broken glass, or skid marks and there were no witnesses to corroborate Plaintiff's claim.

31

4.     On July 11, 2014, an Employer's First Report of Injury claim form was submitted to Bergen Risk Managers, the insurance carrier for the Borough of Wallington, on behalf of Plaintiff because he was injured while "on-duty" as a volunteer fireman.

5.     On August 5, 2014, Plaintiff voluntarily visited the Borough of Wallington Police Department where Officer Kudlacik read him his Miranda rights, which he chose to waive, was interviewed by Officer Kudlacik, and was subsequently placed under arrest for insurance fraud (N.J.S.A. § 2C:21-4(b)(6)(a)) and tampering with public records or information (N.J.S.A. § 2C:28-7(a)).

6.     Borough police officers found no evidence of a hit and run after assessing the scene for debris consistent with a hit and run.

7.     Borough police officers discovered and reviewed security footage from homes in the neighborhood that revealed no vehicles had been in the area during the time of the alleged hit and run.

8.     Defendant Kudlacik consulted with the Bergen County Prosecutor's Office regarding the charges and probable cause to file charges against Plaintiff for insurance fraud (N.J.S.A. § 2C:21-4(b)(6)(a)).

9.     Defendant Kudlacik called Municipal Court Judge Sondey who found probable cause

10.    Plaintiff waived his right to an attorney.

11.    Defendants did not conspire against Plaintiff as retaliation for his activism.

12.    Defendants did not submit the insurance claim form to Bergen Risk Managers in an effort to frame Plaintiff for insurance fraud.

32

13.     Borough officials submitted claim forms to Bergen Risk Managers as a standard practice whenever a town employee, whether they are a volunteer or not, is injured while working on behalf of the Borough.

14.     Plaintiff was injured while working for the Borough as a volunteer for the Borough Emergency Services, therefore a claim form was submitted.

15.     Defendant Kudlacik supported the charging and arresting of Plaintiff.

16.     Defendant Kudlacik had probable cause that Plaintiff had committed crimes of insurance fraud and tampering with public records or information, not because he was acting with specific intent to harm Plaintiff.

17.     Defendant Kudlacik followed accepted law enforcement and investigative procedures in determining whether to charge and arrest Plaintiff.

18.     Defendant Kudlacik acted with the ordinary prudence of a police officer with his experience in determining whether to charge and arrest Plaintiff.

19.     Plaintiff was indicted by a grand jury in Bergen County.

20.     Plaintiff's lack of conviction by a jury is not evidence that Defendant Kudlacik lacked probable cause to charge and arrest Plaintiff.

21.     Baginski had no active role in the investigation of Plaintiff or the alleged accident.

22.     Baginski and Kudlacik did not conspire against plaintiff.

23.     Captain Kudlacik's promotion has no relevance on this claim.  His promotion was in accordance with a change in the Table of Organization approved by the Mayor and Council.

# SECTION 5 – FACT WITNESSES

5.  FACT WITNESSES: (Aside from those called for impeachment purposes, only the fact witnesses set forth by name and address may testify at trial.  No summary of testimony is necessary.)

    A.  **Plaintiff**:

        1.  Joseph Fehl
           Plaintiff
           315 Kipp Avenue
           Hasbrouck Heights, NJ 07604

        2.  Captain Shawn Kudlacik
           Defendant
           Municipal Building, 1st Floor
           54 Union Boulevard
           Wallington, NJ 07057

        3.  Witold Baginski
           Borough of Wallington
           24 Union Boulevard
           Wallington, NJ 07057

        4.  Dorothy Seik
           Former Tax Collector, Payroll Clerk for the Borough of Wallington
           27 Mount Cedar Avenue
           Wallington, NJ 07057

        5.  Sharon McCaffery
           Worker's Compensation Supervisor at Bergen Risk Managers
           100 Hilltop Road
           Ramsey, NJ 07446

        6.  Cindi/Cynthia Rice
           Worker's Compensation Adjuster at Bergen Risk Managers
           100 Hilltop Road
           Ramsey, NJ 07446

        7.  Police Officer Kasper Zieliniski
           Municipal Building, 1st Floor
           54 Union Boulevard
           Wallington, NJ 07057

        8.  Doug Krause
           Wallington Fire Department/EMS
           54 Union Boulevard
           Wallington, NJ 07075

9.  Corey Mustac
    292 Orient Way
    Rutherford, NJ 07070

10. Stewie Stolarz
    41 Geranium Place
    Wallington, NJ 07057

11. John Orme
    242 Baldwin Street
    Bloomfield, NJ 07003

12. Andy Kullaf
    54 Union Boulevard
    Wallington, NJ 07057

13. David Kaczor
    481 Main Avenue
    Wood-Ridge, NJ 07075

14. Peter J. Stewart, MD
    30 Prospect Avenue
    Hackensack, NJ 07601

15. John Ruta
    30 Prospect Avenue
    Hackensack, NJ 07601

16. Charles Chinnici
    30 Prospect Avenue
    Hackensack, NJ 07601

B. **Defendants:**

1.  Captain Kudlacik
    Defendant
    Municipal Building, 1st Floor
    54 Union Boulevard
    Wallington, NJ 07057

2.  Witold Baginski
    Borough Administrator
    Borough of Wallington
    24 Union Boulevard
    Wallington, NJ 07057

3. Dorothy Seik
   Former Tax Collector, Payroll Clerk for the Borough of Wallington
   27 Mount Cedar Avenue
   Wallington, NJ 07057

4. Sharon McCaffery
   Worker's Compensation Supervisor at Bergen Risk Managers
   100 Hilltop Road
   Ramsey, NJ 07446

5. Vando Cardoza
   Bergen County Prosecutor's Office
   10 Main St.
   Hackensack, NJ

6. Police Officer Kasper Zieliniski
   Municipal Building, 1st Floor
   54 Union Boulevard
   Wallington, NJ 07057

7. Diana Lluch
   Bergen County Prosecutor's Office
   10 Main St.
   Hackensack, NJ

8. Corey Mustac
   Wallington Fire Department
   54 Union Boulevard
   Wallington, NJ 07057

9. Chief Carmello Imbruglia
   Municipal Building, 1st Floor
   54 Union Boulevard
   Wallington, NJ 07057

10. Lieutenant J. Michaels
    Municipal Building, 1st Floor
    54 Union Boulevard
    Wallington, NJ 07057

11. John Orme

12. Doug Krause
    Wallington Fire Department
    54 Union Boulevard
    Wallington, NJ 07075

13. Judge Casmir Sondey
    Wallington Municipal Court
    500 Madison Street
    Carlstadt, NJ 07072

# SECTION 6 – EXPERT WITNESSES

6. EXPERT WITNESSES. (No expert shall be permitted to testify at trial unless identified below by name and address and unless the expert's curriculum vitae and report are attached hereto. An expert's qualifications may not be questioned unless the basis therefor is set forth herein.)*[3]

1. Plaintiff:

    1. Joseph Blaettler, 4 Briarwood Lane, Morristown, NJ 07960 (expert report

        and curriculum vitae are attached hereto)

2. Defendants Borough of Wallington/Kudlacik's objections to Plaintiff's expert

    qualifications:

    1. None.

3. Defendant Baginski's objections to Plaintiff's expert qualifications:

    1. None.

4. Defendant Borough of Wallington/Defendant Kudlacik:

    1. Glenn M. Miller, Ship Bottom, New Jersey

5. Plaintiff's objections to Defendant Borough of Wallington/Defendant Kudlacik's

    expert qualifications:

    1. Plaintiff stipulates to Mr. Miller's expert qualifications and only seek to

        file the aforementioned motion in limine seeking to bar his expert report

        and testimony as a net opinion.

---

[3] If the parties stipulate to an expert's qualifications, there is no need to attach a curriculum vitae. In any event, however, the expert's report must be attached.

# Joseph Fehl

## vs.

# Borough of Wallington, Witold Baginski, Sean Kudlacik, Bergen County Prosecutor's Office

## Civil Action No.: 17-cv-11462



Prepared by Joseph Blaettler

ECPINJ

PO Box 219
Brookside, NJ 07926

Phone: 973-725-9677

Fax: 973-543-1218

9/24/19

# **APPENDIX**

1. Resume of Joseph J. Blaettler

2. Rule 26 Disclosure

3. Statement of Joseph Fehl

4. Complaint

5. Bergen Risk Notepad Details

6. Memo Det. Ismael Alsina

7. Statement of Michael Chermak

8. Statement of Doug Krause

9. Police Report Lt. Shawn Kudlacik

10. Excel Sheet created by Lt. Shawn Kudlacik

11. Statements of Orme and Mustac

12. New Jersey Criminal Code 2C:21-4.6

13. Justia Definition of Probable Cause

14. Laws of Arrest Search & Seizure Larry Holtz, Esq. 2015

15. New Jersey Police Training Commission

## I. Introduction

I have been retained by Jason Rindosh of Bedi Rindosh in the matter of Joseph Fehl vs. Borough of Wallington, Witold Baginski, Sean Kudlacik and the Bergen County Prosecutor's Office.

Mr. Fehl is the Plaintiff in this matter and is represented by Mr. Rindosh. I was requested to review the material and evidence obtained in this matter and to provide my professional opinion as to whether proper police policies and procedures were followed. My resume and credentials are included with this report. I am being compensated at the rate of $225.00 per hour for my services.

My report is based on my 33 years of law enforcement experience, training, and education in the field of investigations, supervision, procedures, and operations. My opinions are based within a reasonable degree of certainty in these fields. I reserve the right to amend and supplement this report in the event additional information and documents become available to me.

The following documents have been supplied to me by counsel for the Plaintiff:

- Complaint
- Defendant's Answers
- Criminal Indictment
- Transcript of Trial Testimony – 3/10/15
- Transcript of Hearing – 1/9/18
- Transcript of Trial Testimony – 1/11/18
- Transcript of Trial Testimony – 1/16/18
- Transcript of Trial Testimony – 1/17/18
- Plaintiff's Bates Stamped Documents BR0001-BR0367
- Plaintiff's Bates Stamped Documents BR0368-BR0660
- Plaintiff's Bates Stamped Documents BR0661-BR0864
- First Notice to Produce
- Defendants Borough of Wallington, Witold Baginski and Sean Kudlacik's Demand for Plaintiff Joseph Fehl's Answers to Interrogatories
- Plaintiff's Responses to Defendants' Interrogatory Questions
- Defendants' Answers to Plaintiff's First Set of Interrogatories
- Subpoena Responses from Bergen Risk Managers
- Bergen Risk Managers, Inc. Documents
- Deposition of Joseph Fehl
- Deposition of Shawn Kudlacik with Exhibits
- Deposition of Witold Baginski with Exhibits
- Deposition of Dorothy Siek with Exhibits

- Deposition of Sharon McCaffrey with Exhibits
- Flash Drive labeled W/all Audio and Videos

## II. Summary of Events

At the time and date of this incident the Plaintiff Joseph Fehl was a volunteer fireman with the Borough of Wallington. During his time as a volunteer Fehl was a vocal critic of Borough Administrator Witold Baginski, questioning his conduct and actions. On July 03, 2014 at approximately 10pm Plaintiff went to the Wallington Fire house. Since it was a holiday weekend and he knew it would be busy, he wanted to be at the firehouse so he could quickly respond to any calls. At approximately 11:30pm two of Plaintiff's friends arrived at the firehouse to hang out, Corey Mustac and John Orme. While hanging out Plaintiff decided to go the 7/11 to get some chips. As he was returning from 7/11 a call came in. Plaintiff parked his car on Adamson St. across from the firehouse and ran into the house to tell his friends that he was going on a call. He estimates the time of the call to be between 1-3am. After dropping off the chips and advising his friends he was leaving, he left the firehouse and ran to his vehicle. As he was running to his vehicle, he believes he was struck by an oncoming vehicle. He was rendered unconscious and the vehicle fled the scene. When he came to, Plaintiff first called the Wallington Police Department to report the incident and then he called Doug Krauss, a supervisor at his firehouse. The first officer to arrive at the scene was Officer Zielinski who took an accident report. Other than the accident report Zielinski had no further involvement in the investigation. In addition to Zielinski, squad members Doug Krauss, Mike Chermak, and "Andy" all arrived at the scene to treat and transport Plaintiff to the hospital. On the date and time of the accident all the first responders who were interviewed acknowledged that Plaintiff was dazed, confused, and injured. Doug Krauss later stated he believed Plaintiff was truly hurt and not lying. Plaintiff was transported to the hospital where he remained for several days. After being released from the hospital, Plaintiff was advised by Krauss that as per department policy, he had to report to Borough Hall and fill out a First Report of Injury Form, which he did. On August 5, 2014 Plaintiff was asked to come into the Wallington Police Station to meet with Lt. Kudlacik. At the station Kudlacik advised him of his rights and questioned him about the accident. During the questioning Kudlacik asked Plaintiff if it was possible that rather than being struck by a car he tripped and fell when he was running to his car and got knocked out? Plaintiff stated it was possible, but maintained that he believed he was struck by a vehicle. At the conclusion of the interview, Plaintiff was placed under arrest for insurance fraud and filing a false police report. In January of 2018 the case went to trial and after hearing all evidence presented by the state, Plaintiff was found not guilty of all charges by a jury of his peers.

## III. Summary of Depositions

**Deposition of Shawn Kudlacik May 9, 2019**

- Kudlacik stated that the current chief is Carmello Imbruglia. He believes he was either the Chief in 2014 or the captain officer in charge. Page 7
- When asked how do you get promoted in the police force in Wallington? Kudlacik stated you have to take a written exam and interview and for Captain you take a written exam, an oral exam in front of a panel in Trenton, and an interview with the mayor and council. Page 11
- When asked was there a time when there was only one captain? Kudlacik stated there was a time the table called for one captain. There is verbiage in the table of organization that says at any time the mayor and council can promote and take away positions. Page 17
- Kudlacik stated it changed to two captains, but now there is one again. Kudlacik stated he believes the table can be changed through a resolution by the council. Kudlacik stated Baginski is not a voting member so he has no say in that. Roman Kruk is a councilman and Kudlacik is aware that he voted against Kudlacik getting promoted. Joseph Brunacki is the police commissioner. Page 18-19
- Kudlacik stated he is aware that Brunacki also voted against Kudlacik being promoted. Kudlacik doesn't recall Brunacki saying that he didn't see the need for a second captain. Page 19
- When asked if he has had any internal affairs complaints filed against him, Kudlacik stated 'sure, yes.' Page 21
- When asked if it was sustained or not sustained, Kudlacik stated 'yeah, but it wasn't a suspension, it wasn't any loss of time.' When asked about hearing through the grapevine of a lawsuit with Fehl in Hasbrouck Heights, Kudlacik stated that he knows absolutely nothing. Page 23
- Kudlacik was asked when was the first time he contacted the Bergen County Prosecutor's Office and stated that he believes it was prior to administering the charges. Kudlacik believes he would have a record that he spoke to them, but not the specifics. He may or may not have recorded the date he spoke to them. Kudlacik cannot recall when he specifically contacted the prosecutors. He believes it was definitely before he arrested Fehl. Kudlacik stated he contacted them to vet some of the evidence through them because of this type of case. It wasn't a normal type of case. It wasn't normal because it involved insurance. Page 25
- Kudlacik stated he believes he may have received training specific to insurance fraud investigations. He doesn't recall what the training taught him, but is trained in 2C. 2C meaning the criminal code. Kudlacik stated 'yes' when asked if there is training specific to police officers investigating pedestrian/motor vehicle accidents. Page 26-27

- Kudlacik stated he is not familiar with the New Jersey Office of the Insurance Fraud Prosecutor. Kudlacik stated he is not certain if this was his first insurance fraud arrest. Kudlacik believes the BCPO has prosecutors with specialized training in insurance fraud or investigators. Page 28-29
- Kudlacik stated he did call their legal advisor prior to administering charges, so he was vetting. His legal advisor was Dyanne Lluch. Page 30
- Kudlacik is not sure if he spoke to Dyanne solely, but he did speak to Dyanne or Karen Gwynn who is their backup. He can't recall what he told or asked them. Page 31
- Kudlacik lives in Wallington. Page 32
- Kudlacik is not aware that Fehl watched surveillance videos with the police chief before Kudlacik arrested him. Kudlacik was told that sometime between July 3 and August 5th, Fehl viewed the surveillance video that was recovered from Park Row. Kudlacik stated he wasn't aware of that. Page 33
- Kudlacik stated that he has seen the Bergen Risk manager's documents related to Fehl. He saw a document that he believes shows that he was injured and it was signed by either him or a supervisor – he cannot recall. When asked if it mattered who signed it or not from his investigative perspective, Kudlacik stated it mattered that he reported it. When asked if it was his understanding that he was required to report it because he got hurt while on a volunteer squad call, Kudlacik stated yes, if the facts were true, he would be required. Page 34-35
- Kudlacik stated he looked at the medical records – he looked at them by the injuries. When asked if he ever heard from anyone through the grapevine that Fehl was complaining about people in Wallington on the internet, Kudlacik stated 'yes, he may have heard that, yes.' Page 36
- Kudlacik stated he believes that Baginski is going through some troubles with the town. Page 38
- Kudlacik stated he wasn't aware that Baginski was in contact with Bergen Risk Managers between July 3 and August 5th. Page 39
- Kudlacik stated yes that he agrees that he performed the investigation that led to Fehl's arrest. Kudlacik doesn't believe that Fehl suffered an injury while responding to a squad call on July 3. Page 41
- Kudlacik stated that Fehl may have been injured but not from a car. Kudlacik stated that based on his investigation, he is not certain that Fehl was injured as a result of that call. Kudlacik stated that he wasn't there, but the EMTs reported that he had some scrapes on him. Kudlacik stated he did not respond to the scene where Fehl was injured. Kudlacik stated he believes he looked at the statute on the crime of insurance fraud before he arrested Fehl. Page 42-43
- Kudlacik stated that if he charged him, he believes he looked at the statute. Kudlacik stated that Fehl documented on the insurance papers that he was struck by a vehicle. Kudlacik stated that he is not certain if Fehl got injured by falling responding to a call. Kudlacik stated his investigation concluded that there was a lack of physical evidence at the scene. Kudlacik stated that the surveillance shows that no vehicle turned down that Kudlacik stated he made the decision to arrest Fehl. Page 44-45

- When asked if Fehl fell while running to his car as opposed to getting hit by a car, would that constitute insurance fraud, Kudlacik stated no. Kudlacik stated no when asked if it would matter if he was conscious or unconscious. When asked if he knows what a claim is in insurance fraud law, Kudlacik stated he believes if you put a claim in, you are trying to get compensated somehow. Page 46-47

- Kudlacik stated yes when asked if he arrested Fehl for filing an insurance claim. When asked what was the claim, Kudlacik stated that he was struck by a vehicle. Kudlacik stated he is not familiar with a First report of Injury, FROI. Kudlacik stated he doesn't know if there are different types of insurance fraud. Page 48

- Kudlacik stated he cannot name anyone he has ever arrested for insurance fraud. When asked what the purpose of the investigation was, Kudlacik stated it was to find out who struck Fehl with a small compact vehicle. The purpose of the investigation was to find the black car. When asked if Zielinski had done an investigation that night, Kudlacik stated yes. Page 49- 50

- Kudlacik stated that Zielinski's investigation was that Fehl described a specific vehicle that went down a specific route that pushed him 20 yards and that specific vehicle went down Stein Avenue at a high rate of speed. Page 51

- Kudlacik stated they got the surveillance videos within a week or later. The videos don't show where Fehl went down to the ground. Kudlacik doesn't remember if he or other officers canvassed for the videos.

- Kudlacik stated he believes they would have canvassed the street to find every possible camera on Stein, Adamson, and Park Row, but it wasn't the direction of travel reported. When asked if he considered the recollection was incorrect because Fehl was unconscious at some point, Kudlacik stated it is hard to say. He was very specific of the direction of flight, the make and model of the car, how many feet he got shoved, the direction of the vehicle post-strike. He was very specific in those details. When asked if Fehl ever said he didn't remember or maybe it happened a different way, Kudlacik stated he believes he may have said that after the fact, after the initial statement. Page 52-53

- Kudlacik stated the first thing he did when he got the investigation was trying to get an identification on the vehicle and that is what set forth the canvassing for the video cameras. Kudlacik stated they did complete the investigation when Joe was served with his charges. He believes that would have been the 5th. When asked if he spoke to anyone from Bergen Risk in connection with the investigation, Kudlacik sates he is not certain if he specifically spoke to them or not. Page 54-55

- Kudlacik stated that he did speak to Dorothy Siek, but he is not certain what she told him; he doesn't recall. Page 56

- Kudlacik stated he never spoke to Baginski about this case. Page 57

- When asked when he gets a document in an investigation, does he record that in a report? Kudlacik stated it is not required to record everything, memorialize everything you do. When asked if it is good practice, Kudlacik stated it is good practice. When asked if he recorded in writing anywhere the document that he received from Siek, Kudlacik stated no, but he believes they may be signed and dated when he received them. Kudlacik stated that he did not get input from anyone in how to investigate the matter; he was in charge

Expert Report Prepared by Joseph Blaettler 6

of the investigation. When asked if he supervised Zielinski's investigation, Kudlacik stated he was the initial officer for the accident. When asked if Zielinski's investigation was voided, Kudlacik stated yes. Page 58-60

- Kudlacik was asked that with all the canvassing, only 27 Park Row and 55 was what they came up with. Page 61
- Kudlacik stated it showed that no vehicle ever turned down Adamson Street the way it was described. It didn't turn down at all. There was no vehicle. When asked if Fehl had said that he is not sure exactly what happened, Kudlacik stated he said that after the fact. Kudlacik was asked if Doug Krause essentially said that he believed that Joe was injured and they didn't know what happened, but believed he was seriously hurt. Page 63-64
- Kudlacik is shown statements that Orme and Mustac wrote. Page 65
- Regarding Mustac's statement, Kudlacik stated that what he got out of the statement was that they didn't see anything pertinent to the investigation. When asked if his investigation revealed that when they found Joe, he had blood on his jawline on one side, Kudlacik doesn't remember that specifically being stated, from his head to his jawline. Page 66
- Kudlacik was asked if he ever considered talking to Orem and Mustac, Kudlacik stated he never took a statement from them. Page 67
- When asked if he should have taken a statement, Kudlacik stated if they would have come in, yes. When asked if they were uncooperative, Kudlacik stated he can't say. When asked if he thought the written statements were inaccurate, Kudlacik stated no that didn't cross his mind. Page 68
- Kudlacik stated he doesn't know if he reviewed the Wallington FD Emergency Squad report. The report is marked and shown to Kudlacik. He was asked if he ever reviewed it as part of the investigation and Kudlacik stated yes. Page 69
- Kudlacik stated the investigation was centering around who struck Fehl. Kudlacik stated that Fehl did say initially, not initially at the scene, but subsequent to his initial statement that he wasn't exactly sure what happened. Kudlacik stated he can't say when asked if Fehl was faking his injuries. Kudlacik stated his investigation didn't conclude that he faked his injuries. It concluded that his injuries weren't a result of being struck by a car. Page 71
- When asked if it was an investigation into whether a car stuck Fehl or he got hurt some other way, Kudlacik stated he can't recall; he can't say definitively. When asked when he decided to take recorded statements, Kudlacik stated usually for crimes it is required, well not usually. For crimes of second and third degree, it's required to take audio and video statements. He also does them for some victims as well. Page 72
- When asked what he remembers learning from Chermak's statement, Kudlacik stated he was the driver of the ambulance. He had a birds-eye view of what transpired. Kudlacik felt he was more credible because the other two didn't observe Fehl's injuries. Page 74
- When asked if he knows who else was at the scene with Chermak that night, Kudlacik stated he believes Doug Krause, and the officer that responded. He doesn't know if there was one or two. He knows Zielinski and can't recall if another officer was there. Lt. Michaels was on the desk dispatching. When asked if he said that he thought Chermak

was more credible than the firefighters that didn't see Fehl until he was already transported to the hospital, Kudlacik stated yes. Page 75

- Kudlacik stated it is his interpretation that Fehl, according to Chermak, couldn't provide a color or make of vehicle that hit him. Page 76
- Kudlacik stated that Zielinski didn't draft a narrative report. Kudlacik stated yes when asked if it was his understanding that the squad members arrived before Zielinski. Page 77
- Kudlacik stated according to Krause that Fehl's glasses were thrown another two or three cars down from where he was. Kudlacik believes Krause was being truthful. Page 83
- Kudlacik stated that Krause initially stated that Fehl told him he didn't remember how he got further down the road. When asked if it was Krause's interpretation that he seemed out of it and might have lost consciousness, Kudlacik stated that's not Krause's total interpretation of the whole interview. Page 84
- When asked is it possible that Fehl was running and wiped out, and there was no car and he lost consciousness, Kudlacik stated he believes he asked him that question. Kudlacik stated Fehl's response was yeah, now that I think about it, I probably did. Or something like that. Page 85-86
- When asked if you can have a pedestrian struck by a motor vehicle with no skid marks, debris or glass in the road, Kudlacik stated yes. When asked with a severe injury, Kudlacik stated yes. Page 87
- Kudlacik stated yes, he has seen an accident where a pedestrian was involved and there were no skid marks and the person was injured. Kudlacik stated that in some accidents, yes, he has seen an accident where a pedestrian was struck by a motor vehicle and there is no debris in the road, but the person is injured. Kudlacik stated that in some accidents, yes, he has seen an accident where a pedestrian was struck by a motor vehicle and there is no glass on the road, but the person is injured. Page 89
- When asked when did he first suspect that Fehl might have fallen as opposed to being struck by a motor vehicle, Kudlacik stated maybe when he saw him on the surveillance feed. Page 90
- When asked if Joe said he was running, Kudlacik stated Joe wasn't sure what happened. Page 91
- Kudlacik is read: "Everybody has their own speculation around the firehouse about what could have happened." Page 92
- Kudlacik is read "We both draw the same conclusions on Joe and we are both are like, you know, he's not lying. He's hurt." Kudlacik is asked if it is his understanding that he is talking about Andy in his conclusions. Kudlacik stated he is not sure who he is talking about here. When asked if someone is in the academy, is it a reason not to interview them if they have relevant knowledge of a crime he is investigating, Kudlacik stated no. When asked if he should have questioned Andy, Kudlacik stated he is not certain at this point if it would have mattered. Page 96-97
- Kudlacik was shown the Waiver of Rights and was asked if it is the standard Miranda waiver used in the police department. Kudlacik stated yes. Kudlacik stated yes that it is

his recollection that this was the time it was filled out - dated August 5, 2014 and it has 15:41 hours which is 3:41pm. Page 98

- When asked why he made him execute the Waiver of Rights, Kudlacik stated because he was being questioned and he was the only victim and witness to the accident. When asked if he was told he's the target or suspect of the investigation, Kudlacik stated he is not sure if he communicated that to him after he read the rights to him. When asked if he had probable cause to arrest him before he took his statement that day, Kudlacik asks before he took his statement? Kudlacik stated I'm not --- I was getting there, but I wanted to be sure. When asked what he means by getting there, Kudlacik stated to probable cause. He wanted to make sure he had enough probable cause for the charges and he wanted to speak to him because he was the only witness. Page 99-100

- When asked if Joe submitted anything to Bergen Risk in connection with his injury, Kudlacik stated he doesn't know if he submitted anything, but he did report something. When asked if Baginski told him he had to fill out documents? Kudlacik stated he is not certain if he did or didn't at that point. Kudlacik stated he didn't learn that Fehl was told to fill out paperwork. Fehl appeared to give a statement voluntarily. Page 100-101

- When asked if his investigation concluded that Joe was hanging out at the firehouse and received a squad call, Kudlacik stated no. Page 102

- Kudlacik stated that he did not canvass the area. Page 106

- Kudlacik stated he was a supervisor directing officers. When asked who canvassed the area, Kudlacik stated he believes Officer Stolarz was one of them because he was their tac officer. Page 107

- When asked if officers canvassing the area are required to make a report of what they did exactly, Kudlacik stated they are not required to do that. Page 108

- Kudlacik stated he had no evidence that Fehl was drinking. When asked if he agrees that Fehl did not say at any point in his transcript that he was having money problems, Kudlacik says he would agree with that. Page 110-111

- Kudlacik stated he had a hard time believing Fehl was disoriented when Kasper was talking to him at the scene. Kudlacik stated that yes EMS was at the scene. Page 114

- When asked if his investigation revealed that Fehl had made the emergency call first and then called Doug, Kudlacik stated he can't recall who he called first, but they were very soon after each other. Page 115-116

- When asked if it is possible that a car came down Stein, hit Joe and turned around and wasn't on camera, Kudlacik stated no. When asked why it wasn't possible, Kudlacik stated because of the facts that were gathered during the investigation. The video surveillance shows that there were roughly 4-7 cars that drove down that street after he parked, none of which turned down Adamson or merged from Adamson. The only vehicle that turned down Adamson was Krause and he was already tending to him and Zielinski was already at the scene. Page 118

- Kudlacik stated that's true that the camera's vantage points don't show Joe going to the ground. When asked if a car is coming down Stein and Joe had been incorrect about the direction, the cameras wouldn't have caught the car if it turned around and went back to Stein, Kudlacik stated the camera probably wouldn't have caught that. Page 119

- When asked if he ever looked at the medical admission of Joe related to this hospitalization, Kudlacik stated he doesn't recall what that would even look like. Page 129
- When asked if he remembers Joe saying he wasn't seeking money for anything during the interview, Kudlacik stated he believes he may have said that after the fact. When asked if he confirmed before the arrest if he was seeking payment from either Wallington or Bergen Risk, Kudlacik stated he verified that once he reported a claim that triggered fraud at that point. Page 130
- Kudlacik stated it is not for him to determine whether he (Plaintiff) is seeking compensation or not. It is the fact that he reported something that didn't happen. Kudlacik stated yes, that Fehl was charged with two crimes. Kudlacik stated no one told him to charge Joe. Kudlacik stated he charged him as a result of the lack of evidence at the scene, the inconsistency with his story, the video surveillance, the victim interviews, and conclusively Joe's interview. As a result of all those things; it was vetted through the prosecutor's office, the legal advisor and he was charged. When asked if the BCPO directed him to arrest Fehl, Kudlacik stated no. Kudlacik stated he believes that's the reason he was calling them; he was vetting this through them as well. Page 131-132
- When asked what facts he reported to the BCPO during the phone call before he charged Joe, Kudlacik stated evidence at the scene, the video surveillance, the interviews. When asked did they say go ahead and arrest him, Kudlacik stated that they didn't tell him not to do it. Page 133-134
- Kudlacik stated after he interviewed Joe, he knew he was arrested soon after because he was waiting, but he was under arrest after that. Page 136
- Kudlacik stated yes, he selected the two charges they put on Joe. Kudlacik stated that yes, he believes he had probable cause to show that Joe acted with the purpose to defraud as required for the second charge. Page 138
- Kudlacik stated he believes the investigation revealed two cameras. Only on Park Row. Page 142
- Kudlacik is read "A subpoena for suspect's medical records was filed through Sharon Rosner of HUMC legal department and those records were submitted to the case file." When asked if he had them in his possession when he wrote the August 6 report, Kudlacik state he may have, he doesn't remember. When asked if he thinks it is important to have medical records when investigating insurance fraud related to bodily injury, Kudlacik stated it's hard to say. A lot of insurance fraud happens without injury. Kudlacik stated he is not sure when he got the medical records, but insurance fraud isn't always linked to injury all the time. Kudlacik answers yes when asked if it is linked to trying to seek compensation or money. Page 145-146
- Kudlacik stated he cannot say with certainty if he spoke with Dyanne Lluch before he arrested Fehl. He spoke to her a few times. He was asked if he sees from the report that Fehl signs the Miranda waiver at 15:41 and is charged with insurance fraud at 16:21. Page 147
- Kudlacik stated he doesn't recall what he told the judge, but he gave him the fact pattern of what he had. Page 148

- When asked if Joe was free to leave after the interview was finished, Kudlacik stated not at that time, no. When asked why not, Kudlacik stated he was under arrest. Page 153
- Kudlacik stated he may have given comments to newspapers. Page 167
- When asked if he gave a comment to the Cliffview Pilot on August 7th, Kudlacik stated yes, he may have advised them or they called him. Page 168
- Kudlacik is read the direct comment "one of them had a direct view of the firehouse." Kudlacik is asked if he gave that comment and was that a quote from him to Jerry DeMarco, stated he may have said that. Page 169
- Kudlacik stated that the chief makes the comments or press releases or he'll designate him to do it. When asked if the chief designated him to do it, Kudlacik stated most of the cases that involve him, the chief does the press releases. Not all of them, but most of them.
- When asked if he believes that Joe made it all up, Kudlacik stated that something took place there. He just doesn't know. Only Joe knows what took place there. Kudlacik stated he believes Joe filed a false police report and he committed an insurance fraud. That's what he was charged with. Page 170-171
- "Primary payer" and "self-pay code 619" is referenced. When asked if Joe was paying his own medical bills, would he still have been charged with insurance fraud, Kudlacik stated he doesn't think Fehl would have filed a worker's comp claim. When asked if it is his understanding that when you fill out a report of injury, you've made a worker's comp claim, Kudlacik stated yes. If he was bit by a dog and he went to the hospital and told his supervisor and they fill it out and send it to Bergen Risk. When asked if that means he made an affirmative worker's comp claim, Kudlacik stated he would think so. He doesn't know if he filled it out or not. Page 173
- Kudlacik stated he did not talk to the judge about Doug Krause. He did not talk to the judge about the fact that Andy was there and he didn't interview him. He did not talk to the judge about Chermak's statement; he didn't specify their statements. Kudlacik stated he did tell the judge there was no evidence of the car striking Fehl. He told the judge that there was surveillance video that was viewed. He told the judge that there was no physical evidence of a car accident. He told the judge that there was no evidence of a pedestrian motor vehicle accident. Page 177

### Deposition of Witold Baginski July 16, 2019

- Baginski acknowledges that Kudlacik is a captain now; that was his reward. Baginski has known Kudlacik for about 20 years. Page 12
- Baginski stated that according to the Borough attorney, he is terminated from Wallington. Due to his actions on February 5th, he is on administrative duty. When asked if he was referring to Corrigan when he said Borough Attorney, Baginski stated he means someone else and asks you don't know who the Borough attorney is? Baginski stated some guy named Magalieri or whatever his name is. He was escorted out as he took office. Page 13

- Baginski was read Subsection D, the duties listed under Municipal Administrator. When asked what that means, Baginski stated he coordinated or managed day to day operations, period. When asked if there was a contract between Wallington and the South Bergen Municipal JIF, Baginski stated there is a resolution, it's in play making us part of South Bergen JIF. Baginski stated yes when asked if there is another resolution that makes him a liaison for the town. Liaison position means to attend meetings. Baginski stated he was a liaison and eventually was put on the executive board of South Bergen Joint Insurance Fund. Page 17-19

- When asked if he had authority for personnel decisions in the fire department or EMS squad, he stated 'not usually.' When asked if the Borough Administrator was in charge of purchasing for the volunteer departments, Baginski stated that he wore many hats. Purchasing was part of it; it was not specific to the fire department or EMS. It was overall. He signed off on just about every purchase order. The fire department is a little different as the fire commissioner insisted on signing off also, so that the commissioner had control over the budget. Page 21

- The fire department has its own board. Page 23

- When asked if the borough administrator has any duties when an employee is injured during the line of work, Baginski stated he made it his business to make sure the proper paperwork was filled out for the sake of the individual who got injured. It did not matter if someone was an employee or a volunteer. When asked if it is called a FROI – First report of Injury, Baginski stated correct. Baginski stated it is a policy that was instituted by the South Bergen JIF. When asked if it was a claim form, Baginski stated there is a sequence of events that need to take place for all claims. The form was part of the sequence.

- Baginski stated the sequence is that all employees are issued little cards with an 800 number on it. If at any time someone is injured, the number is to be called; after hours a message should be left. The next day you come in and see Ms. Sheck (Siek) and you do a First Report of Injury and the supervisor also needs to come in and fill out a First Report of Injury and that gets sent to South Bergen JIF or Bergen Risk. Baginski stated not usually when asked if he, Wallington, Ms. Sheck stays involved in the claim after Bergen Risk gets it. Baginski stated when paperwork isn't filled out correctly, they try to contact the individual and if they don't respond, they contact him or Sheck. Page 25

- Baginski stated he is still a volunteer in Wallington. He has been a fireman 28 years and prior to that he believes 15 years as EMS. Page 26

- Baginski stated he has had someone who was injured in the line of duty as a volunteer. Page 29

- When asked if he prevented Fehl from filing, Baginski stated he never prevented anyone from filing a form. Page 30

- Baginski stated yes when asked if he remembers anyone complaining about dive suits being destroyed. Baginski stated they weren't complaints, they were claims. It was forwarded to the insurance company and to FEMA. Baginski doesn't recall if new dive suits were bought. Baginski stated eventually, yes, they got the money for the dive suits. Baginski stated he very rarely interacted with Fehl. Page 32

- Baginski stated he never interacted with Fehl regarding the dive suits. Baginski would have nothing to do with that. Page 33
- When asked if he ever heard anyone in town talking about Fehl, Baginski stated yes. Baginski stated there were questions being asked of him as to what to do with him. When asked what he heard other people say about Fehl, Baginski stated they don't know what to do about him. He is a bit of a rebel rouser in his own way. Page 35
- When asked if he investigates a claim on his own after a First Report of Injury is sent, Baginski stated 'absolutely not.' Baginski stated the agency responsible for the investigation does. Page 36
- Baginski stated he spoke to Bergen Risk managers McCaffrey and Rice on the phone a thousand times. Page 37
- Baginski stated that whenever a claim did not get filed properly, attempts were made to contact the employee and if the employee did not respond, the last-ditch effort was to contact the administrator. When asked if he thinks that public officials in Wallington retaliate against people for saying what they think about the town, Baginski says previously no, but presently yes. Page 38
- Baginski knows that Fehl was on the Hasbrouck Heights fire company before Wallington. Baginski became aware of insurance claims that he filed as a volunteer. Baginski was aware that Fehl had complained how Baginski ran the town as borough administrator. Page 39
- Baginski stated he was made aware through friends that Fehl was bashing him and badmouthing him on Facebook. Shots of his threads that were subsequently turned over to Kudlacik, but nothing was done about that. Baginski says Fehl never complained to him how the hurricane and insurance money was handled. When asked if he heard of a complaint that Fehl made about being prevented from bidding on a hydro-seeding contract, Baginski stated he doesn't understand it because they didn't stop anyone from bidding on anything. Page 40
- Baginski stated he was removed as Borough Administrator since May of 2017. Baginski is aware that Fehl was indicted for the crime of insurance fraud. Baginski stated 'not to his knowledge' when asked if there have ever been any worker's compensation fraud allegations against anyone else in Wallington. Baginski stated he doesn't know of any other fraud investigations. Page 42-43
- When asked if it is his understanding that the Borough Administrator sets all personnel policies, Baginski stated I am supposed to set—Page 44
- When asked if a policy applies only to employees, Baginski stated that volunteers are considered employees, are they not? Page 45
- Baginski is aware that Fehl was injured on July 3, 2014. Baginski stated from what he recollects, there was never a dispute that he was hurt. Baginski had no part in any investigation of the injury. Baginski does know an investigation was performed. Lt. Kudlacik performed the investigation. Lt. Kudlacik came to Baginski and said he was investigating it. When asked if Lt. Kudlacik told him later why he was investigating, he told Baginski that he was indicted. Page 51

- Baginski stated he knows who Kasper Zielinski is. He came into the office, but doesn't remember if he was the supervisor. Page 52
- When asked if he is confusing Zielinski with Kaczor, Baginski stated maybe. Baginski stated he first learned of the injury the next day. It would have been July 5th. He doesn't remember exactly; it might have been Kaczor that said he was involved in an accident. Baginski stated his only concern was that a FROI was filed out. Page 53
- When asked when he met with Kaczor, Baginski stated he didn't meet with him, he happened to walk into the office. Baginski stated his only concern was that for any type of injury, especially an employee, is that the paperwork is filed correctly and in a timely manner. Page 54
- When asked why did they get premium returns, Baginski stated that once they've met their statutory numbers for the state of being a self-insured JIF, it becomes excessive in the balances. It was decided among the executive group of South Bergen JIF to issue monies back. It was not exclusive to Wallington. It went to every individual member, meaning towns, not people. Baginski doesn't recollect who his (Fehl) supervisor was at the time, but if it was Kaczor, he did tell him he had to fill out the safety supervisor report. Page 56
- When asked if the FROI needs to be filed before the supervisor report, Baginski stated he could not tell you. When asked if he required Fehl to fill out an injury report, Baginski stated when he did see him and he doesn't even remember seeing him to be honest. Baginski was asked if Fehl was told that he needed to fill out a form or be suspended. Baginski stated they are not required to file if they don't want to get paid. If you don't want to get paid…Page 58
- Baginski says he has met with the prosecutor. Page 59
- Baginski stated he has no control over the police department. Baginski stated he did have conversations with the police chief about Fehl's injury. Baginski stated they were more of concern that anything else. When asked what the concern was Baginski stated that the paperwork was being filed correctly and that he was all right because he had no contact with Fehl. Page 60
- Baginski did not know that sometimes Siek would add information to the forms without talking to the insured. Page 61
- Baginski did know Fehl was a tow truck driver. When asked if he ever spoke to Kudlacik after the indictment, Baginski stated yes. Baginski stated they discussed that he (Fehl) was successful in his trial. Page 63
- Baginski was asked if he thinks that Fehl was guilty of insurance fraud. Baginski stated he wasn't present at the trial. Page 63-64
- Baginski was read for 7/11 "issues with this loss. Vic Bag. Issues with this loss Vic Baginski had called and given the call to Sam. Loss never entered. Placed a call to Vic. He was out of the office. FROI doesn't have street on it." When asked if he remembered calling around July 11th on this claim, Baginski stated 'no sir.' Page 65

- Baginski was read for 7/23 "Vic Baginski was on vacation." "He advised claim is under investigation. He turned the loss over to the police department." When asked who started the investigation, Baginski stated he has no idea. Page 66
- When asked if they contacted him to let him know they were starting an investigation, Baginski stated he doesn't recall. Baginski doesn't know why it was being investigated. Baginski is read "Just waiting to see what Víctor advises Sam." When asked why McCaffrey would be waiting for his advice, Baginski stated he has no idea. Page 67
- Baginski is shown a document that reads "Attention: Vic Baginski" "involved party, insured South Bergen JIF." Baginski stated it never came to him. It was never provided to him. Page 69
- Baginski stated he cannot recall how Kudlacik became captain. When asked if there were ever 2 captains in Wallington, Baginski stated no. When asked if Captain Kudlacik is the first time they ever had two captains, Baginski stated yes. Baginski stated 'absolutely' when asked if they had to redo the table of organizations to make that position. Page 77-78
- When asked if other than referring the Facebook postings of Fehl to Kudlacik, had Baginski done anything else, Baginski stated he doesn't react to garbage. Page 80
- Baginski stated in his recollection of being the administrator for 22 years or so, we never issued Rice Notices. Page 82
- When asked if he ever spoke to Stolarz, Sr. about the dive suits, Baginski stated he may have. Page 86
- When asked if both paid employees and volunteers are covered by workmen's compensation insurance, Baginski stated correct. When asked if both paid employees and volunteers are required to report injuries if they happen during the course of work, Baginski stated correct. When asked if volunteers are entitled to a wage if they miss work due to an injury, Baginski stated yes. Page 88

**Deposition of Joseph Fehl June 4, 2019**

- Fehl stated that he currently volunteers as a firefighter in Palisades Park. Page 9
- Fehl stated that prior to his employment at Nuchie's, he was unemployed. He was unemployed since the date he got arrested, August 5th, 2014. Page 10
- Fehl was not serving as a volunteer anywhere from 2014-2016 as he was first out on medical leave that the borough wanted and then they suspended him pending - was supposed to be pending the outcome. When asked if he was ever hit by a car, Fehl stated in his mind, yes. Fehl stated he began in the Wallington Fire Department in 2009. Page 11
- Fehl estimates that he was a volunteer in Hasbrouck Heights for 11 years. Fehl estimates that he was certified as a firefighter in 1999. Page 12
- The Ridgefield Fire Department was his first volunteer job. He then went to Wallington and then to Palisades Park. Page 13

- Fehl stated he was both a first responder and firefighter in Wallington. Fehl let his first responder certification lapse in 2014. Page 15
- The business address for Paradise Towing was Saddle River Avenue in South Hackensack. Fehl was the sole owner of the company. It was a partnership. Fehl had a silent partner, Matt Crook. The business is closed now because he lost the Copart contract when he was arrested in Wallington. Page 18
- Fehl stated that he did file a civil rights lawsuit against the Borough of Hasbrouck Heights. Fehl apologized for saying that he had not been a plaintiff in any lawsuit. Fehl stated there is a gag order on the lawsuit. The attorney was Eric Kleiner and Fehl was the only plaintiff. Page 20
- The lawsuit was filed in 2007 or 2008. Fehl was suing in the capacity as a firefighter. Fehl stated the allegations were retaliation of the firehouse. When asked retaliation for what, Fehl stated he guesses just being an officer. He guesses guys decided to do something that wasn't right, so he sued the town for it. Fehl stated they wrote a false claim. Page 23
- Fehl stated that the allegation was that he was watching child porn on the computer in the office. Fehl never watched child porn. The allegation was made to the chief of the department, Mike Rakowski. Page 25
- When asked who made the written allegation, Fehl stated Dan Wixen. Wixen was a firefighter. As a result of the allegation, Fehl was put on administrative leave. The Bergen County Prosecutor's Office took the computer but found nothing. Charges were never brought against Fehl. Fehl did remain on the Hasbrouck Heights Fire department after this incident. Page 26
- Fehl started as a volunteer with Wallington in 2009. Fehl was never a paid employee of Wallington. Page 27
- Fehl was assigned to Engine Company 203.That firehouse was located on Park Row. At the time, there were 21 firefighters. Page 30
- Meetings are held for the firefighters. Individual company meetings are held once a month. There are departmental hearings held every three months. Page 33
- There are separate emergency squad meetings held once a month. Fehl stated that the Park Row firehouse had a chain of command. Anthony Rispoli was the chief at the time of the car accident. There was one captain. Fehl believes it was Kyle Mizdol. Page 34
- There was one lieutenant. Fehl believes it was Andy Kullaf. There was a similar structure for the emergency squad. When asked if they had a chief, Fehl stated they have a captain. Fehl stated that would have been Dave Kaczor and the lieutenant would be Doug Krauss. Page 35
- Fehl only worked for this particular squad/chief. For the rescue squad, Fehl worked with Kaczor and Krauss. When asked for an estimate of how many fire-calls they would receive in one week, Fehl stated it could be from five to ten calls. For the emergency squad, Fehl stated 50 calls a week. Fehl would be able to respond to about half of the calls. When asked if he ever got hurt on the job, Fehl stated yes. He thinks it was in 2012. Fehl stated they had to work a house fire in Hasbrouck Heights. When asked if he got the

tone, Fehl responds yes. When asked if he went to the firehouse and put on his gear and went in a truck to the fire, Fehl responds that's correct. Fehl stated they put the fire out. Once they were done, he came out and had difficulty breathing. They sent him to medical and his blood pressure was a little up and they made him get checked out as a precaution. Page 36-37

- Fehl stated he went to fill out paperwork for the incident. He went to Borough Hall, but he didn't fill it out. When asked who filled it out, Fehl stated nobody. Fehl stated Victor Baginski wouldn't let him fill it out. Fehl stated Baginski told him he wouldn't give him the form. Fehl did not ask anyone else for the form as Baginski was the only one there at the time. The form was never filled out. Nobody paid the hospital bills. It is still in collections. Page 38-39

- Fehl stated Bergen Risk Managers is the town insurance. When asked if it is his understanding that he is entitled to worker's compensation if he is injured in the course of duty with the volunteer fire department, Fehl stated yes. When asked if the town is supposed to pay your bills if you are injured, Fehl stated yes. Other than the incident in 2012, Fehl has never been injured in the line of duty as a firefighter. Fehl was injured in the line of duty as a first responder. Page 40

- Fehl stated that he did attend three quarters of the emergency and fire squad meetings. It was mandatory to make six out of the twelve meetings. Page 41

- Fehl does not get paid a stipend as a firefighter in Wallington. Fehl stated he does get a clothing allowance check at the end of the year. Fehl estimates it to be $500.When asked if he received any financial remuneration for being on the fire department, Fehl stated you're supposed to have the LOSAP program. That is, if you make a percentage for the year the town puts $1100 into, like, an investment and then whatever the investment makes. Every year they're supposed to put that in. When asked if Wallington did that, Fehl stated that every year his paperwork got lost when he turned it in to Victor. He followed up every year with Matt Palmer. Fehl believes he was the department secretary at the time. Brian Meyers had similar complaints. When asked if he brought it to the attention of the mayor or the council, Fehl stated that a council member was in his company, so he knew. Mark Tomko attended every one of Fehl's meetings. He was a councilman and is now the mayor. He was also a fireman at Fehl's firehouse. Fehl spoke to him several times about not receiving the LOSAP payment and they said they were going to look into it. Fehl never received a payment from 2009 through 2014 when he served with Wallington. Page 42-44

- When asked if he spoke to anyone other than Tomko and Palmer, Fehl stated he spoke to his chief at the time, Kasmarskik. Page 45

- Baginski was a member of the fire department, but Fehl doesn't know the time period. Fehl believes he is still a volunteer at 202's firehouse on Johnson Avenue. Page 46

- Fehl would describe his relationship with Baginski like water and oil. Fehl stated he never liked me from the day he joined from when he was with Hasbrouck Heights. He did not want Fehl on the department. Page 47

- Fehl describes his relationship with Captain Kudlacik as fine. Page 48

- Fehl is read Paragraph 17: "Plaintiff is a vocal person." Fehl would describe himself as a vocal person. Fehl stated "When something is not right, I'll open my mouth, when something is wrong. Fehl stated he expressed his feelings in public frequently. Page 49
- Fehl is read Paragraph 19: In Paragraph 19 "In March of 2009 defendant Baginski made statements after the fire department meetings suggesting that Plaintiff should be removed." Fehl stated he was present for those statements. Fehl stated Baginski made those statements to Ike from 201 and I forgot who the other guy was at the time. Fehl stated that he was sitting in front of him. He didn't realize it was me that he was talking about. When asked what was said exactly, Fehl stated his words were "We shouldn't have a child molester, whatever, on this company. We need to get rid of him. Page 50
- Fehl stated that he did report the two incidents to his officers, Kasmarsick and Chief Benny Kullack. Page 52
- In Paragraph 23, Fehl alleges Baginski barred him from putting in a bid for hydro-seeding of Centennial Field, which was a public bid for work. Fehl stated he did put in a bid, but it never made it to the council. Fehl stated they have to read all the names who put a bid in and who got awarded. Fehl's name was never there. Page 53-54
- Fehl made the allegation that dive suits were destroyed as a result of flooding from Superstorm Sandy. Fehl observed a couple of the suits had little holes. The damage was brought up, everyone discussed it at the meetings. Page 56-57
- Fehl stated he made a big stink that the suits had not been replaced yet. Page 58
- Fehl stated that the treasurer Stu Stolarz said he was going to look into what happened. Page 59
- In Paragraph 37, Fehl alleges that he went to the Wallington Police Department but was told to get out. Fehl stated he saw Kudlacik and asked him to look into seeing what happened with the dive suits and he told Fehl to get out. Page 62
- Fehl stated that the only conversation he had with Kudlacik was the one when he told him to get out. Page 64
- Fehl stated that he went to the Wallington Firehouse on July 3, 2014 at about 10pm. Page 65
- Fehl was not consuming alcohol, marijuana or drugs on July 3, 2014. Fehl was hanging out with 2 friends of his, firefighters from Rutherford, Corey Mustac and John Orme. Fehl stated there is no rule prohibiting non-firefighters in the Wallington Firefighter House. Page 67-68
- Fehl approximates Mustac and Orme arrived around 11:30pm. They came in 2 separate vehicles around the same time. Fehl came in a black pickup truck. Page 69
- Fehl stated he arrived at approximately 10:00pm and parked on Adamson going towards Stein. After parking, Fehl walked to the firehouse, a twenty to thirty-foot walk. Page 70
- Fehl estimates that an ambulance call came in between 1:00 and 3:00am. He doesn't know exactly what time. Fehl stated he told John and Corey "I'll be right back, just hang out. If anyone says anything, you know, you guys are in the firehouse, I went on a call". Page 71

- Fehl stated he usually walks fast to his vehicle for a call. He was wearing sneakers. When asked if he was running or walking for this call, Fehl stated: Oh, the call? I originally -- before the call came in, I left to go to 7/11 to get chips. That's why I left and I came right back. Right when the call was coming in, I came back, was coming up the block. Ran inside to tell them I was going on the call and I would be back if anybody says anything. Here's the chips. Went back to my vehicle and that's when the car came up around the block and clipped me. Page 72
- Fehl stated that as he was coming back from 7/11, the call came in. He parked the car, ran up to tell them he was leaving to go on a squad call. Page 73
- Fehl sates he doesn't remember if he was running or walking fast. Fehl stated that he got to the street right near his vehicle and remembers turning left and seeing headlights and he tried to get out of the way and he got clipped. Page 74
- Fehl stated it was a dark colored vehicle. The car came from Adamson by Stein.
- Fehl would say it came from the north side. The driver side would be closest to him. Fehl's right side was struck. He wound up on the ground and he must have blacked out for a bit because he called the desk and told them he was hit. Told them the car was at the stop sign of Stein and Main Avenue. The first time he observed the vehicle was when he saw the headlights coming towards the door of the truck. Page 75-76
- It was a two-way street. Page 77
- When asked if he was thrown or dragged, Fehl stated as it came by, he guesses he went up on the hood and when they sped up, he fell over here (indicates) Page 79
- Fehl stated he called 911 and said "I was hit by a car and the car is going down Stein." Fehl believes he spoke with Bobby Michaels. Page 80
- Fehl stated he remained on the ground. He believes Kasper, a Wallington cop was the first to arrive on scene. Page 81
- Fehl stated that Kasper put Band-Aids on his head to stop the bleeding. Andy Kullaf, a firefighter out of his house and also on the emergency squad, then showed up. He told Andy what happened. He told Kasper that he was hit by a car that left the scene. He told Kullaf that he was hit by a car that left the scene. An ambulance from Wallington arrived. Page 82-83
- Fehl stated that he told the paramedic exactly what he told everyone else. Fehl said the paramedic, from what he was told, cut his clothes off and started an IV. He guesses they put drugs in him and transported him. Both medics stayed on board. They put him on a backboard and in a collar. Page 84
- He was admitted to Hackensack Medical Center and stayed a couple of days. He was told he had a bruised muscle, a bruise around the hip, cuts on his head. They kept him for observation because he whacked his head hard and had a hard time walking on his leg. Page 85
- Fehl had no debt prior to this. When asked if anyone from the fire department told him that he had to report the incident to the town after he was released, Fehl stated that Doug Krauss, Lt. of the emergency squad did. Four or five days after he was released, Krauss called him and said that he had to go to Victor's office to fill paperwork out. Fehl went to

Victor's office and he told him to fill the incident report out. The incident report was located in Borough hall. Victor went and got the file and told Fehl to fill it out and he did. Page 90

- When asked when did it first come to his attention that there was some indication that he was not hit by a car, Fehl stated when he was told to come to the police station August 5. However, he was notified by Hasbrouck Heights PD four days prior to that he had to get ahold of Kudlacik. Fehl stated while at the hospital, he wasn't involved in the police investigation as to the car leaving the scene. Page 91

- Fehl stated that when he first went to fill out the form, he went to the police station to talk to the chief, Teddy Ingrasselino. The purpose was to find out what was going on. Teddy told him that they are not putting it on the back burner; they had a bank robbery at the scene the following morning and they wanted to finish that one up before doing anything to his. Page 92

- Fehl stated he was notified to report to Kudlacik on August first or second. He called Kudlacik who asked him to come in to talk for a minute. He asked Fehl to come in on August 5th around four and Fehl said ok. Fehl had already spoke to the police chief. Page 93

- When asked if anyone ever told him that if he was hurt on the job as a volunteer that he was entitled to a stipend, Fehl stated no and asked what did he mean by stipend? Page 95

- Fehl was given crutches when he left the hospital. His right leg was in a brace. He doesn't know why everyone is saying both legs were in a brace. They did X-rays at the hospital. Page 96

- When asked about his conversation with Kudlacik, Fehl stated that before the conversation started, we had a conversation. We talked for a little bit. He asked me if I had a wire or if I'm -- if my phone, can I shut it off. I said "Okay." I said, "Is everything all right?" He said, "Yeah, everything is fine. I just got to ask you questions." I said, "Okay." He says, "I'm going to record it and for me to record it I got to give you Miranda rights because I'm actually recording." At that point I never thought I was arrested because I never really get in trouble so I don't really, you know, I believed him. He said -- you know, read the little piece of paper. I signed it and that was it and then we went to questions. Page 97

- When asked if anyone ever told him he didn't get hit, Fehl stated that Kudlacik told him before the recording started that he didn't really think he got hit. Fehl stated he believed he was and didn't really think he was in trouble or did anything wrong. After 20, 25, 30 minutes Kudlacik shut the tape off and left the room. When he came back, he told Fehl he was under arrest for insurance fraud. They had some words and Kasper was called off the streets to come book him. Fehl then posted bail and Kasper told him everything will work out in the long run. Kasper cuffed Fehl to the bench. They made him sit there for 20 minutes. They fingerprinted him, took his picture, and humiliated him 'big time.' Page 98

- After he was told he was being arrested, Fehl stated he said "This is bullshit and you are doing this for a fucking political stunt." Page 99

- Fehl stated that bail was set for $2000 with 10 percent so he had to put up $200. After posting bail, they all walked outside and Fehl was told it will all work out. Don't worry about it. Page 101
- Fehl stated that the following morning the phone calls started because his mugshot was all over the papers. Fehl read the article. Page 102
- After the articles, Fehl turned off his cell phone and stayed in the house as he was embarrassed. Page 103
- Fehl did not speak to anyone at the BCPO prior to going to court. Fehl did speak to Kudlacik. The hospital called to ask him to pick up his clothes. He got them from the hospital and brought them to the police station and told them that maybe they should look into the evidence of the clothes. He told him to get out of the police station for the second time. He wouldn't take the clothes as evidence. Fehl did not leave the clothes; his attorney still has them in the same package. Page 104-105
- When asked which witnesses were called at trial, Fehl stated Bobby Michaels, Lt. Kudlacik at the time, Kasper. Thinks it is Zielinski. Page 109-110
- The trial lasted two days. The jury came back with a verdict of not guilty on all charges. Page 111
- Fehl stated that he had a couple of conversations with Sharon McCaffrey from the JIF. When asked about the first conversation, Fehl stated: I wanted to know where the claim came from because I didn't want to put in for a claim. Second time I called her I said well, I was going through my business insurance. I didn't even -- you didn't even receive a bill. Her answer to me was, "Well, Victor called and notified me that you were under investigation. That's why we stopped the claim," which I don't know what claim she was doing. I said because I didn't send any forms or anything in and I didn't send any bills and the hospital didn't even send any bills to the town either. Page 117
- Fehl was not aware that Bergen Risk Managers receives the forms electronically. Fehl was asked if he is aware that an employee from the Borough testified that she inputted all the information electronically and sent it to Bergen Risk. Page 118
- Fehl stated that information on Siek-1 has been altered: Where it says "Employee still out of work" I left it blank. That's got a checkmark, checkmark and I didn't put that in. I know I forgot to mark in what time loss of work. I left that blank and all my answers with the circles were all crossed and I forgot to put male one. That's a mark-off the mail. Everything I did with an X, somebody crossed it off. If you get the original, like I did during the trial, two different penships (SIC), two different pens wrote it. Fehl continues: If you go to the ones that, I guess, Dorothy did where it says full time, part-time employee, I left it blank because of the fact I'm not. I'm a volunteer and it asked did I get paid weekly or bi-weekly. I left that blank because I don't get paid. And hers is marked. It's also marked that I make $850 a week. Fehl stated it is fair to say that there is a version of the form with just his handwriting and the version they are looking at is not it. Page 119-120
- Fehl stated this is not the original form that he filled out; it has additional information. When asked who Grazyna Torbus is, Fehl stated it is one house they have surveillance from. Page 121

- When asked who Klaudia Kasprek is, Fehl stated it's the other house they have surveillance from. Page 122
- Copart was his client at the towing company prior to this incident. Page 124
- When asked if Krauss indicated to him that he needed to fill out paperwork related to the incident, Fehl stated yes and he filled it out in the Borough office. Page 125
- When asked if it is his allegation that Baginski orchestrated the entire insurance claim, Fehl stated yes. Fehl stated that Krauss had him fill out the paperwork, but said it was per Victor. It is a requirement to fill out a form after you are injured on the job. Fehl still maintains that Baginski orchestrated his entire investigation even though Siek testified she submitted the form and made changes. Page 126
- When asked if any of Fehl's witnesses heard Kudlacik and Baginski talk about the insurance claim, Fehl stated that Dave Pinto, a life member from his company, now on the Board of Ed in Wallington, told him that Victor was going to screw him for this and his exact words were that he's 'doing everything in his power to screw him.' Page 128
- When Fehl was asked when Kudlacik asked him if it was possible that he might have slipped and fell and hit his head, and he agreed that might have been a possibility, Fehl stated that he said it was possible, but it was still in his mind that he was hit by a car. Fehl stated he never changed his story. Fehl stated that he is aware that the police reviewed surveillance video that showed no cars traveling in front of the fire department at the time and place he was hit. Fehl stated that it is also his knowledge that they didn't go to Stein Avenue, which they should have because there were more cameras on that block. He feels it was malicious not to have done a full investigation. Page 131
- Fehl believes Kudlacik's agenda was to become a captain. When asked how this incident affects Kudlacik's promotion, Fehl stated because I was going after Victor all the time for the stuff that he was doing illegal. If you get rid of me and quiet me, he stays, he gets his promotion because it goes by the Borough. Page 132
- Fehl stated that everyone in his firehouse turned on him by voting to throw him off before he was found guilty and deleting him, not talking to him, ignoring him when it is supposed to be a brotherhood. Page 136
- When asked what actions support his claim that Baginski was motivated to get him off the fire department, Fehl stated he was harassing him, making comments – something wasn't right. Something should be done about it and nothing was done. Everyone talked about what Victor did, so Fehl looked into it. Stealing fuel, stealing this; he owns Bobby O. Automotive. Victor said he didn't pay taxes on it. Victor said the check was missing; it wasn't. It was cashed and Bobby O made a big stink. The dive suit money came in, but the suits were not bought. When Fehl questioned it, Stolarz said "Victor said it was like a used car. You could do whatever you want with the money." Not when it comes to Government funding. Page 142-143
- Fehl answers correct when asked that he didn't intend to make a workman's compensation claim with the town. Page 149

**Deposition of Dorothy Siek May 28, 2019**

- Siek stated that she last worked for the Borough of Wallington as the tax collector, treasurer, payroll clerk, clerk recording secretary of the planning board, clerk recording secretary of the zoning board. She was doing all the worker's compensation claims. Page 6-7
- Siek stated that if she was in the office at the time someone came in to fill out a claim, she would ask them questions on the form. The person would not have to sign or hand write anything afterwards. Page 8
- Ms. Siek stated that the First Report of Injury form is the form she fills out. She would think that is the claim form as it is what starts the claim. Page 9
- When asked if a volunteer is hurt on the job, are they required to fill out that form, Ms. Siek stated that she doesn't require them to fill out a form, their supervisor would tell them. Page 11
- Ms. Siek stated her job is to only get the information and send it to Bergen Risk. Page 13
- When asked how someone at Bergen Risk Managers would know if someone is hurt on the job before her, Siek stated there is an 800 hotline. After hours you would call that number. Page 14
- When asked if her role is to be there to submit the form, Siek stated, that's it. Page 16
- Siek stated that if she isn't there, the filled-out form is left on her desk, she puts it in the computer, and it goes via email to Bergen Risk. Page 17
- Siek stated she has never met Joseph Fehl. Page 18
- When asked to name the other employees working at 24 Union Boulevard with her, Siek stated Cathy Rapacz, Agnes Brynczka, Victor Baginski, Linda Branick and she thinks the secretary was Susan Friedman. The nurse was Mary Van Eck. Page 19
- When asked if she is aware that Mr. Baginski is no longer the Borough Administrator, Siek stated he is on administrative leave. She doesn't know why. Page 21
- Siek stated she remembers testifying at Fehl's trial. She was not aware that she was testifying that he had been indicted for insurance fraud. Siek stated she met with the prosecutor Vanda to talk about her testimony. Page 22
- Siek stopped working because she retired. Page 25
- Siek stated that when she was working with Baginski this year, his position was borough clerk. He was formerly borough administrator but the council took it away from him, but she doesn't know why. Page 28
- Siek stated she did not follow up with Fehl about the form. She doesn't follow up with anybody. When asked what date she submitted the form to Bergen Risk, Siek stated that looking at the form, it says 7/11 at the bottom; she doesn't remember but thinks she would have submitted on 7/11. Page 32
- Siek stated that the handwriting on Date of Hire on the first page is hers. Page 33
- Siek never received training on how to fill out the forms, but stated it is very simple. She has no training or schooling in insurance law. Page 36

- When asked if anyone ever contacted her to get information after she submitted the First Report of Injury, Siek stated no. Siek stated she did not talk to any police officers about Fehl's form. When asked who David Kaczor is, Siek stated he is either on the volunteer firemen or both firemen and emergency. Page 41-42
- Kaczor sat with Siek to fill out the form. He was required to submit the report as he was Fehl's supervisor at that time. Page 43-44
- Siek stated that she was aware in 2017 that Wallington was stripping Baginski of his role of business administrator as she did the payroll. When asked if she believes that Baginski was retaliated against when she was working there, Siek stated she doesn't know. Page 46
- Siek is aware of a lawsuit in town having to do with a landscape company receiving free electric. KC Electric. Page 49
- Siek stated that Baginski was put on administrative leave February 5th, 2019. Page 51
- Siek is asked to review a newspaper article that stated that Baginski transmitted inappropriate and false information in response to public records requests and he was found to have received \$20,000 unauthorized overtime. Page 54
- Siek stated no when asked if she ever saw Baginski retaliated against in Wallington. Page 57
- Baginski received overtime for both hurricanes. Siek stated he submitted paperwork with hours. Page 58

## IV. Analysis and Opinion

Having reviewed the documents supplied to me by counsel for the Plaintiff, it is my opinion which I base on 33 years of police training, supervision, education, and experience in police policy and procedures that no reasonable police officer acting in good faith would have found probable cause to arrest and charge Plaintiff with insurance fraud and filing a false police report. The arrest of Plaintiff was made absent probable cause and in violation of recognized police practices to wit, probable cause is required to arrest a citizen and deprive them of their freedoms.

*Probable Cause*—The concept of "probable cause" is central to the meaning of the warrant clause. Neither the Fourth Amendment nor the federal statutory provisions relevant to the area define "probable cause"; the definition is entirely a judicial construct. An applicant for a warrant must present to the magistrate facts sufficient to enable the officer himself to make a determination of probable cause. "In determining what is probable cause . . . [w]e are concerned only with the question whether the affiant had reasonable grounds at the time of his affidavit . . . for the belief that the law was being violated on the premises to be searched; and if the apparent facts set out in the affidavit are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged, there is probable cause justifying the issuance of a warrant."[116] Probable cause is to be determined according to "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."[117] Warrants are favored in the law and their use will not be thwarted by

a hyper technical reading of the supporting affidavit and supporting testimony.[118] For the same reason, reviewing courts will accept evidence of a less "judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant."[119] Courts will sustain the determination of probable cause so long as "there was substantial basis for [the magistrate] to conclude that" there was probable cause.[120i]

As per Defendant Kudlacik's Answers to Interrogatories he was asked:

21: Identify and explain why you had probable cause to arrest Joseph Fehl?

There was a lack of physical evidence supporting Plaintiff's claim, a lack of witnesses to support Plaintiff's claim, a lack of surveillance footage supporting Plaintiff's claim and the admissions made in the course of Plaintiff's interview.

## In regard to a lack of physical evidence:

Defendants' lack of evidence was based on what they perceived as a lack of debris at the scene of the injuries. It should be noted that Defendant Kudlacik, who was the arresting and charging officer, never traveled to the scene on the night Plaintiff was injured. The first responding officer was Officer Casper Zielinski who filed an accident report. Other than the accident report, Zielinski filed no other paper work. During his trial testimony on January 11, 2018 he was asked and answered as follows:

1. Zielinski stated yes when asked if he has been to other sites where car accidents occurred and there were no debris or skid marks.
2. Zielinski stated yes when asked is it correct that if a pedestrian is struck by a car that you would not always find skid marks.
3. Zielinski stated yes when asked is it correct that if a pedestrian is struck by a car that you would not always find debris.
4. Zielinski stated yes when asked is it correct that if a pedestrian is struck by a car that you would not always find skid marks.
5. Zielinski did not take any photos at the scene.
6. Zielinski did not take any photos of the scene after the victim was taken to the hospital.
7. When asked if he secured the area by putting up any police tape, Zielinski states no police tape. Page 201-21

During Defendant Kudlacik's deposition he was asked a series of questions regarding skid marks and debris at the scene of a motor vehicle accident involving a pedestrian and acknowledged that he had been to scenes where no debris or skid marks had been found.

Zielinski agrees that Plaintiff was found in the street and injured. He acknowledges that he did not secure the scene or take pictures. He stated there was nothing to take pictures of. Zielinski had no reason to believe Plaintiff was lying about being struck by a car. Zielinski further testified that based on his experience, the lack of physical evidence does not mean a person was not struck by a car.

On the night Zielinski responded to the call of a pedestrian (Plaintiff) struck by an auto he failed to properly secure and process the scene. There was nothing preventing Zielinski from securing the scene and requesting an accident reconstructionist to respond. If no accident reconstructionist was available there was nothing preventing Zielinski from taking pictures. For example, photos of Plaintiff, photos of where Plaintiff was struck and photo of Plaintiff's vehicle. Photos of Plaintiff's eye glasses which were found in the street 20 feet away. Zielinski and later Kudlacik made no attempt to secure Plaintiff's clothes. If the clothes had been secured, they could have been examined for evidence to determine whether or not he was struck by a vehicle. Evidence could have included tire marks on his clothing, transfer of paint or dirt from a vehicle or damage to his clothing.

Based on Zielinski's trial testimony, Kudlacik's deposition testimony and my own experience in motor vehicle accidents involving pedestrians, it is not uncommon for a pedestrian to be struck by an auto with no debris left at the scene. Therefore, it is my opinion that the lack of debris at the scene was not relevant in determining probable cause; the fact that Defendants used the lack of physical debris at the scene to establish probable cause was flawed.

**In regard to a lack of witnesses:**

The mere fact that there were no witnesses to the actual incident does not in itself or in totality of this matter establish probable cause to support the charges of insurance fraud or filing a false police report. It should also be noted that Defendant Kudlacik, who was the investigating, arresting and charging officer, never interviewed the two witnesses who were in the firehouse and made no attempt to interview "Andy" who was an EMT who responded to the scene. Witnesses who were interviewed support the fact that Plaintiff was injured and disoriented. Witnesses also stated they had no reason not to believe Plaintiff's claim that he was struck by a vehicle.

During the interview of Douglas Krause, an EMT who responded to the scene:

Audio Statement of Douglas R. Krause July 22, 2014

Krause stated that Fehl was on the front of the car, on the front driver's side tire. He was bleeding from his head. When asked what did he complain about, Krause stated his glasses were two or three cars further down. He was complaining that he had pain everywhere and eventually the ambulance came. When they went to lower him onto the backboard, he said his legs were in extreme pain. Page 6

When asked what was the dialogue between them when he was first on scene, Krause stated that he said he was hit by a car, a black car. He was kind of out of it. He didn't really know too much was going on IA[1]. Page 7

---

[1] Inaudible

Krause stated that Fehl said the last thing he remembered was he saw a car come whipping around the corner, a black car around Park Row, onto Abramson. Page 9

Krause stated that in the ambulance Fehl's legs definitely appeared injured. Page 14

When asked was his injury consistent with being struck by a car, Krause stated yes and no. Yes, with the leg injury of being hit by a car. Page 15

When asked did Krause ask him what was his IA, Krause stated Fehl seemed very out of it. He really didn't know what happened. When asked if Fehl told him that he was launched 20-40 feet, Krause stated he said he didn't remember anything. The last thing he said he remembered was the car turning the corner very fast from Park Row onto Adamson. He said he looked to his left and saw the car and said you know like you are gonna get hit and said that's the last thing he remembered. Krause personally thinks that there was a little bit of a downtime if that's how the whole scenario played out. There was a lapse of time from the second tone, there was a timeframe that lapsed from the third tone to the time he actually called Krause. Krause thinks he might have been unconscious because he didn't really remember too much. Page 23

Krause stated if you were there you would've seen like it didn't look like he was lying. It looked like if you knew he was genuinely hurt, injured, seemed like he didn't know what happened. He didn't know what hit him. He just didn't seem like it was one of his falsified injuries that you know one time I was having a heart attack; you're not really having a heart attack stop bullshittin' us. Page 24

One of his partners was there with him on the call and we both drew the same conclusions on Joe and both know he's not lying, he's hurt. He doesn't remember what happened. Something did happen, he didn't really remember too much it seemed. Fehl told them he didn't remember. When asked if Krause is going by what Fehl told him, he stated yea. His partner is Andy. Don't call him to question him because he is in the corrections academy. Page 25

**In regard to a lack of surveillance footage to support the claim:**

Based on all documents I reviewed, Defendant Kudlacik never went to the scene to canvass for cameras. The officers who did canvass the area appear to have only canvassed Park Row where they located two cameras which did not show any vehicles turning the corner at or around the time Plaintiff believes he was struck by a motor vehicle. Based on numerous statements and testimony, there is overwhelming evidence to support the claim that Plaintiff was knocked unconscious and was confused. Defendants never considered the possibility that Plaintiff was disoriented, lost his bearings and was confused as to where the vehicle actually came from. Defendants never investigated or considered the possibility that the vehicle actually came from Stein Ave. or Adamson St. Had defendants conducted a thorough investigation as they claim, it would have included canvassing Stein Street for video footage. This could have assisted Defendants in their investigation. A failure to canvass Stein shows Defendants had no interest in thoroughly investigating this matter to its logical conclusion.

As per Defendant Shawn Kudlacik's Answers to Plaintiff's Interrogatories he stated:
After Plaintiff alleged that he was involved in a hit and run, the police department conducted a thorough investigation to identify the suspect vehicle that allegedly struck Plaintiff. Because Plaintiff was a Borough volunteer, the investigation was conducted very thoroughly. Due to the lack of evidence at the scene and discrepancies in the video surveillance, there was a lack of evidence supporting a hit and run but rather, evidence contrary to Plaintiff's claim. The Bergen County Prosecutor was contacted and an investigation ensued.

Having reviewed the documents supplied to me by counsel for the Plaintiff, it is my opinion that Defendants failed to conduct a thorough investigation as they claim.

Based on Defendant Kudlacik's own admission, he is unable to articulate what his probable cause was. A lack of witnesses, a lack of physical evidence, and a lack video footage could not support probable cause to arrest Plaintiff. Defendant Kudlacik stated in his interrogatories that Plaintiff made admissions during his interview. Having reviewed the audio and transcribed statement of Plaintiff, he did not make any admissions of guilt or wrong doing, he simply agreed with Defendant's theory that it was possible that Plaintiff fell rather than being struck by a car. Plaintiff maintained his position that he believed he was struck by a car.

There is no disputing that on July 3, 2014 at approximately 01:58:21 the Plaintiff was found injured and lying in the street. Plaintiff has maintained the position that he was struck by a car and knocked unconscious. Defendants concede that Plaintiff was injured, but take the position that he was not struck by a car. Regardless of how Plaintiff was injured, whether he was hit by a car or tripped and fell, his actions of calling the police for assistance and later filing out a First Report of Injury (FROI) did not amount to insurance fraud or filing a false police report and no reasonable police officer acting in good faith would have charged Plaintiff with such crimes. Defendants acknowledge that regardless of how Plaintiff was injured (hit by a car or tripped and fell) he would have been covered by the Borough. Therefore, Plaintiff had no motive for knowingly lying about how he was injured.

Defendant Kudlacik acknowledged that he lacked training and experience in insurance fraud investigations. Rather than seek outside assistance from the Bergen County Prosecutor's Office (BCPO) or the New Jersey Attorney General's Office (NJAG), Defendant Kudlacik decided to act on his own and arrest and charge Plaintiff. During depositions Defendant Kudlacik claims at some point he did in fact notify the BCPO. However, he failed to document the date, time and content of the conversation. Therefore, it is unclear if he was making a notification that he was investigating or if he was seeking guidance. As per Defendant Shawn Kudlacik's Answers to Interrogatories, he stated the BCPO was contacted and then the investigation ensued. Although Defendant Kudlacik claims the BCPO was called, there is no evidence to support his claim or the reason why he called them.

Defendant Kudlacik's failure to involve the BCPO in the actual investigation, arrest and charges calls into question his motives. Any reasonable officer acting in good faith and realizing his/her lack of experience in insurance fraud investigations would have requested the BCPO's assistance

in the actual investigation and would have sought the BCPO's approval prior to filing charges. As per the BCPO's web-site:

The Financial Crimes Unit is responsible for the investigation of major theft and fraud offenses committed in Bergen County. Generally, the Financial Crimes Unit limits its participation in theft and fraud investigations to cases involving a loss of $75,000 or more. Due to the complex and multi-jurisdictional nature of theft and fraud investigations, the squad often assists local municipalities in cases requiring special expertise.ii

As per the complaint filed by Defendant Kudlacik:

Within the jurisdiction of this court commit insurance fraud by reporting a false motor vehicle accident and utilizing the Borough of Wallington's insurance carrier. 3rd Degree.

As per New Jersey State Statue:

2C:21-4.6. Crime of insurance fraud
73. a. A person is guilty of the crime of insurance fraud if that person knowingly makes, or causes to be made, a false, fictitious, fraudulent, or misleading statement of material fact in, or omits a material fact from, or causes a material fact to be omitted from, any record, bill, claim or other document, in writing, electronically, orally or in any other form, that a person attempts to submit, submits, causes to be submitted, or attempts to cause to be submitted as part of, in support of or opposition to or in connection with: (1) a claim for payment, reimbursement or other benefit pursuant to an insurance policy, or from an insurance company or the "Unsatisfied Claim and Judgment Fund Law," P.L.1952, c.174 (C.39:6-61 et seq.); (2) an application to obtain or renew an insurance policy; (3) any payment made or to be made in accordance with the terms of an insurance policy or premium finance transaction; or (4) an affidavit, certification, record or other document used in any insurance or premium finance transaction.iii

In order to be guilty of the crime of insurance fraud Plaintiff would have had to knowingly acted to gain a benefit.

As per New Jersey General requirements of culpability:

(2) Knowingly. A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning.

Plaintiff has taken the position that he was struck by a motor vehicle and that is what caused his injuries. There is no disputing that Plaintiff had head injuries and other injuries; Plaintiff and witnesses who responded to the scene stated that they believe Plaintiff was knocked unconscious. If Plaintiff truly believes he was struck by a car and had no intent of misleading anyone, then no insurance fraud was committed. Additionally, there is no evidence that Plaintiff ever filed an actual claim. Defendants take the position that since Plaintiff filed a FORI he committed fraud. Plaintiff testified under oath that he was ordered to submit the FORI under threat of discipline if he failed to do so. Once Plaintiff submitted the FORI to Wallington, employees of Wallington took it upon themselves to write in information on Plaintiff's FORI-- adding salary and other information, and submitted the form to Bergen Risk Mangers. Once the revised form was submitted to Bergen Risk Managers, Plaintiff took no further steps to process a claim. In a supplemental report filed by Det. Ismael Alsina of the BCPO, he stated that he conducted a phone interview of Sharon McCaffrey of Bergen Risk Managers. During the interview McCaffrey detailed the steps one must take when submitting a claim. As per the report, one step is:

Bergen Risk Managers would request injured workers to complete various claim forms in order to continue receiving benefits.[2]

Other than the FORI Plaintiff was ordered to submitted, no other claims or paper work was filed by Plaintiff. Additionally, Plaintiff never received any benefit from Bergen Risk or Wallington related to his injury. Since no benefit was secured or even requested, it is unclear how Plaintiff committed insurance fraud?

In addition to the Fraud charge Plaintiff was also charged with: 2C:28-7a(1):

**2C:28-7. Tampering with public records or information**

2C:28-7. Tampering with public records or information. a. Offense defined. A person commits an offense if he:

(1) Knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government.[iv]

As per my previous opinion regarding the fraud charge, if Plaintiff truly believed he was hit by a motor vehicle, and had no intent of misleading anyone, then the charge of filing a false police report does not apply.

Defendant Kudlacik was asked during depositions if prior to interviewing Plaintiff did he have probable cause to arrest him?

As per his deposition:

[2] Supplemental Report by Det. Alsina filed 7/13/2017

I was getting there, but I wanted to be sure. When asked what he means by getting there, Kudlacik stated to probable cause. He wanted to make sure he had enough probable cause for the charges and he wanted to speak to him because he was the only witness. Page 99-100

Since Defendant Kudlacik lacked probable cause prior to interviewing Plaintiff, it is my opinion (having reviewed the interview between Kudlacik and Plaintiff) that nothing changed giving Kudlacik probable cause to arrest Plaintiff.

During the interview Kudlacik suggested an alternate theory that it was possible that Plaintiff fell as opposed to being struck by a car. Plaintiff acknowledged that was possible, but maintained his position that it was his belief that he was struck by a motor vehicle. Since Kudlacik lacked probable cause prior to the interview, the interview did nothing to change the facts of the case.

During depositions Defendant Baginski stated he had no involvement in the investigation or claim. However, based on documents supplied by Bergen Risk Managers, on 07/11/2014 they were notified by Defendant Baginski that there were issues with the claim. As per an entry made on 07/23/2014 Risk Managers were again in contact with Defendant Baginski and Defendant Kudlacik. Baginski advised that the claim was under investigation and Kudlacik was advised that "nothing has been paid and we never heard from CLMT." On 08/01/2014 Bergen Risk noted "just waiting to see what Vic advises." '

As per the time-line of events, Defendant Kudlacik interviewed witness Michael Chermak on 7/21/2014. Witness Douglas Krause was interviewed on 07/22/2014 and Plaintiff was interviewed on 08/05/2014. Defendant Kudlacik failed to state in his report the dates when the video footage was obtained and reviewed. Since witnesses were not called in until 7/22/2014 and it is unclear the dates when the videos were reviewed, it calls into question how Defendant Baginski (who claims he had no involvement with the investigation or claim) knew on 7/11/2014 that there were issues with the claim?

Having reviewed the documents supplied to me by counsel for the Plaintiff, it is my opinion that Defendant Baginski was involved in the investigation of Plaintiff and did coordinate with Bergen Risk Managers. If is further my opinion that Defendant Kudlacik arrested Plaintiff absent probable cause and was acting in bad faith when he arrested Plaintiff and took away his liberties. No police officer acting in good faith would have arrested Plaintiff based on the fact pattern of this matter.

## V. Conclusion

There is no disputing that on July 03, 2014 Plaintiff was injured while responding to an emergency call in his capacity as a Wallington Fireman. There is also no disputing that prior to July 03, 2014 Plaintiff was a vocal critic of Wallington Borough Administrator Vic Baginski. As per Baginski's deposition testimony: When asked if he ever heard any one in town talking about

Fehl, Baginski stated yes. Baginski stated there were questions being asked of him 'what to do with him.' When asked what he heard other people say about Fehl, Baginski stated they don't know what to do about him. He is a bit of a rebel rouser in his own way. Page 35. Defendant Kudlacik was asked during his deposition if he ever heard from anyone through the grapevine that Fehl was complaining about people in Wallington on the internet; Kudlacik stated yes, he may have heard that, yes, Page 36. As per Defendants Baginski and Kudlacik's testimony, they knew Plaintiff was complaining about city officials and their conduct. Based on Baginski's testimony, parties within Wallington wanted Baginski to 'do something with Plaintiff.'

As a result of Plaintiff being injured on July 03, 2014 Lt. Kudlacik was tasked with conducting the investigation. Based on my review of Lt. Kudlacik's investigation, it is my opinion which I base on 33 years of police training, education, experience, and knowledge of police policy and procedures that Defendant Kudlacik failed to conduct a thorough investigation as he claims. I base my opinion on the following:

- Only one 4-page report was generated by Kudlacik in regard to this investigation
- No photos were ever taken of the actual scene
- Defendant Kudlacik never traveled to the scene
- Defendant Kudlacik failed to personally interview three witnesses, John Orme, Corey Mustac and "Andy"
- Defendant Kudlacik failed to secure Plaintiff's clothing
- Defendant Kudlacik failed to document the date and times of the canvass for video footage
- Defendant Kudlacik failed to direct his officers to canvass Stein Street in an attempt to locate additional video footage
- Defendant Kudlacik acknowledged that he lacked training and experience in insurance fraud investigations; he failed to request assistance from the BCPO
- Defendant Kudlacik failed to document his conversation with the BCPO
- Defendant Kudlacik failed to conduct a formal interview with Dorothy Siek (the person who handled the FROI report and forwarded it to Bergen Risk). Defendant claims he spoke to her but failed to document what was said. Page 56
- Defendant Kudlacik failed to seek input from anyone on how to investigate this matter. Page 58-60

Based on an incomplete investigation and lack of probable cause, Defendant Kudlacik took it upon himself to arrest Plaintiff. Based on all reports I have read, Defendant Kudlacik never discussed his decision to arrest Plaintiff with the BCPO or his own Chief of Police. Since Plaintiff was a volunteer Fireman and subject to official misconduct charges, recognized police practices and procedures would have been to consult with the BCPO and the Chief of Police prior to arresting Plaintiff; Defendant Kudlacik failed to do so.

Starting in the police academy and continuing throughout their careers, police officers are taught what probable cause is. When in doubt, they are taught to contact the local prosecutor's office for guidance.

As per the Police Training Commission:

INSTRUCTIONAL UNIT 5.2 Probable Cause UNIT GOAL The trainee will identify the concept of probable cause. PERFORMANCE OBJECTIVES 5.2.1 The trainee will identify the definition of probable cause as it pertains to: A. An arrest with a warrant; B. An arrest without a warrant; C. A search with a warrant; and D. A search without a warrant. 5.2.2 The trainee will identify sources for developing probable cause. 5.2.3 The trainee will identify problems with establishing probable cause through anonymous informants.[v]

INSTRUCTIONAL UNIT 5.3 Legal Requirements and Procedures of Lawful Arrest UNIT GOAL The trainee will identify the legal requirements and procedures for an arrest. PERFORMANCE OBJECTIVES 5.3.1 The trainee will identify the differences between: A. Hunch; B. Reasonable and Articulable Suspicion; C. Probable Cause; and D. Proof Beyond a Reasonable Doubt. 5.3.2 The trainee will identify the requirements of a legal arrest for a: A. Crime; and B. Offense. 5[vi]

Probable Cause: Probable cause for an arrest exist when the facts and circumstances within the officer's knowledge are sufficient to permit a prudent person, or one of reasonable caution, to conclude that there is a fair probability that a criminal offense is being or has been committed, and the suspect is or was the criminal participant. Illinois v. Gates, 462 U.S. 213, 230-31, 238,103 S. Ct 2317, 2328, 2332 (1983)

It has been described as a well-grounded suspicion or belief. Is a practical, non-technical probability.

State v Dangerfield

Schneider v. Simonini

The totality of the circumstances test.

a. State v. Bates, 202 NJ Super, 416 (App. Div. 1985). – To determine whether probable cause exists, a court will look at the totality of the circumstances – the whole picture to decide whether the total knowledge of all the officers at the time was sufficient to persuade a reasonable mind that there was a fair probability that a criminal offense has been or is being committed and the person to be arrested is or was a criminal participant.

b. Probable cause constitutes
Something less than proof needed to convict and something more than a raw
unsupported suspicion. [vii]

In my review of this matter I reviewed documents supplied to me by counsel for the Plaintiff, I
conducted a site visit of the accident scene on September 23, 2019 (where I met with Plaintiff
who walked me through the incident) and I interviewed Plaintiff. His description of events is
consistent with his deposition and other reports I have read. It is my opinion, which I base on my
training, education, experience, and knowledge of police policy and procedures that on the date
and time Defendant Kudlacik arrested Plaintiff he lacked probable cause to make such an arrest
and by doing so deprived the Plaintiff of his liberties in violation of his rights.

All of my opinions have been made within a reasonable degree of certainty regarding police
policy and procedures.

I reserve the right to amend and supplement this report in the event additional information and
documents become available to me.

Joseph J. Blaettler

ECPINJ

[i] Justia US Law Probable Cause

[ii] BCPO's Web-site https://www.bcpo.net/units-squads/white-collar-crimes-unit

[iii] New Jersey Code of Criminal Justice 2C:21-4.6

[iv] New Jersey Code of Criminal Justice 2C:28-7a (1)

[v] New Jersey Police Training Commission

[vi] New Jersey Police Training Commission

[vii] Laws of Arrest Search & Seizure Larry Holtz, Esq. 2015

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CIVIL ACTION # 2:17-CV-11462-KSH-CLW

IN THE MATTER OF

JOSEPH FEHL

Plaintiff,

vs.

BOROUGH OF WALLINGTON, et al

Defendants

REPORT OF GLENN M. MILLER

LAW ENFORCEMENT POLICY, PROCEDURES AND
PROFESSIONAL STANDARDS
CONSULTANT

1

## INTRODUCTION

The following report details my analysis of materials related to the civil action filed against the Borough of Wallington, et al, on November 9, 2017 by Joseph Fehl.

This report was developed by me, Glenn M. Miller, a law enforcement policy, procedures and professional standards expert. **(See attachment #1, resume of Glenn M. Miller)** I have reviewed all materials forwarded to my office by Ms. Mary C. McDonnell, Esq. of the firm of PFUND MCDONNELL, P.C., Ridgewood, NJ, the law firm representing the Borough of Wallington in this matter. A list of all materials that I have reviewed and relied upon in the formulation of my opinion and in the preparation of this document are listed in this report and can be found under the section entitled **"Materials Reviewed"**. The opinions that I have expressed in this report are based upon my detailed review of this material and my experience, knowledge and training in the generally accepted best practices in law enforcement.

## MATERIALS REVIEWED

In order to render my opinion in this case, I have reviewed the following materials related to this matter.

1. Complaint CIVIL ACTION # 2:17-CV-11462-KSH-CLW
2. Bergen County Superior Court Trial Testimony, ref. Indictment #S-323-15, trial of Joseph Fehl, transcripts dated, January 11, 2018, January 16, 2018 and January 17, 2018
3. Interrogatory responses from Captain Kudlacik, dated, 9/11/18
4. Wallington Police Department (WPD) Incident Report Form, WG-14-05584 completed by Lieutenant Kudlacik, 4 pages, updated, 8/6/14
5. Copy of Complaint Warrant W-2014-000104 charging Joseph Fehl with Insurance Fraud and Making a False Report to Police, dated, 8/5/14
6. Waiver of rights form signed by Joseph Fehl on 8/5/14
7. Handwritten statement of Corey Mustac, dated 7/3/14
8. Handwritten statement of John Orme, dated 7/3/14
9. Timeline of video review from 27 and 55 Park Row completed by Lt. Kudlacik
10. Copies of photos of vehicles obtained from video review of 27 and 55 Park Row
11. Voided Accident Report # WG-14-05584 completed by Ptl. Zielinski ref. to alleged hit and run accident involving Joseph Fehl
12. Bergen Risk Managers Supervisory Safety Report (electronic) completed by David Kaczor, dated 7/23/14
13. Bergen Risk Managers First Report of Injury Form (electronic) detailing injury report of Joseph Fehl, dated 7/11/14, completed by Dorothy Siek
14. Bergen Risk Managers First Report of Injury Form, handwritten, detailing injury to Joseph Fehl on 7/3/14
15. New Jersey Bail Recognizance Form for Joseph Fehl, dated, 8/5/14
16. Bergen Risk Managers letter denying Joseph Fehl's claim from Sharon McCaffrey, dated 8/6/14
17. Cliffview Pilot article detailing Joseph Fehl's arrest, dated 8/6/14 written by Jerry Demarco
18. Workmen's Compensation First Report of Injury/Illness Form 1A1OSHA for Joseph Fehl
19. Transcribed deposition of Witold Baginski, dated 7/16/19
20. Transcribed deposition of Dorothy Siek, dated 5/28/19

3

21. Transcribed deposition of Joseph Fehl, dated 6/4/19
22. Transcribed deposition of Shawn Kudlacik, dated 5/9/19
23. Transcribed deposition of Sharon McCaffrey, dated 2/25/19
24. Report prepared by Joseph Blaettler, dated 9/24/19
25. Statement of Michael Chermak to Lt. Kudlacik, dated 7/21/14
26. Statement of EMS Lt. Douglas Krause to Lt. Kudlacik, dated 7/22/14
27. Statement of Joseph Fehl to Lt. Kudlacik, dated 8/5/14
28. MICCOM report #14-801618 for treatment of Fehl on 7/3/14
29. Wallington EMS report #14-04584 for treatment of Fehl on 7/3/14
30. Copy of Indictment #S-0323-15 ref. BC Grand Jury Indictment of Fehl
31. Hackensack University Medical Center Admission Record for Fehl on 7/3/14
32. Borough of Wallington Chapter 80, "Length of Service Awards"
33. Goggle map of area alleged incident occurred
34. *Illinois v. Gates*, 462 U.S. 213 (1983),
35. NJ Statutes 2C:21-4.6a and 2C:28-7a(1)
36. NJ Police Training Commission "Basic Course for Police Officers"

## I. REVIEW OF INITIAL INCIDENT, 7/3/14

On July 3, 2014, Joseph Fehl was with two friends at the Wallington Fire Company #203 which is located at the intersection of Park Row and Adamson Streets in the Borough of Wallington. His two friends, John Orme and Corey Mustac, a Rutherford volunteer firefighter had arrived to meet with Mr. Fehl, himself a volunteer firefighter and First Aid Squad member in Wallington around 11:30pm, shortly after another Wallington Firefighter had left the firehouse. Mr. Fehl was a member of Fire Company #203 on this date. Allegedly the three of them sat in the fire house and watched television. Mr. Mustac recalled he was watching a food show when he was there. Mr. Fehl allegedly left the firehouse at some point, leaving the two non-members inside the firehouse by themselves. Mr. Fehl allegedly left to get a bag of potato chips at the nearby 7-11 Store. When he was driving back to the firehouse after obtaining the chips, he claims to have received a page for a first aid call. He arrives back at the firehouse, parks his car and goes into the firehouse to tell his friends he has a first aid call to respond to and that they should stay in the firehouse even though there was not a Wallington Fire Department member present. He drops off the potato chips to his friends, receives a second tone for the first aid call and allegedly leaves the firehouse to respond to that call. Mr. Fehl claims to see a small black car "whipping" around the corner of Adamson

4

coming from Park Row while he is going to his vehicle which is parked on Adamson. The small black car allegedly strikes Mr. Fehl on Adamson and leaves the scene. Mr. Fehl alleges he was thrown onto the hood of the car and carried approximately 20 feet until he fell off the car and ended up on the street. He reported to WPD that the car traveled to Stein Avenue and turned onto Main Street. Mr. Fehl alleges he blacked out for a short period of time after he was struck but when he came to, he contacted the WPD via his cell phone and advised them he had been struck by a car which had fled the scene. He also called his First Aid Squad (EMS) supervisor (Lt. Krause) to advise him he had been struck by a hit and run vehicle and injured while responding to an EMS call. An officer from Wallington Police arrives at the scene shortly after Mr. Fehl's call to WPD and commences an investigation. Mr. Fehl changes his story when questioned by this officer and could no longer provide any information on the vehicle that allegedly struck him. EMS and Paramedics arrive and begin treating Mr. Fehl's injuries. He is taken to Hackensack Hospital where he is eventually admitted. Mr. Fehl had told several EMS personnel at the scene that he was struck by a vehicle while going to his truck to respond to the EMS call. Eventually Hackensack Hospital personnel were provided the same information.

Investigation at the scene by Officer Zielinski on this night revealed no evidence that could be used to substantiate Mr. Fehl's claim of a hit and run, i.e. no witnesses, no physical evidence or debris on the roadway, no valid description of the involved vehicle, no skid marks and no evidence of any substantial injury to Mr. Fehl.

Eventually, Detective Lieutenant Shawn Kudlacik is detailed to continue this investigation and ascertain if he could find the vehicle that allegedly struck Mr. Fehl. A neighborhood canvas of the area where the alleged accident occurred was conducted by members of the WPD and two residential videos (27 and 55 Park Row) were located. A review of those videos revealed no vehicle turning onto Adamson St. during the time period Mr. Fehl alleged he was hit by a car. Mr. Fehl had told police and others the vehicle that struck him came from Park Row and turned onto Adamson and these two residential videos would have shown the vehicle making that turn. In fact, the only vehicle observed turning from Park Row to Adamson was Mr. Fehl's vehicle and that was approximately 6 minutes before Mr. Fehl contacted WPD about the hit and run accident. It should be noted the time stamps on the residence videos may not exactly coincide with the police receipt of the emergency call from Fehl. However, Mr.

5

Fehl advised he had just returned to the firehouse from the 7-11 Store several minutes before he left the firehouse for the EMS call and was allegedly struck by a vehicle. This information confirmed the residential videos were from the same time period in question as Mr. Fehl's vehicle is seen making the turn from Park Row onto Adamson shortly before he contacted the WPD about the alleged accident.

Mr. Fehl eventually completes a First Report of Injury Form (FROI) in his own handwriting and using the information he submitted, with some additional information required to submit the form added by Dorothy Siek, it is electronically submitted to Bergen Risk Managers on 7/11/14.

On August 5, 2014, Mr. Fehl is interviewed, after being given his Miranda Warnings by Lt. Kudlacik at WPD. Although he acknowledges during the interview he may have tripped and fell, he maintained the fact that he believed he was struck by a vehicle. Lt. Kudlacik, after consultation with the Bergen County Prosecutor's Office charged Mr. Fehl with Insurance Fraud and Filing a False Police Report. Judge Sondey was contacted and determined there was probable cause to issue a warrant (1621 hours, 8/5/14) and bail was set at $2,000 with 10%, which Mr. Fehl eventually posted and was released from the WPD.

A Bergen County Grand Jury indicted Mr. Fehl on the charges reference to Indictment #S-323-15. In January 2018, after several days of testimony, Mr. Fehl was found not guilty of the charges by a jury.

## II. REVIEW OF CIVIL COMPLAINT FILED BY JOSEPH FEHL ON NOVEMBER 9, 2017, REF. # 2:17-CV-11462-KSH-CLW

Mr. Fehl filed this action under both Federal Title 42 USC{1983 and New Jersey Title 10:6-2, both civil rights violations. He alleges in his complaint that as a result of his exercise of free speech, he was retaliated against resulting in his arrest and prosecution. Although I will not examine each item of "Factual Background", nor will I examine each Count contained in the action, I will address some of the more significant areas where I believe there are either inaccuracies or no factual basis for the relevant statement(s).

1. In both Factual Background # 19 and #20, Mr. Fehl alleges that Mr. Baginski made comments at the Wallington Fire Department's (WFD) monthly meetings that Fehl should be removed from the WFD based upon a civil action Fehl had taken against a previous municipality in which he was a volunteer firefighter. There is absolutely no evidence or testimony from any WFD member, except Mr. Fehl, that Mr. Baginski ever attended these meetings, although he was a WFD volunteer firefighter. In fact, Mr. Baginski testified under oath during his deposition that "I don't attend these meetings" (Page 33) when asked about the WFD monthly meetings.

2. In Factual Background #23, Fehl alleges that Baginski "barred" him from putting in a bid on a hydroseeding project at Centennial Park in May 2012. This is simply false, and Mr. Fehl acknowledged this is not true. In Mr. Fehl's deposition he was asked if he put a bid in for this project. Mr. Fehl stated, "Yes, I did." (Page 53) The fact he did not get the job may be for several reasons, i.e., not the lowest bid. Mr. Fehl could have accessed public records to see which company did get the project and what was the amount of the contract for the hydroseeding project. This is public information. He never alleges his bid was the lowest bid which I think he would have if that was the case. So, Mr. Fehl makes this allegation without any substance and alleges Mr. Baginski orchestrated this action because Baginski did not like Fehl. There are strict state guidelines for purchasing and I am reasonably certain that Mr. Baginski, knowing all this information is publicly accessible, would not discard a bid without a basis to do so according to purchasing guidelines. Mr. Fehl was not "barred" from putting a bid in for this project. For whatever reason, all of which would be publicly available under OPRA he did not receive the project.

3. Factual Background #s 26-32 are in reference to WFD dive suits that were damaged as a result of Superstorm Sandy. It alleges an insurance claim was filed regarding these suits and that the suits were never purchased. Fehl also alleges that Baginski "misappropriated" the insurance money received for these damaged suits. Mr. Baginski testified that although he would sign off on all purchases for the WFD along with the Fire Commissioner he did not decide how money was spent in that department. It is common in many government agencies to have a "purchasing agent", which is someone familiar with the guidelines for making purchases. Baginski testified at his deposition that the "Fire Commissioner had control over the budget" referring to the WFD. He did not have that control or authority although he

7

would co-sign with the Commissioner any purchases the WFD made. If there was any "misappropriation" of insurance funds, it would not have been Mr. Baginski doing it. It would have been the Fire Commissioner. It should be noted that Fehl admits the dive suits were purchased however were never picked up according to his testimony during his deposition. He stated, "…suits are still…were still waiting to get picked up. They were ordered." (Page 58). It should be noted that for a government entity to order any equipment or service there needs to be money in a budget. Once the equipment/service is ordered, that money is then encumbered so it can not be re-spent. That is the government purchasing process. So, if they were ordered, as alleged by Mr. Fehl, it is not Mr. Baginski's job to pick them up. That would be up to the WFD.

4. Factual Background # 39 alleges that Fehl "ran" out of the firehouse when he was responding to an EMS call on 7/3/14. In response to a question during his deposition if he was walking or running when he left the WFD to respond to an EMS call he stated, "To be honest with you, I don't remember if I was running or if I was walking fast" (Page 74). However, in the civil complaint, as a "Factual Background", all of sudden Fehl remembers he "ran" out of the WFD to the call. Again, there is absolutely no factual basis to state he "ran" from the WFD and that is according to Mr. Fehl's own testimony under oath.

5. Factual Background #s39 and 42 indicate that Fehl remembers seeing headlights and a small dark compact car (39), and "reasonably believed that he had been struck by a car" (42). Fehl had originally made similar statements to the WPD when he called them for assistance and also made a similar statement to the first responding police officer on 7/3/14. Although he may have somewhat changed his story during the course of the investigation and indicated it was "possible" he may have fallen as opposed to being struck by a vehicle, he still "reasonably believed" he was struck by a vehicle. I have interviewed many victims of vehicle collisions and the ones that could speak, never told me they "reasonably believed" they were struck by a vehicle. There was never any question is their respective minds that they were struck by a vehicle unless they were so drunk or drugged that they did not know what happened to them. It is not unusual that the victim may not know what the vehicle looked like or be able to give a good description of the vehicle that hit them. Mr. Fehl advised he was not intoxicated or under the influence of drugs on the night of July 3, 2014. So,

8

why does he say he "reasonably believed" he was struck by a car. Is it because he knows that the police investigation revealed there was no vehicle in the area that could have hit him? Did Mr. Fehl get caught in a lie as to how he was injured on the night of 7/3/14 as a result of the police investigation? It would certainly appear he did and now only "reasonably believed" he was struck by a car. If you are hit by a car, absent a state of severe intoxication, it is not reasonable for anyone to believe you don't remember being hit by a car. Mr. Fehl is pretty clear on his recollection of events for the entire evening of his injury and only becomes unclear when confronted with the fact there was no car available to hit him.

6. Factual Background #s 45, 47, and 53 involve the filing of the workmen's compensation paperwork for the injury Mr. Fehl alleged he received on 7/3/14. He claims he was required to complete the paperwork, that he did not intend to file any claim and he never submitted anything to Bergen Risk Managers (BRM) involving his injury. The real fact is that he did complete a First Report of Injury (FROI) form on 7/11/14 in his own handwriting whether he was required to or not. Since the form needs to be submitted electronically, it is a common practice that an employee familiar with that electronic submission would complete the submission for the injured employee. The fact several areas were not completed on Fehl's submission but were completed on the electronic submission have no relevance on the claim. The fact that Fehl indicated in his handwritten FROI form that he was injured because he was "hit by car going to EMS call" is false. The police investigation clearly determined that is not true and this statement is false, despite what Mr. Fehl now "reasonably believed". As stated by Sharon McCaffrey, BRM supervisor, in her deposition "as long as we know it's not correct, (referring to the FROI) we wouldn't pay" (Page 100). The form submitted by Fehl on 7/11/14 in his own handwriting contained false information and therefore the claim should have been denied. It should be noted that Mr. Fehl did contact BRM several times after he received a letter from them denying his claim and asking why his medical bills have not been paid. If he never intended on filing a claim, as he indicates, why would he contact the agency to which he filed the claim (BRM) asking why they have not paid the claim he said he did not file? The fact is that he did submit a FROI which is a workmen's compensation claim and that claim was denied due to a false statement on Fehl's handwritten submitted form.

9

7. Factual Background #57 indicates that Mr. Baginski and others "conspired to frame Plaintiff for insurance fraud" based upon Fehl's allegations that Baginski misappropriated funds received for dive suits. I have already addressed the dive suits and the real fact that Baginski had nothing to due to with the WFD budget or their purchases. The Fire Commissioner is responsible for that. So, the question would be how did Baginski and others "frame" the Plaintiff? The police conducted an investigation into an alleged hit and run accident and determined there was no hit and run accident. The Plaintiff filed a claim for his injuries allegedly sustained during the hit and run accident that did not occur. How did Baginski or anyone "frame" him? Mr. Fehl's filing of a false claim is the reason he was arrested and charged, and Baginski would have had nothing to do with that as the Business Administrator.

8. Factual Background #59 indicates that Baginski, "instructed, coerced, conspired with or directed that a criminal investigation be commenced against Plaintiff…" In my nearly 20 years of experience as a law enforcement executive, civilians, i.e. Baginski, do not direct or instruct any police officer on who to investigate or when an investigation should commence. If anything, Baginski would have asked the Chief to follow up on the alleged hit and run accident as it was one of Wallington's volunteer EMS personnel but my experience is that would not have been necessary. There is always a close bond between first responders and when one gets injured by the action of another, the investigation becomes a priority. It appears WPD did have another significant investigation (bank robbery) around this same time but once they concluded that investigation, resources were diverted to this investigation. WPD did not start the investigation thinking Mr. Fehl had provided a false report to them, i.e. a hit and run accident. They were looking for video that might help them determine a make or model of a suspect vehicle. When they determined there was no suspect vehicle, the alleged victim became a potential suspect and a criminal investigation commenced. That is how law enforcement proceeds in situations such as this incident. They don't go out to prove the victim is lying. They want to locate the perpetrator. The WPD investigation determined that there was no perpetrator except the alleged victim himself. In my opinion Mr. Baginski did not direct anything that the police did regarding this investigation. The police properly conducted the investigation and the facts provided WPD with the probable cause that resulted in the arrest of Mr. Fehl.

10

9. In Factual Background #66 Fehl alleges that "At no point, however, did Plaintiff specifically state(d) how he knew how he was injured." The basis for this information is from the statement taken from Fehl by Lt. Kudlacik on 8/5/14. But this is not a true statement. On 7/3/14 he had told the police and EMS personnel that he was struck by a vehicle that had departed the scene. He completed the FROI on 7/11/14. In Fehl's handwritten FROI he writes that he was "hit by car going to EMS call" so Lt. Kudlacik knew what Fehl had already stated. He knew Fehl had already filed a false report and although the Lieutenant, during his interview and subsequent statement gave Fehl the opportunity to change his false report and tell the truth he did not.

10. Factual Background #77 indicates that Mr. Fehl would have been covered by Workmen's Compensation even if he had slipped and got injured while responding to the EMS call. Based on my experience, if Mr. Fehl had indicated to the police that he slipped and fell while responding to an EMS call and he was injured, he probably would have been covered under that insurance. However, when someone falsely reports an on-duty injury, a reasonable person would be suspect of how the injury actually occurred. Why would someone concoct a hit and run accident if he fell? Did he think he would get more attention or recognition due to the fact he was injured during a hit and run accident? Was he embarrassed to say he slipped and fell while running to his car? When a person's credibility is compromised, as I believe is the case with Mr. Fehl, it would lead a reasonable person to suspect how and when the injury occurred. Did it occur when he and his two friends were horse playing inside the firehouse earlier that evening? Is it reasonable to assume three grown men were sitting around the firehouse in the middle of the night watching the food channel for several hours? Did Mr. Fehl have a tow truck call he got hurt on earlier that evening? Did he slip and fall? Did he get into a fight? Only Mr. Fehl knows the real way he was injured and if he was injured while he was responding to an EMS call, he should have reported exactly what happened, then he would have been covered by insurance. The real fact is, he did not and the WPD investigation determined he was not telling the truth.

11. Factual Background #77 indicates that Captain Kudlacik "failed to perform an adequate professional and competent investigation". My experience in nearly 42 years of law enforcement both conducting and supervising many types of investigations, I believe Lt. Kudlacik did conduct a very competent

11

investigation. Could additional investigative work have been done on this investigation? My experience is that in almost every investigation I have been involved with there is always something else that could be done. But law enforcement has limited resources and can't make every investigation the "Kennedy Assassination" investigation. It's just not possible. Based on the information I have reviewed, including Lt. Kudlacik's police report the investigation was conducted in a professional, thorough and very competent manner and within accepted best practices for law enforcement.

12. Factual Background #78 claims that Lt. Kudlacik "ignored information exonerating Plaintiff". This claim does not provide any facts to support such an allegation. Is the Plaintiff alleging that Lt. Kudlacik did not take into account interviews that were conducted, for example of the EMS members? If that is the allegation, what relevance would that information have to the crimes being investigated? The EMS personnel said Fehl had injuries. There is little dispute that he had injuries, although the seriousness of those injuries was questioned by some. His friends at the firehouse did not see what happened, allegedly. What information not included in the police investigation could have exonerated Fehl? The fact his injuries may have resulted from a fall or that he "reasonably believed" he was hit by a car? He advised police and submitted paperwork indicating he was hit by a car. I don't see what information may have exonerated Fehl that Lt. Kudlacik did not include in his investigation? Since the complaint does not provide what that exonerating information may be, it is very difficult to respond to this claim.

13. Factual Background #80 indicates that Kudlacik attempted to fabricate, alter, modify or create evidence against Fehl. The complaint alleges his questioning "was calculated to accomplish this end" that being the arrest of Mr. Fehl. The complaint does not specifically state what evidence was created or modified, nor what questions were asked that were not appropriate. When Fehl was questioned during his deposition in regard to what evidence was fabricated, Mr. Fehl indicated, "I don't know" (deposition, page 133). If he doesn't know what was fabricated why was it alleged in the civil complaint? Anyway, from all the documents this writer has reviewed I have seen no indication of anything that was fabricated or created that lead to the arrest of Mr. Fehl. Quite the contrary, the investigation followed a logical path that would be considered reasonable and professional in the law enforcement profession. In fact, during

12

questioning of Mr. Fehl, it is possible Lt. Kudlacik was giving Fehl an opportunity to change his story so he would not face criminal charges. Kudlacik had no personal issue with Fehl as acknowledged by Fehl in his deposition when asked about Kudlacik and he responded, "everything was fine" (Page 48). Maybe Lt. Kudlacik would have preferred to have this incident handled administratively due to the fact Fehl was a WFD and EMS member and they did have a business-friendly relationship?  But there is nothing in the information I reviewed to indicate anything was done inappropriately or that any evidence was fabricated by Lt. Kudlacik.

14. Factual Background #82 indicates that Mr. Fehl was "imprisoned" until he was released on bail. This is quite an embellishment of what really occurred during Mr. Fehl's arrest.  Fehl was charged on 8/5/14 after Judge Sondey found probable cause to issue the warrant and bail was set by the Judge at $2,000 with 10%. Fehl was given the opportunity to contact a friend and have them post the $200 judicially required bail.  Between processing and waiting for his friend to post bail, Mr. Fehl may have been at the WPD a couple of hours after his arrest. There is no indication he was ever placed in a jail cell at WPD and he was not transported to the Bergen County Jail. To make the embellished allegation he was "imprisoned" implies he was in some type of prison which is certainly not the case. The WPD were following accepted criminal justice procedures that were in place in July 2014. If Mr. Fehl could not have posted bail, he would have been "imprisoned" in Bergen County Jail.  He was detained not "imprisoned" at the WPD while the WPD followed normal law enforcement arrest and processing procedures.

15. Factual Background #84 indicates that Lt. Kudlacik provided false and misleading Grand Jury testimony. When Fehl was questioned about this allegation during his deposition he stated it was 'all because of the statement he asked me, is it possible and anything is possible." This is in reference to how his injury occurred and the statement he made to Lt. Kudlacik. It should be noted that Fehl indicated he never read the Grand Jury testimony (page 134).  To allege that a police officer provided false testimony under oath is a very serious allegation and could cost an officer his/her career.  As with many of the other factual background allegations in this civil complaint, this one lacks any substance or credibility and even Mr. Fehl does not know what false testimony Lt. Kudlacik gave to the Grand Jury since he never read the testimony transcript.

13

16. Although there are many other Factual Background statements in the civil action, I have only addressed those where there appears to be some contradiction to the facts in this case or no factual substance to support the allegation. Others may also contain factual inaccuracies, but I have only addressed the most substantial of those. One issue I will address at this time is the allegation by Fehl in his deposition (page 44) that Baginski would not submit his LOSAP paperwork. LOSAP is a state-wide program that provides some potential monetary benefits to a volunteer fireman or EMT for their service. Wallington has endorsed the program and provides for a maximum benefit of $1,150 per year if the volunteer has participated in a specified number of events/responses in that year. Wallington Borough Code #80, "Length of Service Awards" covers the LOSAP distributions. Code #80-3, "Eligibility Criteria" clearly states that a member (80-3B) needs to have five (5) years of service for vesting. Mr. Fehl joined the WFD in January 2009, so he would not have been vested until January 2014, five years later. If Fehl had not been suspended in July 2014, he would have been eligible for the LOSAP distribution at the end of 2014, assuming he met the specified amount of activity during that year. He would not have been eligible for LOSAP distributions prior to that time as he was not in the WFD or WEMS for five years so Baginski would not have submitted that paperwork because the WFD would not have put Fehl's name on the eligible list that was supplied to Baginski annually by the WFD.

17. Next, I will examine some issues that were alleged in the various counts that are contained in the civil complaint and focus more specifically on several allegations in the 9 counts contained in the suit that are the basis for each respective count. The First and Second Counts of the complaint allege false arrest. Simply stated, the Counts allege there was not probable cause to established to file charges, arrest or prosecute Mr. Fehl. In my opinion and as I have documented later in this report under **Section IV,** "Establishment and Documentation of Probable Cause", there was ample probable cause to arrest and charge Mr. Fehl for the crimes he was charged with.    Also, included under these counts is the allegation that Kudlacik conspired with Baginski or was directed by Baginski to arrest and charge Fehl. As previously stated in this report, law enforcement does not report to or need to seek the approval of Business Administrators or Managers to conduct an investigation or make an arrest. It is not reasonable to assume in this instance Baginski directed this investigation. Both Baginski and Lt.

14

Kudlacik denied this occurred and there is no evidence to contradict their testimony under oath to indicate this occurred.

## III. REVIEW OF JOSEPH FEHL'S ACCOUNTS OF HIS INJURIES

- 7/3/14, approximately 1:33am, a cell phone call is made to the WPD advising WPD Lt. Michaels that a car just hit me (Fehl) and took off. He claimed it was a black older car.
- 7/3/14, approximately 1:40am, he contacts his EMS supervisor via his cell phone and advises his EMS Lieutenant and friend, Douglas Krause that he was struck by a vehicle as he was coming out of the firehouse.
- 7/3/14, approximately 1:45am, he advises responding WPD Officer Zielinski that a vehicle that had come from Park Row turned onto Adamson, struck him and made a right turn onto Stein heading towards Main.
- 7/3/14, unknown time, he again advises EMT Lt. Krause that the vehicle that struck him came from Park Row onto Adamson and whipped around the corner. First, he said it was a black vehicle then he changed his story to a dark colored vehicle.
- 7/3/14, approximately 1:45am, he advises EMS responder Michael Chermak, that a vehicle "came around the corner off of Park Row… made a right onto Adamson". He then advised Chermak that "he (Fehl) went to the corner of Stein and Adamson to see if he could see the vehicle that struck him." He said he "collapsed about 75 feet from the corner of Adamson" (page 3 Chermak statement). It should be noted that in Mr. Chermak's statement to Lt. Kudlacik on 7/21/14, in response to a question about Fehl's injuries that evening, Chermak stated, "There was no way he was boost (ed) twenty feet because how would you do that and walk down to Stein Ave. to see if the vehicle was there, then crawl back to the spot where you got hit." (Page 8)
- 7/3/14, approximately 2:00am, he advises the responding Paramedics (Buta and Chinnici) that he was struck by a vehicle after he exited his vehicle (ALS Report)
- On 7/3/14, unknown time, he advised Corey Mustac that he had been struck by a vehicle who left the scene.
- On 7/3/14, at various times, he advises various Hackensack Hospital employees that he had been struck by a vehicle.
- On 7/11/14, he completes and submits, in his own handwriting, a FROI form that he was "hit by car going to EMS call".

15

- On 7/23/14, his EMS supervisor, David Kaczor submits a supervisory form for Workmen's Compensation on which Mr. Kaczor states Fehl, "was crossing the street to answer a call and got hit by a car."
- On 8/5/14, in a statement to Lt. Kudlacik, he said that "I walked outside, and I walked out, and somebody came flying around the corner and that was it" (page 4). Fehl advised later in the statement that the corner he was referring to was Park Row and he was crossing Adamson in route to the EMS call. He told Lt. Kudlacik it was "a dark colored car". He also advised he did not know if he went up (on hood) or if the car dragged him when he was struck.
- On November 9, 2017, in his Civil Action complaint, he maintains that he "reasonably believed" he was struck by a hit and run vehicle.
- On June 4, 2019, during his deposition, Fehl appears to have changed his story about the vehicle that struck him. He said the "vehicle came from Adamson by Stein" and he was struck on his right side (page 75). He said the car that struck him "didn't go straight. It must have backed up because there was a car here that sped off quick." (page 78). He said, "I guess I went up on the hood and when they sped out (off), I fell right over here" (pointing to a map of the area, page 79). It appears Fehl is saying the vehicle that struck him now came from Stein, (not Park Row) hit him and then turned around and went back to Stein.

Based on my review of the reports, depositions, trial testimony and official reports, it appears that Mr. Fehl gave many individuals the story that he was struck by a car. Even after confronted by Lt. Kudlacik on 8/5/14 (Fehl advised the Chief of Police had showed him the videos the day before he gave the statement to Lt. Kudlacik where there was no indication of a vehicle turning from Park Row onto Adamson) he continued to maintain that he "really thought I got hit by a car" (page 23). Well, what story should we believe? The first story that he told the police when he reported the accident? The second story; The car dragging him 20 feet (or 40 feet); the small black or dark colored car whipping around the corner of Park Row; he chased the car to the corner of Adamson and Stein; or maybe, after nearly 5 years Fehl says the car came from Stein onto Adamson and then turned around, after it struck him? Is that because he now knows the police could not locate any residential videos from Stein and if the alleged vehicle did not turn around on Adamson after it struck Fehl it would have been captured on the 55 Park Row residence video? Is it possible for someone, who was not intoxicated to not know if they were hit by a vehicle? Especially if they were "dragged" or "boosted" by the car. A reasonable person could never believe someone would not know if they were struck by a vehicle. It's just not a reasonable assumption. I have never

16

encountered a sober accident victim who "reasonably believed" they were struck by a vehicle. They were either struck or not. However, Mr. Fehl, not realizing police would complete a diligent and thorough investigation by locating videos of the area was caught in a lie. A lie he refused to retreat from despite overwhelming evidence a hit and run could not have occurred. Now, he tries another story during his deposition. One, that I might add is even less believable than the original. That is, a car strikes a pedestrian, stops the vehicle, turns it around and heads back in the direction it came from. My experience has been that hit and run vehicles flee from the scene as fast as possible. They don't stop and turn around and then flee. No reasonable person would believe that.

I think it is also necessary to examine the alleged injuries of Mr. Fehl. A couple of minor abrasions, a small laceration to the head and pain in his legs. Are these the injuries of someone who has been hit by a car that came "whipping" around the corner, then either dragged by or carried on the car 20-40 feet until he came to fell off? My experience in investigating and supervising the investigation of pedestrian accidents as described by Mr. Fehl is that significant bruising and contusions would be present in the area he was struck (he says right side) and the head trauma would be much more significant. He would probably have significant abrasions on his legs, arms, hands and face from sliding on the pavement. But he did not have these injuries. Mr. Krause, an experienced EMS and friend of Fehl did not believe the injuries matched a vehicle/pedestrian collision. In fact, Mr. Krause said that the Paramedics told him that Mr. Fehl's lack of injuries "was like a miracle. Quote miracle". (Page 26) Mr. Chermak, an experienced EMS did not believe it. Dr. Kelly Rippy, Hackensack Medical Center Trauma Surgeon with 15 years of experience did not believe his injuries. Mr. Fehl's injuries just do not coincide with a pedestrian being struck by a vehicle at the speed Mr. Fehl had claimed the vehicle was traveling.

Additionally, a reasonable person would assume, based upon the stories Mr. Fehl has given to different people regarding the alleged accident, that there would be some vehicle debris at the scene. Mr. Fehl is approximately 5'9" tall and at the time weighed close to 200 pounds. He's the size of a very large deer. When a deer is struck by a car, there is significant damage to a car (and the deer) and usually debris would be found at the scene. However, nothing was found at this scene. Of course, it's possible debris would not be left at the accident scene, but it's much more probable based on Fehl's accounts of the alleged incident that there would be some debris left at the scene from the striking vehicle.

17

Lastly, Mr. Fehl's cell phone was not damaged? He is allegedly struck by a vehicle, thrown or dragged 20-40 feet and his cell phone remains intact and operational? No where in any report or deposition was there any indication that Mr. Fehl's cell phone was damaged. Is it possible that it was not damaged? Of course, anything is possible, but again, not probable if Mr. Fehl's accounts of the hit and run are to be believed. In fact, he had it readily available to make a phone call to the WPD and Lt. Krause minutes after the alleged incident. I also believe Mr. Fehl wore eyeglasses at the time of this incident. I believe they were found on the roadway a short distance away from where Mr. Fehl was located by first responders. Were they damaged? Did Mr. Fehl need them to make the two calls on his cell phone we know he made? Again, it is reasonable to assume eyeglasses would be damaged if Mr. Fehl's account of the incident is factual.

In summation, only Mr. Fehl knows how he was injured on 7/3/14 and why he did not tell the truth about those injuries. However, there is absolutely no evidence to indicate he was struck by a motor vehicle who fled the scene.

## IV. ESTABLISHMENT AND DOCUMENTATION OF PROBABLE CAUSE

The Supreme Court in the case, *Illinois v. Gates*, 462 U.S. 213 (1983), decided that probable cause is not necessarily one factor but needs to be decided by the "*totality of the circumstances*" known to the police at the time. Justice Rehnquist writing the opinion for the Court stated:

*We agree with the Illinois Supreme Court that an informant's "veracity," "reliability" and "basis of knowledge" are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case... [T]hey should be understood simply as closely intertwined issues that may usefully illuminate the common sense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.*

In the United States criminal justice system, **probable cause** is the standard by which police have the justification to obtain a warrant for the arrest of a suspected criminal. It is also the standard by which a Grand Jury would use in deciding

18

whether to indict a person. The term comes from the Fourth Amendment of the US Constitution:

*"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."*

In New Jersey, law enforcement is taught the concept of probable cause in their Basic Police Academy Training. They also learn the concept of probable cause through their experience in dealing with criminal investigations, from other experienced police officers, prosecutors, judges and various in-service trainings. They are also taught that without probable cause you cannot make an arrest, nor can you apply for a search warrant. If you do, you are taught there are serious criminal and civil penalties. There are safeguards in place in our New Jersey criminal justice system to ensure a warrant is not issued without sufficient probable cause. For example, for a warrant to be issued, an independent judicial authority must be contacted, and that judicial authority must review the probable cause being submitted by the police and agree with the police that there is probable cause.

Also, in many instances before the issuance of a warrant the respective County Prosecutor's Office must be contacted, and an Assistant Prosecutor must approve the probable cause for the issuance of a warrant prior to its submission to a judicial authority. If the warrant is being issued for an indictable crime, County Prosecutor's Offices have a unit (many call it the Case Screening Unit) that reviews every indictable crime that is charged in that respective county. This unit typically includes Prosecutor's Detectives or Agents and Assistant Prosecutors. If this unit does not believe there is sufficient evidence to convict the defendant (a much higher standard than probable cause) of the respective charge(s) in a jury trial, they have several options. The first option would be to dismiss the case. The second option would be to downgrade the indictable charge to a disorderly persons' offense where the case would then be heard in a Municipal Court. The third option would be to conduct additional investigation or obtain additional evidence that would assist the case at trial. There is no requirement that an indictable charge against a defendant be presented to a Grand Jury. Prosecutors would be violating their ethics if they brought a case into a Grand Jury seeking an indictment knowing there was not probable cause and reasonably believing the case could be won at a Superior Court trial. In my experience in working with all 21 County Prosecutor's Offices and the State Attorney General's Office in my

19

nearly 42 years of law enforcement experience on many different criminal investigations, I have never experienced a prosecutor that did not take their ethical obligations very seriously. A prosecutor will not take a case into Grand Jury seeking an indictment without having probable cause <u>and</u> a reasonable belief that case could be won at a Superior Court trial.   It is important to note there is a significant difference between having probable cause which is the standard for issuance of a warrant or indictment, and proof beyond a reasonable doubt which is the standard for a conviction of a crime.

I think it is important to examine the specific information relevant to this investigation as they relate to probable cause. I will list below the various areas of probable cause that are available in this case and based upon the "totality of circumstances" standard from the US Supreme Court, those areas need to be examined as a total package, not as a singular event.

- Fehl contacts WPD advising he has been hit by a car on Adamson near the WFD, Station 203, and the vehicle has left the scene heading toward Stein St.
- Fehl advises the responding WPD officer (Zielinski) that he was struck by a vehicle that came whipping around the corner from Park Row onto Adamson where he was struck by the vehicle. He first claimed it was a black colored vehicle that struck him, and after he was struck by that vehicle, he went onto the hood of the vehicle which carried him about 20 feet before he fell off it.
- Fehl later tells the first responding WPD officer that he is not sure of the type or color of the vehicle that struck him.
- Fehl claims injuries to his right side although there were no visible injuries other than several scrapes on his arm and hand, and a small laceration to his head.
- Officer Zielinski checks the scene for evidence, and nothing is located. There were no skid marks, no debris from a vehicle, no witnesses other than Mr. Fehl nor any visible evidence on Mr. Fehl.
- Mr. Fehl tells other EMS, Paramedics and hospital personnel that he was struck by a car on Adamson as he was responding to a first aid call.
- Mr. Fehl completes a First Report of Injury Report on July 11, 2014 and claims he was struck by a vehicle while he was responding to an EMS call.
- WPD conducts a canvas of the neighborhood in the surrounding area of the scene of the alleged hit and run. Two residential surveillance cameras are located, and the video is reviewed.

20

- The residential cameras are located at 27 and 55 Park Row. Any vehicle that turned from Park Row onto Adamson would have been seen on the video recording from these two houses. A review of the videos reveals no vehicle turned onto Adamson from Park Row in the time period Mr. Fehl alleged he was struck by a vehicle.
- A statement is taken from Mr. Fehl on 8/5/14 during which he continues to believe he was struck by a vehicle although he says it is possible, he may have fallen.

These are the facts that were determined as a result of the WPD investigation. Lt. Kudlacik consulted with the Bergen County Prosecutor's Office legal advisor for WPD, either Assistant Prosecutor (AP) Dyanne Lluch or Karen Gwynn prior to the issuance of the arrest warrant. This conversation would have involved providing the facts of the case to the respective AP and the AP advising Lt. Kudlacik there was probable cause to charge Mr. Fehl with Insurance Fraud and False Police Report. On August 5, 2014, Lt. Kudlacik contacts Judge Sondey, advises him of the facts he has learned during this investigation and Judge Sondey agrees with Lt. Kudlacik that there is probable cause to issue a warrant for the arrest of Joseph Fehl. Listed below are the various individuals or entities that determined there was probable cause to charge Mr. Fehl based upon the Supreme Court's "totality of the circumstances" involved in this investigation:

- A seasoned detective (Kudlacik) with many years of experience in criminal investigations determines there is probable cause to arrest Mr. Fehl.
- A BCPO AP (either Lluch or Gwynn) who have an ethical responsibility that requires they independently determine probable cause based upon the facts of this case prior to the issuance of a warrant, determined there was probable cause to arrest and charge Mr. Fehl.
- An independent judicial authority, Judge Casmir Sondey, after hearing the facts of the case from Lt. Kudlacik determined there was probable cause to issue an arrest warrant for Mr. Fehl.
- A BCPO "Case Screening" Unit Assistant Prosecutor and a Detective determined there was probable cause (and probably enough evidence to convict) to present the case to Grand Jury for indictment.
- The Bergen County AP who presented the case to the Grand Jury believed there was probable cause to indict Mr. Fehl.
- A Bergen County Grand Jury, after hearing the facts of the case determined there was probable cause to issue an indictment against Mr. Fehl.

21

- The opinion of this writer with nearly 42 years of law enforcement experience, much of it conducting criminal investigations, is that based upon the facts of this case there is a significant amount of probable cause to believe Mr. Fehl committed the crimes of Insurance Fraud and Filing a False Report to the Police.

The fact that Mr. Fehl was not convicted at a trial does in no way translate to a lack of probable cause to arrest and charge Mr. Fehl. They are two completely different burdens of proof and I have never seen a case brought to trial before a jury where probable cause for the arrest was an issue. That issue is decided by numerous authorities well before a trial. In fact, if the Superior Court trial judge did not believe the State had sufficient evidence to convict, upon a defense motion, that case would have been dismissed and never got to a jury. That did not happen in this case, so clearly the trial judge believed there was at least sufficient proof to convict which is a standard well beyond probable cause.

## V. REVIEW OF REPORT SUBMITTED BY JOSEPH BLAETTLER, DATED 9/24/19

Prior to reviewing Mr. Blaettler's report this writer examined his resume to ascertain the qualifications of the individual completing this report. It appears Mr. Blaettler had approximately 23 years of law enforcement experience and retired as a Deputy Chief for Union City Police Department. He worked as a law enforcement officer in only one venue, that being Union City. He retired in 2009 and has been in private investigations and out of law enforcement since that time, about 10 years. He states in his report, that "My report is based on my 33 years of law enforcement experience…" which does not coincide with the facts on his resume. I make note of this contradiction as he is purporting to be an expert in determining what is probable cause and what is not probable cause, but he has not been involved in making that decision for at least 10 years and probably longer than that as Deputy Chiefs do not normally get involved in many of those decisions.

I will examine his report to take note of issues he has raised that I believe are either incorrect or not in the accepted best practices in law enforcement today.

1. Page 24: "Analysis and Opinion" Section- "The arrest of Plaintiff was made absent probable cause and in violation of recognized police practices…"

22

This is simply preposterous that any person with law enforcement experience could make a statement like this if he actually reviewed the facts of this case. Lt. Kudlacik clearly followed accepted law enforcement investigative procedures in conducting this investigation. He followed the investigation until its logical conclusion which resulted in Mr. Fehl being arrested and charged. For Mr. Blaettler to state there was no probable cause when he knows no less than 5 criminal justice professionals and 1 Grand Jury found probable cause clearly indicates that he does not really understand the concept of probable cause or, since he's been out of law enforcement for over 10 years maybe he forgot that concept.

2. Page 25-Mr. Blaettler criticizes the investigation because there was not an Accident Reconstructionist contacted to assist at the scene.

I am not sure if Mr. Blaettler is familiar with what an Accident Reconstructionist can do? I supervised the State Police Fatal Accident Unit which is one of the most highly trained fatal accident units in this State and many of its members are recognized as experts in accident reconstruction. To reconstruct an accident, you need some type of evidence, i.e. debris, skid marks, tire yaw marks, clothing, or any type of evidence. There was no evidence located at the scene. An Accident Reconstructionist would have told the requesting officer there is nothing they can assist with. It would have been a waste of limited law enforcement resources to have contacted a reconstructionist as any experienced police officer would know. WPD knew that which is why they did not contact them. Again, Mr. Blaettler is trying to throw mud around to see if anything will stick on the wall but, he is simply incorrect in making this statement.

3. Page 25- Mr. Blaettler believes Mr. Fehl's clothes should have been secured and "could have been examined for evidence."

I would agree with Mr. Blaettler that it never hurts to secure items for potential evidence but in this case, securing the clothing would not have yielded anything that would have furthered this investigation. Mr. Blaettler thinks a forensic lab may have been able to find evidence on Mr. Fehl's clothing, i.e. tire marks, paint or dirt transfer from a vehicle or damage to the clothing. It should be noted the clothing was cut off Mr. Fehl by the EMS, so it was already contaminated. Mr. Fehl was a tow truck driver. Who knows what dirt or other paint transfers may be on that clothing? Even if paint was on the clothing, what information would that give you, maybe who manufactured the vehicle (i.e. Ford, Chevrolet, etc.)? It's also been my experience that the NJSP Forensic Lab would not take this evidence for

23

examination. The Lab has limited resources and need to focus their resources on more serious investigations. An alleged hit and run accident with minor injuries is probably not a case they would take for examination and if they did it would not be high on their priority list for sure. And, most importantly, Lt. Kudlacik's investigation determined there was no hit and run accident. What evidence would be on the clothing since no vehicle struck Mr. Fehl? So, although it's always a good practice to secure items that may be evidential, in this instance it did not make any sense to secure Mr. Fehl's clothing and WPD knew that.

4. Page 25: "It is not uncommon for a pedestrian to be struck by an auto with no debris left at the scene." The "…lack of debris used to establish probable cause was flawed".

It is possible for a pedestrian-auto collision to have a scene where there are no debris left at the scene. However, in my experience it is not probable based upon Fehl's statement describing how he was allegedly struck. For example, a low speed pedestrian strike in a parking lot where a car is backing out of a parking space and strikes someone, it is reasonable to assume that there may not be vehicle debris at the scene. However, Mr. Fehl claimed the hit and run vehicle came "whipping" around the corner from Park Row onto Adamson, struck Fehl and threw him onto the hood of the vehicle which carried him approximately 20 feet (or 40 feet depending on which account is used) until he fell off. From my experience, that type of pedestrian collision will result in vehicle debris left at the scene. The front portion of most vehicles today is plastic, i.e. the bumper, headlights, grill, etc. It does not take a high-speed impact to crack that plastic. A slow speed impact will probably do that. Striking Mr. Fehl, who is approximately 5'9" and 200 pounds, at any speed above 5-10MPH will probably leave some vehicle debris from the front of the vehicle at the scene. Then Mr. Fehl claims he was thrown onto the hood of the vehicle. As he was thrown off the hood of the vehicle, it is very probable he would have had some impact with the windshield or driver's side door mirror. Windshields crack and if the contact is of any significance, it would be probable that windshield glass would have been left at the scene. Also, the side view mirror is plastic and glass, and both break very easily upon impact. A reasonable person would expect to find that type of debris at the scene based upon Mr. Fehl's description of the alleged hit and run. So, in my opinion and based upon my experience with pedestrian/vehicle accidents there would have been some debris at the scene if Mr. Fehl was struck by a vehicle as he said he was. But, again, Lt. Kudlacik's investigation determined there was no such incident, so there would be no debris left at the scene.

24

Let me now examine the second part of the statement in Mr. Blaettler's report regarding the lack of debris found at the scene as being used to establish probable cause. Clearly, Mr. Blaettler does not understand the concept of probable cause nor the Supreme Court standard of the "totality of circumstances" to determine probable cause. The lack of debris at the scene does not in and of itself determine there is probable cause to arrest Mr. Fehl. That is one fact in a series of facts that determined probable cause in this case. (See Section IV of this report) That's what the Supreme Court meant when they established the "totality of circumstances" standard, so Mr. Blaettler is incorrect in making such a statement.

5. Page 26: Mr. Blaettler states that a lack of witnesses "does not in itself or in totality of this matter establish probable cause."

We agree that a lack of witnesses does not establish probable cause. But, as previously stated in this report, it may be part of the "totality of circumstances" when probable cause is established. He then criticizes the WPD investigation because the two friends of Mr. Fehl who were in the firehouse were not interviewed by Lt. Kudlacik. Well, the fact is that Lt. Kudlacik attempted to contact both of those friends and they never contacted him to set up an interview. Both friends (Orme and Mustac) had already provided a written statement to Officer Zielinski on the night of Fehl's injury so the fact is they had been interviewed. And as any law enforcement officer knows, you can ask people if they would consent to a voluntary interview, but you can't compel them to talk, which is exactly the case when Orme and Mustac did not contact Lt. Kudlacik upon his request. I will note here, more for speculation than anything else, but Mr. Mustac in his written statement to Officer Zielinski said he left the WFD firehouse at 1:06am to go to the 7-11 Store to get coffee. Mr. Fehl claims to have traveled to the same 7-11 Store to get a bag of potato chips, arriving back at the WFD firehouse at 1:27am. Why wouldn't Mustac have gotten the potato chips or why didn't Fehl get the coffee for Mustac? It seems they would have been at the 7-11 Store almost at the same time or within minutes of each other? Again, this does not make sense but it's another question in a series of questions regarding what actually occurred on the evening of Mr. Fehl's injury.

6. Page 27: Mr. Blaettler claims that Mr. Fehl was "disoriented, lost his bearings and was confused as to where the vehicle actually came from".

25

Mr. Fehl provided information to emergency personnel on the night of his injury that was later determined to be false. He then tried to change his story and "reasonably believed" he was struck by a vehicle. Mr. Fehl was very clear on where the vehicle came from and how he was struck on the night of the alleged incident. He may have appeared disoriented or feigning being disoriented, but he was not so disoriented that he did not immediately call WPD to report the alleged incident. Nor was he so disoriented that he called his EMS supervisor, right after he called the WPD to let him know he was hit by a car when responding to an EMS call. I don't see either of those phone calls as an example of a person who is disoriented. He knew exactly who to call almost as if it was rehearsed. If a passerby came upon Mr. Fehl laying in the street unconscious, then I would consider that he might be disoriented. But he knew very well who to call, what to report and being a trained EMS responder knew the symptoms he needed to display.

7. Page 27: Mr. Blaettler indicates that "A failure to canvas Stein shows defendant had no interest in thoroughly investigating this matter to its logical conclusion."

Again, Mr. Blaettler did not review or chose to ignore the deposition testimony of Captain Kudlacik where he states that to his knowledge Stein was canvassed by either Officer Stolarz or the Chief. (Page 49). It should be noted that in Fehl's statements on the night of the alleged incident he was very clear that the car came from Park Row and turned onto Adamson where he was allegedly struck by that vehicle. A vehicle traveling down Stein would not be helpful in determining if that vehicle struck Fehl on Adamson, but, according to Captain Kudlacik's testimony Stein was canvassed for residential video by the Chief and another WPD officer so Mr. Blaettler is incorrect.

8. Page 28: Mr. Blaettler states, "Plaintiff had no motive for knowingly lying about how he was injured."

I would dispute this statement and I believe he had every reason to lie. If Mr. Fehl was actually responding to an EMS call and tripped and fell, I agree, he may not have a reason to lie. But he may have a reason to embellish his story for personal reasons. Did he want notoriety or media coverage? Did Mr. Fehl think EMS members would think less of him because he fell and think more of him because he got hit by a car? Fehl's friend for several years, Doug Krause, the second person he chose to call after he called the police on July 3, 2014, stated to Lt. Kudlacik,

"I've been friends with him (Fehl) for a while and some of his stories are a little different. They're a little farfetched." And Krause continued in that statement by describing "farfetched" as, "just like you know with everything he exaggerates, you know his business or his personal life..." (Pages 15 and 16). Krause who knew Fehl well, doubted his story from the beginning.

I don't know Mr. Fehl's motivations, but something made him tell a lie about what happened that night. Previously in this report I speculated Mr. Fehl may have been injured earlier in the evening, possibly while towing a car, possibly during horseplay at the firehouse, maybe in a fight? He then he stages a hit and run accident while he claims to be in route to an EMS call, so he is covered by insurance. I think that situation is as possible as another theory proposed by the Plaintiff's team where they speculate a car came down Stein, strikes Fehl and then turns around and heads back down Stein. But Mr. Fehl clearly was motivated to lie, including the fact that according to his medical records from the hospital he did not list any medical insurance information. It was listed as "self-pay", meaning Fehl would have to pay the hospital bill out of pocket. So, he did have several reasons to lie about what happened. And he knew, just like every other volunteer first responder would know, that if he is injured while "on duty" his injuries are covered by insurance and he may be entitled to pay while he was out of work. It was EMS Lt. Krause, Fehl's friend who said in his statement to Lt. Kudlacik in reference to workmen's compensation, "we all know that" (Page 18).
Whatever the real reason he did not tell the truth about his injuries only Mr. Fehl could answer that.

9. Page 28: Mr. Blaettler writes in his report, "Defendant Kudlacik's failure to involve the BCPO in the investigation, arrest and charges calls into question his motives."

Again, Mr. Blaettler did not review or chose to ignore testimony relevant to this issue. Captain Kudlacik testified that he contacted the BCPO and spoke with WPD's AP legal advisor (either Lluch or Gwynn) for guidance about charging Mr. Fehl. That legal advisor from BCPO would have determined there was probable cause to arrest Fehl on charges of Insurance Fraud and Filing a False Police Report. Mr. Blaettler's suggestion that the BCPO's Financial Crimes Unit would have assisted in the investigation is not correct. It is stated right on their Financial Crimes' web site (and in Mr. Blaettler's report) that a loss over $75,000 is required prior to the BCPO becoming involved in the investigation. Also, the State Office of the Insurance Fraud Prosecutor has monetary limits that must be met before they

27

will get involved in an investigation. So, other than some minor investigative guidance (i.e., issuance of subpoenas) neither agency would have been much help. And Lt. Kudlacik said he had access to subpoenas through the BCPO legal advisor which is how he obtained Fehl's medical records from the hospital.

10.Page 29: Mr. Blaettler states, "In order to be guilty of the crime of insurance fraud Plaintiff would have had to knowingly acted to gain a benefit."

I guess the issue here is did Mr. Fehl act knowingly? He clearly would have received a benefit if the workmen's compensation claim was approved. My opinion is a reasonable person acting in good faith would believe that Mr. Fehl was acting knowingly when he reported a hit and run accident that did not occur. I can't imagine any situation, unless the person was completely intoxicated or drugged where an individual would not know if they were hit by a car. Mr. Fehl gave specific information on the vehicle, color, direction of travel and what happened to him after he allegedly got hit. If he really did not know what happened to him, why not just tell the police, "I don't know what happened?" There is nothing wrong with that. Mr. Fehl knew what he was doing and reported he was struck by a vehicle on the FROI more than a week after the alleged incident. He knew there was workmen compensation benefits he would be entitled to. My experience has been that all volunteers, EMS and firefighters are briefed on that benefit, so to say he did not know he would get a benefit is simply not correct. As EMS Krause, Fehl's friend stated in his statement to Lt. Kudlacik in reference to workmen's compensation, "we all know that" (Page 18).

11.Page 29: Mr. Blaettler states, "Additionally, there is no evidence that Plaintiff ever filed an actual claim."

Again, he is incorrect. There is evidence, written in the Plaintiff's own handwriting that he filed a claim when he completed the FROI form. He knew he was filing a workmen's comp claim when he filled out that form. In fact, he contacted BRM several times inquiring why his medical bills had not been paid, so he knew the process. For Mr. Blaettler to allege that there is no evidence he filed a claim is just not correct. The fact Fehl did not submit the form electronically, as BRM requires does not mean he didn't file a claim. The fact is he did file a claim and he did it in his own handwriting.

28

12. Page 30:  Mr. Blaettler states, "No police officer acting in good faith would
    have arrested the Plaintiff." Before this statement he also opines that Lt.
    Kudlacik did not have probable cause to arrest Fehl.

Well, I guess a police officer who has been retired for over 10 years, who had 23
years of law enforcement experience in one city, in one county has more
experience that Lt. Kudlacik who has 20 years of experience in criminal
investigations, BCPO AP Lluck/Gwynn, Judge Sondey, BCPO Case Screening
personnel, BCPO AP presenting the case to the Grand Jury and a Bergen County
Grand Jury, all of whom determined there was probable cause to arrest, charge and
indict Mr. Fehl? I don't think so. Lt. Kudlacik did a proper and thorough
investigation and as a result of that investigation, there was ample probable cause
to arrest and charge Fehl with Insurance Fraud and Making a False Report to
Police. I disagree with Mr. Blaettler and my opinion is that any reasonable police
officer confronted with the facts of this case would have arrested and charged Mr.
Fehl.

13. Page 31:  Mr. Blaettler states his opinion as, "Baginski was involved in the
    investigation" of Plaintiff. He uses the fact that Baginski worked with BRM
    on the workmen's comp claim as proof that Baginski was involved in the
    investigation.

My experience in working with many police departments throughout the state is
that the Chief of Police will coordinate providing relevant police information to the
appropriate authority in a particular jurisdiction. That does not mean the
appropriate authority is involved in an investigation. An appropriate authority has
a need to know what is happening regarding some investigations, and surely
Baginski needed to be updated regarding this one. That does not mean he is
"involved" in the investigation. Kudlacik testified under oath that Baginski was
not involved in the investigation and Baginski testified under oath that he was not
involved in the investigation. For Mr. Blaettler to opine that Baginski was
involved with the investigation despite sworn testimony to the contrary without
any tangible evidence to prove it is inappropriate. If there was evidence that
Baginski was involved in the investigation I believe that information would already
have been uncovered, and it has not.

14. Page 32:  Mr. Blaettler in his conclusions, states, "Based on an incomplete
    investigation and lack of probable cause, based on all reports I have read,
    Kudlacik never discussed his decision to arrest Plaintiff with the BCPO or

29

the Chief of Police. Since Plaintiff was a volunteer fireman and subject to Official Misconduct charges, recognized police practice and procedures would have been to consult with the BCPO and the Chief of Police prior to arresting Plaintiff. Defendant Kudlacik failed to do so."

Again, Mr. Blaettler has mis-stated the facts. BCPO was contacted prior to the arrest of Fehl and provided legal advice to Lt. Kudlacik regarding probable cause and appropriate charges. My experience is that the Chief of Police would have been regularly updated regarding the investigation and what charges the BCPO had recommended. There is no generally accepted best police practice or procedure that would require the approval of the Chief of Police prior to filing charges or arresting an individual for insurance fraud or filing a false police report. Mr. Blaettler opines about recognized police procedures regarding the charge of official corruption but that is not a charge filed against Mr. Fehl. My opinion is that the BCPO AP legal adviser did not believe there was enough probable cause to charge Fehl with Official Corruption which is why he was charged with other crimes. So, I don't know why Mr. Blaettler would even bring that up in his report. In my opinion and based on my experience, Lt. Kudlacik followed all police best practices and procedures regarding the investigation, the charging and the arrest of Mr. Fehl.

## VI. CONCLUSIONS

Based upon my training, experience and the examination of the materials identified in this report, it is my opinion that the WPD and Captain Kudlacik followed all generally accepted best practices regarding the investigation of Joseph Fehl's alleged injuries on the night of July 3, 2014.

I base my opinion on the following:

1. On July 3, 2014, at approximately 1:33AM, Joseph Fehl reports to the WPD that he was struck by a dark colored compact vehicle on Adamson St. across from WFD Station 203 firehouse. He claims the vehicle turned onto Adamson from Park Row St.
2. Mr. Fehl alleges he was responding to an EMS call when he was struck by that vehicle.
3. Mr. Fehl sustains some minor injuries that are noted by first responders and claims additional injuries involving pain.

30

4. Mr. Fehl files a FROI form on 7/11/14 claiming he was struck by a vehicle and injured while on an EMS call.

5. WPD canvasses the surrounding neighborhood and find 2 residences where relevant video is obtained. Both videos do not show any vehicle turning onto Adamson from Park Row in the time frame Mr. Fehl is alleged to have been hit by a vehicle.

6. Mr. Fehl is interviewed on 8/5/14 and maintains he believes he was struck by a vehicle on the night he was injured. Lt. Kudlacik contacted Judge Sondey who determined there was probable cause and issued an arrest warrant charging Mr. Fehl with Insurance Fraud, 2C:21-4.6a and Tampering with Public Records, 2C:28-7a(1). Bail was set by the Judge at $2,000, with 10% which was subsequently posted.

7. A Bergen County Grand Jury indicts Mr. Fehl, reference to Indictment #S-323-15

8. On November 9, 2017, Joseph Fehl files a Civil Suit in The United States District Court, District of New Jersey against the Borough of Wallington, Witold Baginski, Sean Kudlacik, the Bergen County Prosecutor's Office and others.

9. After a trial in Bergen County Superior Court in January 2018 in front of Judge Christopher Kazlau, J.S.C., a jury found Mr. Fehl not guilty of all charges.

   A. What appears to be at issue in this case is was there probable cause to arrest and charge Mr. Fehl and was that arrest based on retaliatory conduct by the defendants because Mr. Fehl publicly alleged improper conduct by Mr. Baginski, then the Wallington Business Administrator? Although there are other ancillary issues, they all stem from the arrest and prosecution of Mr. Fehl.

   B. I will first address the allegation that Mr. Fehl was voicing his First Amendment right of free speech and because of the exercise of that right, Mr. Baginski retaliated against him. Mr. Fehl alleges that he made claims of improper conduct by Mr. Baginski in Baginski's role as Business Administrator in Wallington. Mr. Fehl allegedly made these claims of impropriety at WFD monthly meetings. He did not make the allegations against Baginski in a public forum, he made them at WFD meetings which are not public and are not attended by the news media. Mr. Fehl never attended a Town Council Meeting, which are public and attended by the media and made these allegations against Baginski. So, Baginski never

**31**

saw his name in the media because of Fehl's alleged comments. Because a volunteer firefighter makes an allegation at a firehouse meeting, a Business Administrator (BA) would go out of their way to retaliate against that person? A BA is a public figure and is subject to regular criticism due to daily decisions they must make. I am sure many of those criticisms are made in a public forum which could result in media coverage. Is it reasonable to assume a BA could retaliate against everyone that said something bad about him at a firehouse meeting? It is not. And, a volunteer firefighter making a criticism, which in essence is not even a valid criticism (i.e., Baginski never purchased dive suits) because it was not in Baginski's authority to make WFD purchases, is even less of a reason for Baginski to retaliate. But in any event, there is no evidence Baginski retaliated or had anything to do with the investigation of Fehl's injuries. A BA simply is not in a position to be able to do that.

C. Next, I will examine the police investigation of the report by Mr. Fehl that he was struck by a hit and run vehicle as I have done previously in this report in Section IV, "Establishment and Documentation of Probable Cause". Police do not create investigations, nor can they direct the outcome of that investigation. They follow the investigation to a logical conclusion. Mr. Fehl created the police investigation, not Mr. Baginski or Lt. Kudlacik when he reported he was struck by a small dark colored car on Adamson St. WPD investigated the reported hit and run accident and did commendable work in eventually determining there was no hit and run accident. The fact Mr. Fehl "reasonably believed" he was struck by a vehicle, which is the story he told after WPD ascertained that he was not struck by a vehicle is not realistic. As previously stated in this report, it is just not reasonable to assume someone would not know they were struck by a vehicle, again assuming non-intoxication. They may not know what color the vehicle was or what type of vehicle it was, that would be reasonable. But you would probably know where the vehicle came from if for no other reason than where on your body you got struck by that vehicle. Mr. Fehl was initially very clear on how and where he was struck and only became "unclear" when confronted with the fact the police investigation determined there was no vehicle in the area of the alleged hit and run incident.

D. Lt. Kudlacik had ample probable cause to arrest and charge Mr. Fehl as noted previously in Section IV of this report. And the fact he had probable

32

cause was confirmed by the BCPO AP legal advisor, Judge Sondey, BCPO Case Screening Unit, the BCPO AP who presented the case to the Grand Jury and the Bergen County Grand Jury. It has been my experience that a Prosecutor's Office would never present a case to a Grand Jury seeking an indictment if they did not have probable cause (and more than likely they believed they have proof beyond a reasonable doubt). It is not ethical for a prosecutor do to that. And I have worked with many prosecutors and Deputy Attorney Generals throughout the State, I can assure you they take their ethical obligations very seriously. So, although Mr. Fehl claims he was improperly arrested, charged and prosecuted that does not coincide with the facts that provided the probable cause to charge and arrest Mr. Fehl in this case. There was significant probable cause for arrest and prosecution regarding this case and that has been documented by the litany of experienced individuals and entities that agreed there was. The fact a jury found Mr. Fehl not guilty of the charges, although unfortunate in my opinion, does not change the fact that police acted in accordance with best practices and procedures regarding investigations, arrests and charging a person with a crime. Probable cause for arrest and prosecution were present in this case when the "totality of the circumstances" involved in this investigation are considered. Lt. Kudlacik had no ill will towards Mr. Fehl nor had any reason to retaliate against him. The belief by Mr. Fehl that Mr. Baginski orchestrated this investigation, arrest and prosecution and used Lt. Kudlacik to further his retaliation is simply not believable and does not coincide with the facts as established in this case.

E. In summary, in my opinion, the Wallington Police Department and Lieutenant Kudlacik acted within the accepted best practices in the law enforcement profession today as it relates to the investigation, arrest, and prosecution of Joseph Fehl.

Should additional information be made available to this writer at a later date, upon request this writer will supplement this report.

## STATEMENT OF COMPENSATION

As the expert retained by the defendants in this matter, I have been or will be compensated at a rate of $125.00 per hour for my services related to this case.

Date_____

Glenn M. Miller

34

## STATEMENT OF COMPENSATION

As the expert retained by the defendants in this matter, I have been or will be compensated at a rate of $125.00 per hour for my services related to this case.

Date /2/2/19

Glenn M. Miller

**GLENN M. MILLER**                                October/2019
glennmillerassociates@gmail.com                    609-457-1997

### SUMMARY OF QUALIFICATIONS

An accomplished law enforcement career encompassing over 41 years with the New Jersey State Police, Stockton College Campus Police and the Ocean County Prosecutor's Office, building a progressive career path involving patrol, investigations, training, supervision, administration, and policy development and compliance. Served in a command level position for over 20 years in three vastly different law enforcement organizations.

### PROFESSIONAL EXPERIENCE

Ocean County Prosecutor's Office (7/13-10/18)     *Chief of Detectives*

- Responsible for the operation, supervision, and administration of the investigative activities of the County Prosecutor's Office
- Managed the Office's $16 million budget and coordinated purchasing activities
- Supervise the investigations of over 70 sworn county detectives including homicide, arson, fatal accidents, high tech crimes, sexual assaults, frauds, narcotics, internal affairs, official corruption, bias crimes, senior crimes and many others.
- Coordinate law enforcement activities with municipal police chiefs to ensure the security and safety of the county and monitor their compliance with Attorney General's Directives.
- Work with state and federal agencies to coordinate criminal investigations in the county.
- Developed the Internal Affairs Investigation Course in conjunction with Atlantic and Cape May County and presented it to over 200 investigators
- Worked with the NJ State Police and others to develop best practices for the investigation of police deadly force encounters
- Vice President of the County Prosecutors' Chiefs of Detectives Association
- Appointed by the Governor to the Secondhand Valuables Transaction Reporting Task Force in October/2017

Richard Stockton College of New Jersey (Stockton University) (1/04 to 6/13)  *Chief of Police*

- Responsible for the operation, supervision, administration and strategic goals of the Richard Stockton College Police Department, a fully sworn and NJ State Association of Chiefs of Police Accredited Police Agency in the State of New Jersey
- College's Emergency Management Coordinator working with College Staff and other municipal, county and state agencies to ensure campus safety and security
- Prepared and managed Police Department's $3 million budget
- Adjunct Professor-Criminal Justice Program
- President of the New Jersey College and University Public Safety Association-2007-2008
- Member Governor's Task Force on Campus Safety-2007
- Co-Chair Stockton College Alcohol Task Force-2008
- Developed and delivered with NJCUPSA the first Supervision Course for campus police and security supervisors in New Jersey
- Member NJ President's Council Campus Security and Safety Committee (2004-2013) which was responsible for developing and implementing the Campus Security Survey and Peer Review Process.

**New Jersey State Police,** Trenton, NJ  (5/77 -1/04)- *Trooper*
- Served in various assignments while in the State Police including Patrol, Investigations, Internal Affairs, Official Corruption, Major Crime and others.
- Investigated and supervised numerous high-profile investigations, including many police deadly force encounters
- Working with the FBI and NJ/NY Port Authority Police developed the first investigative response protocol to a mass casualty incident such as a plane crash.
- Assigned by the Superintendent and Attorney General in 2000 to Co-Chair the committee that developed the State Police Early Warning System (EWS), one of the first computer based EWS in the country that has been used extensively as a model for other agencies nationwide
- Developed the first "Compstat" procedure in the State Police to ensure management accountability
- Retired as the Major in Command of the Field Operations Section with responsibility for the operations of 32 State Police Stations in 5 Troops, two Bureaus, Traffic and Operations, and the Command Operations Center with nearly 2,000 enlisted personnel under my command

**Glenn Miller Associates LLC,** November/18-Present
- Providing expert services in law enforcement practices and procedures to clients
- Providing expert security and safety consulting to clients
- Licensed New Jersey Private Detective
- Certified by Judge Andrew Baron, ALJ as an expert in Law Enforcement Policy, Procedures and Operations

**Seton Hall University** (9/98 - 12/03)
   *Adjunct Professor*
- Developed and taught Graduate level courses in Human Relations, Public Relations, and Human Resources Development Programs.

**Stockton University** (9/04-Present)
   *Adjunct Professor*
- Developed and teach an undergraduate course in the Criminal Justice Program

**EDUCATION AND TRAINING**

- Seton Hall University- M. A. in Education (5/97)
- Trenton State College (College of NJ)- B.S. in Law and Justice (5/92)
- Staten Island Community College -A.S. in Business Administration (6/74)
- Federal Bureau of Investigation National Academy, 185th Class, Quantico, Va.- Graduate (6/96)
- New Jersey State Police Academy- Graduate  (5/77)
- FBI Mid Atlantic Law Enforcement Executive Development Seminar. Princeton, NJ (6/05)

## CERTIFICATIONS

- Police Training Commission/Division of Criminal Justice- Certified Police Instructor
- International Critical Incident Stress Foundation - Certified Critical Incident Stress Counselor
- New Jersey State Association of Chiefs of Police- Certified CALEA Standards Assessor/Team Leader
- Chairman: New Jersey State Association of Chiefs of Police Accreditation Commission (Review police departments' compliance with accreditation standards and approves agency accreditations)
- Licensed New Jersey Private Detective
- Judicially certified as a expert witness in law enforcement policy, procedures and operations

## PROFESSIONAL MEMBERSHIPS

International Association of Chiefs of Police
Past member of The Honor Society of Phi Kappa Phi, Trenton State College Chapter
Past member of the Harvard Associates in Police Science
Federal Bureau of Investigation National Academy Association-NJ Chapter
Past member of Kappa Delta Pi Honor Society, Seton Hall University Chapter
Past member of International Critical Incident Stress Management Organization
New Jersey State Chiefs' of Police Association
Ocean County Chiefs of Police Association
County Prosecutor's Chief of Detectives' Association
Stockton Federation of Teachers-Adjunct
Past member of the New Jersey College and University Public Safety Association- President (2007-2008)
Past member of the International Association of College Law Enforcement Administrators

## Glenn M. Miller's Significant Accomplishments

- Appointed by two (2) NJ Governors to two different task forces examining policy and procedures in campus safety and second hand dealer electronic reporting
- Appointed by four (4) NJ Attorney Generals to various committees examining policy and procedures in many different areas., including early warning systems, mobile and body cameras, use of deadly force, community involvement and traffic stop data.
- Received 6 NJSP Superintendent Commendations for investigative excellance.
- Attended the FBI National Academy at Quantico for 10 weeks of leadership training
- Participated in a group study exchange program and examined the Brazilian law enforcement systems over a 6 week period in Brazil
- Co-Chair of the NJ State Police (NJSP)committee to develop the NJSP Early Warning System (Management Awareness and Personnel Performance Systems, MAPPS). First comprehensive computerized Early Warning System in the nation.
- Spent one week in Columbia and examined the Columbian National Police's procedures and operations in their drug eradication efforts with the DEA
- Assisted in the development and writing of the accreditation standards for the NJ State Association of Chiefs of Police (NJSACOP) Accreditation Program
- Appointed Chairman of the NJSACOP Accreditation Commission
- Spearheaded the effort to develop an Internal Affairs Investigation Course with Atlantic and Cape May County Prosecutor's Office and lectured in same. Over 200 officers have been certified as IA Officers as a result of this course.
- Appointed by the NJ College and University Presidents' Council to their Executive Committee on Campus Safety and Security.
- As part of the President's Council Executive Committee developed a Best Practices Self-Assessment Survey for colleges which included a peer review inspection program; first of its kind developed in the nation.
- Working with the President's Council Executive Committee developed a Campus Public Safety Leadership Course for law enforcement and security supervisors and instructed in same. First course of its kind in New Jersey
- Wrote and exercised the Stockton College Emergency Management Plans and procedures in conjunction with County and State OEM
- Worked with the Department of Homeland Security as a member of the National Driver's License Compact Committee developing best practices for security enhancements for driver's licenses after the 9/11 attacks
- Worked with County and State Law Enforcement leaders to develop best practices for investigating police deadly force situations
- Worked with the FBI, Port Authority of NY/NJ PD and State Medical Examiner to develop a procedure and protocol for a coordinated law enforcement response to a mass casualty incident
- Commanded the State Police Command Post established for response to the 9/11 attacks
- Adjunct professor for Seton Hall University Master's Program (1998-2003) and Stockton University (2004-present)

- Qualified and testified as an expert in law enforcement policy, procedures, internal affairs and operations in front of Judge Andrew Baron, ALJ

# SECTION 7 - DEPOSITIONS

7. DEPOSITIONS: Not later than _____, any party seeking to offer evidence by deposition shall so advise the opposing parties. Within 14 days thereof, all parties are directed to prepare a joint agreed statement, in narrative form, of the testimony which would be given by a deponent if called under oath. No colloquy between counsel shall be included. The agreed statement is not a concession of the factual accuracy of the deponent's testimony. Absent prior leave of Court, no deposition testimony may be offered except as provided herein.

Within 14 days of the first date above, the parties shall simultaneously exchange and submit to the Court any objections to the deposition testimony proposed above. The objections shall note, separately as to each such challenged portion of the deposition, applicable cases or rule which underlie the objection. If a party fails to comply with this paragraph, the challenged deposition testimony shall be deemed admitted.

# SECTION 8 - EXHIBITS

8.   EXHIBITS (Except for exhibits the need for which could not reasonable have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Objections to authenticity are deemed waived unless such objections are set forth.)*

      A.  **Plaintiff's Exhibit list is attached**:

            a.  Defendant Borough of Wallington/Defendant Kudlacik's objections to authenticity of Plaintiff's exhibits:

            b.  Defendant Baginski's objections to authenticity of Plaintiff's exhibits:

      B.  **Defendants Borough of Wallington/Kudlacik and Defendant Baginski's joint exhibit list is attached**:     [

            a.  Plaintiff's objections to authenticity:  D-18 and D-27 as both have not been authenticated by the necessary person(s) in discovery,

*The exhibit lists follow this page.

## PLAINTIFF'S LIST OF EXHIBITS

P-1     August 31, 2017 Borough of Wallington response to OPRA request by Clerk

Baginski (Baginski Dep. Ex. Baginski-10) (BR0185-BR0396)

P-2     Bergen Risk Managers Notepad Detail (McCaffrey Dep. Ex. P-2)

P-3     Fax Cover Sheet 7/11/2014 and electronic Bergen Risk Managers FROI

(McCaffrey Dep. Ex. P-3)

P-4     Fehl's handwritten Bergen Risk Managers FROI (McCaffrey Dep. Ex. P-4)

P-5     Kazcor electronic Bergen Risk Managers Supervisor/Safety Report (McCaffrey

Dep. Ex. P-5)

P-6     McCaffrey July 23, 2014 email re: supervisor safety for Bergen Risk Managers

(McCaffrey Dep. Ex. P-6)

P-7     Bergen Risk Managers August 6, 2014 correspondence by McCaffrey (McCaffrey

Dep. Ex. P-7)

P-8     First Report of Injury (FROI) Form 1A OSHA (McCaffrey Dep. Ex. P-8)

P-9     Bergen Risk Managers June 26, 2017 correspondence by McCaffrey (McCaffrey

Dep. Ex. P-9)

P-10    Bergen Risk Managers Workers' Compensation Employee Card (McCaffrey Dep.

Ex. P-10)

P-11    Paramedic EMS Report dated July 3, 2014 (BR0141-BR0143)

P-12    Fehl Public Facebook Post (Kudlacik Dep. Ex. Kudlacik-2)

P-13    Voluntary Statement of Corey Mustac dated July 3, 2014 (Kudlacik Dep. Ex.

Kudlacik-3)

P-14          Wallington F.D. Emergency Squad Report (Kudlacik Dep. Ex. Kudlacik-4)
              (BR0495-BR0496)

P-15          Audio Statement of Michael Chermak taken July 21, 2014 (Kudlacik Dep. Ex.
              Kudlacik-5) (BR0004-BR0012)

P-16          Audio Statement of Douglas R. Krause taken July 22, 2014 (Kudlacik Dep. Ex.
              Kudlacik-6) (BR0041-BR0066)

P-17          Audio Statement of Joseph Fehl taken August 5, 2014 (BR0016-BR0040)

P-18          Waiver of Rights Form signed by Joseph Fehl and Shawn Kudlacik (BR0015)

P-19          Complaint-Warrant/Incident Report Form (Kudlacik Dep. Ex. Kudlacik-8)
              (BR0108-BR0113)

P-20          Wallington Police Department Warrant/Summons (Kudlacik Dep. Ex. Kudlacik-
              9) (BR0502)

P-21          Seven (7) photographs of Park Row camera location and perspectives (Kudlacik
              Dep. Ex. Kudlacik-10)

P-22          Indictment S-0323-15 for The State of New Jersey v. Joseph Fehl (Kudlacik Dep.
              Ex. Kudlacik-11) (BR0106-BR0107)

P-23          News article "Wallington firefighter charged with insurance fraud in bogus hit
              and run" by Jerry DeMarco published August 6, 2014 (BR00692-BR00693)

P-24          News article "Police: Firefighter lied about hit-and-run accident" by FireRescue1
              published August 7, 2014 (BR00698)

P-25          News article "N.J. Firefighter Charged with Lying About Being Struck" by
              Firehouse.com published August 7, 2014 (BR00699-BR00700)

P-26    Hackensack University Medical Center Admission Record of Joseph Fehl
        (Kudlacik Dep. Ex. Kudlacik-13) (BR0533-BR0540)

P-27    Hackensack University Medical Center medical record of Joseph Fehl for July 3,
        2014 through July 6, 2014 (BR0539-BR0684)

P-28    Excel spreadsheet "Fire203-2017" (Baginski Dep. Ex. Baginski-2)

P-29    Length of Services Award law (Baginski Dep. Ex. Baginski-3) (D002-D006)

P-30    LOSAP Participation Information Input Form (Baginski Dep. Ex. Baginski-3)
        (D007)

P-31    Municipal Excess Liability Joint Insurance Fund Borough of Wallington Model
        Employee Handbook (Baginski Dep. Ex. Baginski-4) (Wallington0001-
        Wallington0040)

P-32    Borough of Wallington Model Personnel Policies and Procedures Manual
        (Baginski Dep. Ex. Baginski-5) (Wallington0041-Wallington0102)

P-33    Municipal Excess Liability Joint Insurance Fund Borough of Wallington Model
        Employee Handbook 2014 (Baginski000131-Baginski000171)

P-34    South Bergen Municipal Joint Insurance Fund correspondence re: JIF renewal
        resolution dated June 21, 2016 (D112)

P-35    Agreement to Renew Membership in the South Bergen Municipal Joint Insurance
        Fund executed June 30, 2016 (D111)

P-36    Municipal Excess Liability JIF Fund Year 2014 Member Manual Wallington
        South Bergen Municipal Joint Insurance Fund (BR0187-BR0396)

P-37    Borough of Wallington Resolution No. 2015-76 (Baginski Dep. Ex. Baginski-12)
        (Wallington0135)

| | |
|---|---|
| P-38 | Reorganization Meeting Minutes January 2, 2017 (Baginski Dep. Ex. Baginski-13) (Baginski001079-Baginski001085) |
| P-39 | Judgment of Acquittal in State of New Jersey v. Fehl Indictment S-0323-15 filed January 26, 2018 |
| P-40 | Hackensack University Medical Center letter to Fehl dated April 6, 2015 (BR0501) |
| P-41 | News article "Wallington suspends clerk, submits charges to state" by Katie Sobko published February 7, 2019 (Siek Dep. Ex. Siek-5) (BR00708-BR00710) |
| P-42 | Deposition transcript of Sharon McCaffrey taken February 25, 2019 |
| P-43 | Deposition transcript of Shawn Kudlacik taken May 9, 2019 |
| P-44 | Deposition transcript of Dorothy Siek taken May 28, 2019 |
| P-45 | Deposition transcript of Witold Baginski taken July 16, 2019 |
| P-46 | Joseph Fehl's Answers to Defendant's Interrogatories |
| P-47 | Fannie Mae Request for Verification of Employment of Witold Baginski (Wallington0153) |
| P-48 | Witold Baginski CV (Wallington0210) |
| P-49 | Borough Attorney letter re: Rice Notice to Baginski dated April 25, 2017 (Baginski000908-Baginski000909) |
| P-50 | Borough of Wallington Resolution No. 2018-239 |
| P-51 | Borough Attorney letter re: Rice Notice to Baginski dated May 5, 2017 (Baginski000935-Baginski000936) |
| P-52 | Borough Attorney letter re: Rice Notice to Baginski dated November 10, 2017 (Baginski000682-Baginski000683) |

P-53       Borough Attorney letter re: Rice Notice to Baginski dated October 17, 2018

P-54       Borough Attorney letter regarding tenure charges and suspension to Baginski
           dated January 28, 2019

P-55       Borough of Wallington Complaint against Witold Baginski by Borough Attorney
           for tenure charges and removal from municipal clerk position dated February 5,
           2019

P-56       State of New Jersey Office of the State Comptroller Analysis of Local
           Government Overtime and Compensatory Time Practices dated April 9, 2014

P-57       Cardoso email to Siek dated June 6, 2017 (D036)

P-58       FEMA Paperwork prepared by Baginski (D043-D068)

P-59       Transcript of grand jury proceedings in State of New Jersey v. Joseph A. Fehl (S-
           323-15) of March 10, 2015 (BR0505-BR0530)

P-60       Trial transcript in State of New Jersey v. Joseph A. Fehl (S-323-15) for date of
           January 11, 2018 (BR714-BR744)

P-61       Trial transcript in State of New Jersey v. Joseph A. Fehl (S-323-15) for date of
           January 16, 2018 (BR745-BR805)

P-62       Trial transcript in State of New Jersey v. Joseph A. Fehl (S-323-15) for date of
           January 17, 2018 (BR806-BR833)

P-63       Borough of Wallington Chief Financial Officer correspondence re: 2013
           Corrective Action Plan Borough of Wallington Previously filed in September of
           2014 dated April 20, 2015 (Baginski000392-Baginski000393)

P-64   Borough of Wallington Chief Financial Officer correspondence re: 2015 Corrective Action Plan Borough of Wallington dated August 25, 2016 (Baginski000389-Baginski000390)

P-65   Baginski letter to Mayor and Council dated March 24, 2017 (Baginski000176)

P-66   Borough of Wallington Chief Financial Officer correspondence regarding 2016 annual audit comments for Borough of Wallington dated August 21, 2017 (Baginski000385-Baginski000387)

P-67   ISO Claim search Match Report Summary for Joseph Fehl of July 14, 2014 (Baginski Dep. Ex. Baginski-9)

P-68   Olkowski letter to Mayor and Council dated September 25, 2017 (Baginski000101-Baginski000102)

P-69   Shawn Kudlacik's Answers to Plaintiff's Interrogatories (Kudlacik Dep. Ex. Kudlacik-1)

P-70   Borough of Wallington Resolution No. 2016-90 approved June 30, 2016 (D110)

P-71   Borough of Wallington April 21, 2016 Regular Meeting Minutes

P-72   Borough of Wallington Ordinance 2001-3 (Baginski Dep. Ex. Baginski-1) (Wallington0139-Wallington0143)

P-73   News article "Former Carlstadt BA to be hired in political shakeup" by Kelly Nicholaides published March 2, 2017 (BR00685-BR00687)

P-74   News article "Wallington sued after removing business administrator for over-purchasing 22,000 gallons of gas (BR00688-BR00689)

P-75   News article "Despite two nay votes, Wallington has new police captain" by Kelly Nicholaides published January 3, 2017 (BR863-BR864)

P-76 News article "Wallington to strip administrator of role" by Kelly Nicholaides published April 22, 2017 (Siek Dep. Ex. Siek-4) (BR00711-BR00712)

P-77 New article "HERO: Firefighter Rescues Suicidal Woman From Route 17 Overpass Leap by Jerry DeMarco published January 1, 2020 (BR000865-BR000867)

P-78 Baginski printed email Covelli-Rachelski dated March 16, 2017 (Baginski Dep. Ex. Baginski-15) (Baginski001132-Baginski001136)

## DEFENDANTS LIST OF EXHIBITS

D-1     BCJIF Insurance policy (McCaffrey Dep. Ex. P-1) (BR0187)

D-2     Notepad detail re: Bergen Risk Claim (McCaffrey dep P-2)

D-3     FROI (First Report of Injury) (McCaffrey dep P-3)

D-4     FROI (handwritten) (McCaffrey dep P-4)

D-5     Supervisor/Safety Report (McCaffrey dep P-5)

D-6     Typed Supervisor's Report (McCaffrey dep P-6)

D-7     Denial of Claim (McCaffrey dep P-7)

D-8     FROI OSHA/WC 1st report (McCaffrey dep P-8)

D-9     Bergen Risk Workers Compensation ID card (McCaffrey dep P-10)

D-10    Kudlacik Answers to Interrogatories

D-11    Supplemental Incident Form

D-12    Video feeds from neighboring properties

D-13    Complaint/Warrant with telephonic authorization by Judge Sondey

D-14    Waiver of Rights form

D-15    Voluntary statement of Corey Mustak (Kudlacik 3)

D-16    Voluntary statement of John Orme

D-17    Wallington F.D. Emergency Report

D-18    Excel Spreadsheet with time/location/direction of vehicles

D-19    Photos of surveillance

D-20    NJ Crash Investigation Report by Officer Zielinski (voided)

D-21    NJ Bail Recognizance Form

D-22    Facebook posting by plaintiff (Kudlacik 2)

D-24        Audio recording Michael Chermak

D-25        Audio recording Douglas Krause

D-26        Audio recording Plaintiff Fehl

D-27        Complaint/Warrant BR0108 (signed by Judge Sondey) (Kudlacik 8)

D-28        Photos (Kudlacik -10)

D-29        Indictment

D-30        Bergen County Superior Court Trial Testimony 6/11/18, 1/16/18, 1/17/18

D-31        Plaintiff's Interrogatory Answers

D-32        Witold Baginski Interrogatory Answers

D-33        Hackensack University Medical Center Admission Record

# SECTION 9 – SINGLE LIST OF LEGAL ISSUES

9. SINGLE LIST OF LEGAL ISSUES (All issues shall be set forth below. The parties need not agree on any issue. Any issue not listed shall be deemed waived.)

**Plaintiff's list of contemplated issues at trial**:

(1) Whether Plaintiff engaged in protected First Amendment activity

(2) Whether Defendants retaliated against Plaintiff for engaging in protected First Amendment activity in violation of his constitutional rights secured under 42 U.S.C. § 1983

(3) Whether Defendants intimidated Plaintiff for engaging in protected First Amendment activity in violation of his constitutional rights secured under 42 U.S.C. § 1983

(4) Whether Defendants intimidated Plaintiff for engaging in protected First Amendment activity in violation of his constitutional rights secured under N.J.S.A. § 10:6-2

(5) Whether Defendants retaliated against Plaintiff for engaging in protected First Amendment activity in violation of his constitutional rights secured under N.J.S.A. § 10:6-2

(6) Whether Defendants threatened or attempted to intimidate Plaintiff for engaging in protected First Amendment activity in violation of his constitutional rights secured under N.J.S.A. § 10:6-2

(7) Whether Defendants threatened or attempted to retaliate against Plaintiff for engaging in protected First Amendment activity in violation of his constitutional rights secured under N.J.S.A. § 10:6-2

(8) Whether the Borough of Wallington has a pattern, practice or custom of retaliating and intimidating individuals for engaging in protected First Amendment activity

(9) Whether Defendant Baginski is a final decision-maker or supervisory employee for purposes of municipal liability

55

(10) Whether Defendant Kudlacik maliciously accused Plaintiff of an indictable offense

(11) Whether Defendant Kudlacik had probable cause to arrest Plaintiff

(12) Whether Defendant Kudlacik charged Plaintiff with an indictable offense without probable cause

(13) Whether Defendant Kudlacik conspired with Defendant Baginski

(14) Whether Defendants abused the criminal complaint process for illegitimate purposes unrelated to the prosecution of crime

(15) Whether Defendant Kudlacik gave false and misleading grand jury testimony

(16) Whether Defendant Kudlacik gave false and misleading trial testimony

(17) Whether Plaintiff's constitutional right to be free from an arrest without probable cause was violated under 42 U.S.C. § 1983

(18) Whether Plaintiff's constitutional right to be free from an arrest without probable cause was violated under N.J.S.A. § 10:6-2

(19) Whether Plaintiff is entitled to costs and attorney fees under 42 U.S.C. § 1988

(20) Whether Plaintiff is entitled to costs and attorney fees under N.J.S.A. § 10:6-2

(21) Whether Plaintiff is entitled to punitive damages

**Defendants list of contemplated issues at trial:**

### FIRST SEPARATE DEFENSE

Plaintiff's common law claims are barred by the application of the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq.

### SECOND SEPARATE DEFENSE

Plaintiff cannot prove a violation of a clearly established constitutional or statutory right.

*Federal § 1983- False Arrest Claim*

56

Defendant Kudlacik had lawful authority to arrest Plaintiff, therefore Plaintiff's claim

that he was falsely arrested lacks merit. False arrest and false imprisonment overlap; the former

is a species of the latter. "Every confinement of the person is an imprisonment, whether it be in a

common prison or in a private house, or in the stocks, or even by forcibly detaining one in

the public streets; and when a man is lawfully in a house, it is imprisonment to prevent him from

leaving the room in which he is." M. Newell, Law of Malicious

Prosecution, False Imprisonment, and Abuse of Legal Process § 2, p 57 (1892) <u>Wallace v. Kato</u>,

549 U.S. 384, 388-89, 127 S. Ct. 1091, 1095, 166 L.Ed.2d 973, 980-81 (2007). The sort of

unlawful detention remediable by the tort of false imprisonment is detention *without legal*

*process.* Id. at 389, 127 S. Ct. at 1095, 166 L.Ed.2d 973, 981 (2007).

Under the prevailing view in this country a peace Defendant who arrests someone with

probable cause is not liable for false arrest simply because the innocence of the suspect is later

proved. Restatement, Second, Torts § 121 (1965); <u>Pierson v. Ray</u>, 386 U.S. 547, 555, 87 S. Ct.

1213, 1218, 18 L.Ed.2d 288, 295 (1967).

Our Supreme Court held in <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 586, 199

L.Ed.2d 453, 463 (2018) that to determine whether an Defendant had probable cause for

an arrest, "we examine the events leading up to the arrest, and then decide 'whether these

historical facts, viewed from the standpoint of an objectively reasonable police Defendant,

amount to' probable cause." *Maryland* v. *Pringle*, 540 U. S. 366, 371, 124 S. Ct. 795, 157 L. Ed.

2d 769 (2003) (quoting *Ornelas* v. *United States*, 517 U. S. 690, 696, 116 S. Ct. 1657, 134 L. Ed.

2d 911 (1996)). And that because probable cause "deals with probabilities and depends on the

totality of the circumstances," 540 U. S., at 371, 124 S. Ct. 795, 157 L. Ed. 2d 769, it is "a fluid

concept" that is "not readily, or even usefully, reduced to a neat set of legal

rules," *Illinois* v. *Gates*, 462 U. S. 213, 232, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Therefore, a finding of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.*, at 243-244, n. 13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). As such, probable cause "is not a high bar." *Kaley* v. *United States*, 571 U. S. ___, ___, 571 U.S. 320, 134 S. Ct. 1090, 1103, 188 L. Ed. 2d 46, 62 (2014).

Defendant Kudlacik had probable cause to arrest Plaintiff for insurance fraud (N.J.S.A. § 2C:21-4(b)(6)(a)) and tampering with public records or information (N.J.S.A. § 2C:28-7(a)). After Plaintiff was in the accident an accident report was completed (D-20, Voided NJ Crash Investigation Report) and an investigation ensued. Police Defendants in the Borough investigated Plaintiff's claim that he was involved in a hit and run accident and found no evidence of such. After reviewing surveillance from homes in the area (D-12, Video feeds from neighboring properties; D-19, Photos of Surveillance) and investigating the scene for evidence of an accident, it was determined that there was no hit and run. Plaintiff ultimately reported the accident to the Borough of Wallington because he was injured in his capacity of an EMT (D-4, First Report of Injury Report).

After the investigation of the accident was completed, Defendant Kudlacik requested Plaintiff to come to the station for questioning. Plaintiff volunteered to attend and subsequently waived his right to an attorney after being given his Miranda Rights (D-14, Waiver of Rights Form). During the interrogation with Defendant Kudlacik, Plaintiff was asked whether he was involved in a hit and run, and Plaintiff was adamant that he believed he was. After the interrogation and based on the investigation of the accident, Defendant Kudlacik determined that he had probable cause to arrest Plaintiff. He then called the Borough of Wallington municipal judge, Judge Casmir Sondey, to request a warrant for Plaintiff's arrest. Judge Sondey granted the

request and a warrant was issued thereafter (D-13, Warrant and Complaint). Plaintiff was then arrested for insurance fraud and tampering with public records and subsequently held at the station (D-21, NJ Bail Recognizance Form).

When looking at the totality of the circumstances, it is clear that Defendant Kudlacik had probable cause to arrest Plaintiff. An investigation into his claim of a hit and run was completed and Plaintiff was interrogated. Defendant Kudlacik determined that the evidence pointed to Plaintiff making a false claim to the insurance company for insurance benefits when there was no evidence of a hit and run and that Plaintiff's story was inconsistent, and the video surveillance footage did not support Plaintiff's claim (D-10, Kudlacik Interrogatory Number 21). Similarly, Plaintiff falsified an official document by claiming there was an accident when the evidence showed that an accident did not occur. Accordingly, Defendant Kudlacik had probable cause to arrest Plaintiff. As the Court has held, the test is not whether the alleged criminal is ultimately found guilty of the crime he is accused of, but whether there is a "probability or substantial chance of criminal activity." Illinois v. Gates, 462 U. S. 213, 243-244, n. 13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Based on the evidence before him, Defendant Kudlacik believed that there was a substantial chance of criminal activity. The fact that Plaintiff was not found guilty of the crime does not make Defendants liable for false arrest when Defendant Kudlacik had probable cause to make an his arrest. Pierson v. Ray, 386 U.S. 547, 555, 87 S. Ct. 1213, 1218, 18 L.Ed.2d 288, 295 (1967).

Plaintiff was enmeshed in the legal process throughout the entire proceeding with Defendant Kudlacik. Plaintiff volunteered to come to the police station and was not coerced. He volunteered to be interrogated and waived his right to an attorney (D-14). Defendant Kudlacik did not in any way deceive Plaintiff or force him to discuss the matter with him without the

59

presence of an attorney. Following the interrogation, a warrant was applied for and granted in

accordance with standard legal procedures (D-13). Plaintiff was then arrested and released on

bail later that day (D-21). Therefore, because Defendant Kudlacik had probable cause to arrest

Plaintiff and Plaintiff was treated to standard legal processes, Plaintiff's §1983 claim for false

arrest must fail.

### *New Jersey State Law False Arrest Claim*

The terms false imprisonment and false arrest are synonymous. They are different names

for the same tort. Price v. Phillips, 90 N.J. Super. 480 (App. Div. 1966). The gist of an action for

false imprisonment is unlawful detention, without more. Jorgensen v. Pennsylvania R.R., 38

N.J. Super. 317 (App. Div. 1955), *rev'd on other grounds*, 25 N.J. 541 (1958); Pine v. Olzewski,

112 N.J.L. 429 (E. & A. 1933); Earl v. Winne, 14 N.J. 119 (1953); Cannon v. Kratowitch, 54

N.J. Super. 93 (App. Div. 1959). The tort of false imprisonment has been defined to include the

following elements [1 *Harper & James, The Law of Torts*, (3rd ed.) at 226]: (i) there must be a

detention; (ii) the detention must be unlawful; (iii) the act of the defendant in confining the plaintiff

must have been done with the intention of causing a confinement; and, (iv) the detention must have

been against the plaintiff's will. Importantly, a detainer pursuant to lawful authority or legal

justification cannot support a false imprisonment action. Genito v. Rabinowitz, 93 N.J. Super. 225

(App. Div. 1966); Cannon v. Kratowitch, supra; Jorgensen v. Penn. R.R., supra; Earl v. Winne,

supra; Lakutis v. Greenwood, 9 N.J. 101 (1952); Pine v. Olzewski, supra; Collins v. Cody, 95

N.J.L. 65 (Sup. Ct. 1920); Shaefer v. Smith, 92 N.J.L. 267 (Sup. Ct. 1919).

Here, as detailed above, Defendant Kudlacik had legal justification for arresting Plaintiff.

After following standard legal procedures, Plaintiff was arrested because Defendant Kudlacik

found there to be probable cause that Plaintiff filed a false insurance claim and tampering with

public records (D-10, Kudlacik Interrogatory Number 21; Expert Report of Glenn M. Miller,

page 18 to 22). Accordingly, Plaintiff's claim that he was falsely imprisoned or arrested must

fail.

### *Federal § 1983 Claim - Abuse of Process*

Defendants did not commit an abuse of process in charging and arresting plaintiff. This

court held in Simone v. Golden Nugget Hotel & Casino, that the gist of the tort of abuse of

process is "the misuse of process justified in itself for a purpose other than that which it was

designed to accomplish, and the essential elements are an ulterior motive and some further act

after the issuance of process representing the perversion of the legitimate use of the process."

844 F.2d 1031, 1036-37 (3d Cir. 1988).

Here, Defendant Kudlacik made a proper, legal arrest authorized by law when he applied

for and received a warrant for Plaintiff's arrest (D-27). As such, the first prong of the charge is

not satisfied. Further, Defendant Kudlacik did not have an ulterior motive for arresting Plaintiff.

Defendant Kudlacik did not have any communications with Defendant Baginski regarding

Plaintiff (D-10, Kudlacik Interrogatory Number 22). This is evidence of a lack of ulterior motive

because the alleged feud was between Defendant Baginski and Plaintiff did not involve

Defendant Kudlacik and he was unaware of it. Thus, the second prong of the charge is not

satisfied. It remains undisputed that the evidence before Defendant Kudlacik revealed probable

cause that Plaintiff committed a criminal act. There is no evidence that the arrest was illegal or

that Defendant Kudlacik had an ulterior motive for the arrest. Accordingly, Plaintiff's claim of

abuse of process must fail.

There are two basic elements necessary to sustain the cause of action of abuse of process in

New Jersey: (i) the defendant made an improper, illegal and perverted use of the legal procedure,

61

that was neither warranted nor authorized by law; and, (ii) the defendant had an ulterior motive in

initiating the legal process. In other words, abuse of process is the misuse or misapplication of the

legal procedure in a manner not contemplated by law. New Jersey Model Civil Jury Charge 3.30D-

Abuse of Process.

> Abuse of process differs from malicious prosecution in that the gist
> of the tort is not commencing an action or causing process to issue
> without justification, but misusing, or misapplying process
> justified in itself for an end other than that which it was designed
> to accomplish. The purpose for which the process is used, once it
> is issued, is the only thing of importance. Consequently, in an
> action for abuse of process it is unnecessary for the plaintiff to
> prove that the proceeding has terminated in his favor, or that the
> process was obtained without probable cause or in the course of a
> proceeding begun without probable cause. It is often said that
> proof of 'malice' is required; but it seems well settled that, except
> on the issue of punitive damages, this does not mean spite or ill
> will, or anything other than the improper purpose itself for which
> the process is used, and that even a pure spite motive is not
> sufficient where process is used only to accomplish the result for
> which it was created. Thus if the defendant prosecutes an innocent
> plaintiff for a crime without reasonable grounds to believe him
> guilty, it is malicious prosecution; if he prosecutes him with such
> grounds to extort payment of a debt, it is abuse of process. *Prosser
> on Torts*, Chap. 22, sec. 121 at 856-857 (4th ed. 1971). *See also
> Earl v. Winne*, 14 *N.J.* 119, 135 (1953); 34 *N.J. Super.* 605, 616 (Cty.
> Ct. 1955), and *Gambocz v. Apel*, *et al.*, 102 *N.J. Super.* 123, 128-130
> (App. Div. 1968), *certif. denied*, 52 *N.J.* 485 (1968).

As stated above, there is no evidence that Defendant Kudlacik's arrest of Plaintiff was

illegal or that Defendant Kudlacik had an ulterior motive for the arrest. Accordingly, Plaintiff's

claim of abuse of process must fail.

*Federal §1983 Claim - Malicious Prosecution*

Defendant Kudlacik did not maliciously prosecute Plaintiff because there was probable

cause to charge and arrest him. In Heck v. Humphrey, our Supreme Court determined the

standards to recover under a malicious prosecution claim. It was held that,

> [I]n order to recover damages for allegedly unconstitutional
> conviction or imprisonment, or for other harm caused by actions
> whose unlawfulness would render a conviction or sentence invalid,
> a § 1983 plaintiff must prove that the conviction or sentence has
> been reversed on direct appeal, expunged by executive order,
> declared invalid by a state tribunal authorized to make such
> determination, or called into question by a federal court's issuance
> of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages
> bearing that relationship to a conviction or sentence that
> has *not* been so invalidated is not cognizable under § 1983. Thus,
> when a state prisoner seeks damages in a § 1983 suit, the district
> court must consider whether a judgment in favor of the plaintiff
> would necessarily imply the invalidity of his conviction or
> sentence; if it would, the complaint must be dismissed unless the
> plaintiff can demonstrate that the conviction or sentence has
> already been invalidated. But if the district court determines that
> the plaintiff's action, even if successful, will *not* demonstrate the
> invalidity of any outstanding criminal judgment against the
> plaintiff, the action should be allowed to proceed, in the absence of
> some other bar to the suit. 512 U.S. 477, 486-87 (1994)

Here, Plaintiff has not proven that the charges against him were unconstitutional. A trial

was held and a jury determined that Plaintiff was not guilty of the charges. That is by no means

the equivalent of the conviction or sentence being reversed on direct appeal, expunged by

executive order, declared invalid by a state tribunal authorized to make such determination, or

called into question by a federal court's issuance of a writ of habeas corpus as is required to

prevail on a malicious prosecution claim under  § 1983.

### *New Jersey State Law Malicious Prosecution Claim*

An action at New Jersey State law for malicious prosecution based upon a prior criminal

judicial proceeding consists of several elements. As the Supreme Court of New Jersey outlined

in Lind v. Schmid, a malicious prosecution action arising out of a criminal prosecution requires

proof: (1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it

was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and

(4) that it was terminated favorably to the plaintiff. *Prosser, Law of Torts*, § 119 at 835 (4*th*

63

ed. 1971); *Evans v. Jersey Central Power, etc., Co.*, 119 *N.J.L.* 88 (*E. & A.* 1937). The plaintiff must establish each element and upon failure to prove any one, the cause must fail. The Court summarized that, "[t]he essence of the cause of action is lack of probable cause, and the burden of proof rests on the plaintiff. The plaintiff must establish a negative, namely, that probable cause did not exist." 67 N.J. 255, 262-63 (1975).

Malice in this connection means the intentional commission of a wrongful act without just cause or excuse. Brennan v. United Hatters, 73 N.J.L. 72 (E.& A. 1906); Kamm v. Flink, 113 N.J.L. 583 (E.& A. 1934); Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552 (1955).

Probable cause has been defined as a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinarily prudent person in believing the party is guilty of the offense. It must be more than mere conjecture or unfounded suspicion. Galafaro v. Kuenstler, 53 N.J. Super. 379 (App. Div. 1958); Dombrowski v. Metropolitan Life Ins. Co., 18 N.J. Misc. 240, *aff'd* 126 N.J.L. 545 (E.&A. 1941). *See* Earl v. Winne, 14 N.J. 119 (1953); Shoemaker v. Shoemaker, supra; Little v. Little, 4 N.J. Super. 352 (App. Div. 1949); Lane v. Pennsylvania R.R. Co., 78 N.J.L. 672 (E.&A. 1910).

The law does not look with favor upon actions for malicious prosecution; it does not encourage them. The reason is embedded deeply in our jurisprudence. Extreme care must be exercised to avoid the creation of a reluctance to seek redress for civil or criminal wrongs for fear of being subjected to a damage suit if the action results adversely. Mayflower v. Thor, 15 N.J. Super. 139 (1951), aff'd 9 N.J. 605 (1952); Toft v. Ketchum, 18 N.J. 280 (1955).

In reviewing the elements as set forth in Lind v. Schmind, it is clear that Plaintiff cannot satisfy two of the four necessary elements: that the prosecution was actuated by malice and that

64

there was an absence of probable cause for the proceeding. Plaintiff has not provided any evidence that Defendant Kudlacik maliciously brought charges against Plaintiff. Further, it has been firmly established that Defendant Kudlacik had probable cause to arrest Plaintiff after the investigation into the accident and Plaintiff's interrogation (D-10, Kudlacik Interrogatory Number 13, 21). Plaintiff has not provided evidence to contradict these findings. It is the burden of the plaintiff to establish each of the elements. When one of the elements is not established, the claim must fail. Here, two of the elements have not been established. Therefore, Plaintiff's claim of malicious prosecution must fail.

### *Federal § 1983 claim - free speech retaliation*

Defendant Kudlacik had probable cause to charge and arrest plaintiff, therefore his retaliation claims must fail. In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action. Thomas v. Indep. Twp., 463 F.3d 285, 296 (3d Cir. 2006). Here, Plaintiff plead that when he "complained to municipal entities, Wallington firefighters, the State of New Jersey, government officials, media sources, and/or other citizens in the Borough of Wallington about the allocation and potential misappropriation of public resources" (Complaint at § 138) he was engaged in a protected constitutional activity, thus satisfying the first prong. Next, he plead that Defendants retaliated against him by charging him with the aforementioned crimes as part of a policy of retaliation against persons exercising their right to free speech, thus satisfying the second prong. Finally, Plaintiff plead that the exercise of his right to free speech led to Defendants retaliating against

him. However, Plaintiff has not substantiated his claim that there is a causal connection between his protected speech and the retaliation.

The presence of probable cause should generally defeat a First Amendment retaliatory arrest claim. Nieves v. Bartlett, 139 S. Ct. 1715, 1726, 204 L.Ed.2d 1, 14 (2019). The analysis here is similar to that of a malicious prosecution claim. The Court in Nieves, generally followed the precedent sent forth in Hartman v. Moore. In Hartman, a respondent chief executive Defendant brought an action against co-respondent postal inspectors for allegedly engineering the chief executive Defendant's criminal prosecution for his criticism of the United State Postal Service in violation of the First Amendment. The Court ultimately held that some evidence had to link the inspectors to the prosecutor, and the connection to be alleged and shown, was the absence of probable cause. See generally, Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695, 164 L.Ed.2d 441 (2006). Absent such a showing, a retaliatory prosecution claim fails. But if the plaintiff establishes the absence of probable cause then the plaintiff must show that the retaliation was a substantial or motivating factor behind the arrest, and, if that showing is made, the defendant can prevail only by showing that the arrest would have been initiated without respect to retaliation. Id. at 547 U. S., at 265-266, 126 S. Ct. 1695, 164 L. Ed. 2d 441)

"Thus, Hartman requires plaintiffs in retaliatory prosecution cases to show more than the subjective animus of an Defendant and a subsequent injury; plaintiffs must also prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause." Nieves v. Bartlett, 139 S. Ct. 1715, 1722-23, 204 L.Ed.2d 1, 10-11 (2019).

As a threshold matter, Plaintiff was charged and arrested after Defendant Kudlacik determined that there was probable cause to do so, thus the arrest was objectively reasonable

because it was supported by probable cause (D-10, Kudlacik Interrogatory Number 13, 21; Expert Report of Glenn M. Miller, page 18-22). Next, the record is void of any evidence that Defendant Kudlacik held any subjective animus towards Plaintiff. As such, Plaintiff cannot establish a causal connection between any alleged animus and the charging of Plaintiff with insurance fraud and forging public documents. Without this connection, there is no evidence that the prosecution was retaliation for Plaintiff's constitutionally protected speech. Defendant Kudlacik was unaware that Plaintiff was outspoken about what he perceived to be corrupt acts by Borough officials. (D-34, Kudlacik Deposition, 32:21 to 33:1). Further, he did not speak to Defendant Baginski when determining whether to arrest Plaintiff (D-10, Kudlacik Interrogatory Number 15). Further still, Plaintiff has not shown that there was a connection between Defendant Kudlacik and Defendant Baginski, who was allegedly motivated to retaliate against Plaintiff. Defendant Kudlacik has probable cause to charge and arrest Plaintiff based on the evidence before him and Plaintiff has not proven that it was objectively unreasonable to charge him with the aforementioned crimes, as is required by Hartman.

## *New Jersey Civil Rights Act claim- Free Speech Retaliation*

Plaintiff now claims the charges brought against him were in violation of the New Jersey Civil Rights Act (the "NJCRA"), N.J.S.A. § 10:6-1 et seq. because they infringed on his constitutional rights. The NJCRA was adopted in 2004 for the broad purpose of assuring a state law cause of action for violations of state and federal constitutional rights and to fill any gaps in state statutory anti-discrimination protection. Owens v. Feigin, 194 N.J. 607, 611 (2008). The Superior Court of New Jersey, Appellate Division has recognized two types of claims under the NJCRA: first, a claim for when one is deprived of a right, and second, a claim for when one's rights are interfered with by threats, intimidation, coercion or force. Interference with a right need

67

not actually result in actual deprivation of the right. <u>Felicioni v. Admin. Office of Courts</u>, 404 N.J. Super. 382, 400 (App.Div.2008), *certif. denied*, 203 N.J. 440 (2010). Free speech claims under the New Jersey Constitution are interpreted consistently with free speech claims under the First Amendment. <u>Gomez v. Town of W. New York</u>, No. 13-0689, 2013 U.S. Dist. LEXIS 157500, 2013 WL 5937415, at *4 (D.N.J. Nov. 4, 2013) (citing *Johnson v. Yurick*, 156 F. Supp. 2d 427, 436 (D.N.J. 2001), *aff'd* 39 F. App'x 742 (3d Cir. 2002); *Binkowski v. State*, 322 N.J. Super. 359, 369, 731 A.2d 64 (N.J. Super. Ct. App. Div. 1999))

Here, as previously stated, there is no evidence that the charges were brought to intimidate Plaintiff and retaliate against him for his speech. Plaintiff was charged and arrested after Defendant Kudlacik determined that there was probable cause to do so, thus the arrest was objectively reasonable because it was supported by probable cause (D-10, Kudlacik Interrogatory Number 13, 21; Expert Report of Glenn M. Miller, page 18-22).

### THIRD SEPARATE DEFENSE

The conduct of these Defendants in the matter at bar was "objectively reasonable" under the Fourth and Fourteenth Amendment as previously stated herein under Defendants' Second Separate Defense. Plaintiff was charged and arrested after Defendant Kudlacik determined that there was probable cause to do so (D-10, Kudlacik Interrogatory Number 13, 21; Expert Report of Glenn M. Miller, page 18-22). Thus, the arrest was objectively reasonable because it was supported by probable cause. As such, Plaintiff's Fourth and Fourteenth Amendment rights were not violated.

### FOURTH SEPARATE DEFENSE

Plaintiff's causes of action, some of them, are barred by the conduct of Plaintiff, which constitutes estoppels. Plaintiff was charged and arrested to insurance fraud and tampering with

public documents stemming from an accident in which he claimed he was involved in a hit and run single car accident. After the Borough of Wallington Police Department investigated the claim, no substantiating evidence was found (D-10, Kudlacik Interrogatory Number 13). Thus, Plaintiff's conduct gave rise to this entire cause of action, therefore estopping him from bringing these claims.

<div align="center">

### FIFTH SEPARATE DEFENSE

</div>

Plaintiff has failed to comply with the Notice of Claims provisions at N.J.S.A. 59:8-3 and 8-8, as a result thereof, is forever barred from making any state common law claims.

<div align="center">

### SIXTH SEPARATE DEFENSE

</div>

At all times relevant hereto, Defendants acted within the scope of their lawful authority or apparent authority. Defendant Kudlacik followed the appropriate police procedures that were designed to protect the established statutory and constitutional rights of those arrested (D-10, Kudlacik Interrogatory Number 13, 21; Expert Report of Glenn M. Miller, page 18-22). After determining that he had probable cause to charge and arrest Plaintiff, he went through the proper procedure to acquire an arrest warrant from the municipal judge (. After the judge determined an arrest warrant was appropriate, a warrant for Plaintiff's arrest was issued. Defendant Kudlacik then executed the warrant.

<div align="center">

### SEVENTH SEPARATE DEFENSE

</div>

These Defendants did not unlawfully or intentionally violate the civil rights of Plaintiff pursuant to the United States Constitution as previously mentioned herein under Defendants' Second Separate Defense.

## EIGHTH SEPARATE DEFENSE

These Defendants did not unlawfully or intentionally violate the civil rights of Plaintiff

pursuant to the State of New Jersey as previously mentioned herein under Defendants' Second

Separate Defense.

## NINTH SEPARATE DEFENSE

Defendants Borough of Wallington and Kudlacik are entitled to qualified immunity. As

held in Good v. Dauphin Cty. Soc. Servs. for Children & Youth,

> Government officials performing discretionary functions, generally
> are shielded from liability for civil damages insofar as their
> conduct does not violate clearly established statutory or
> constitutional rights of which a reasonable person would have
> known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d
> 396, 102 S. Ct. 2727 (1981). On the other hand, "if the law
> [violated] was clearly established, the immunity defense ordinarily
> should fail, since a reasonably competent official should know the
> law governing his conduct." *Id.* at 818-819. State law enforcement
> officials making judgments in connection with searches and
> seizures perform functions sufficiently discretionary to qualify for
> the immunity defense. *See* Malley v. Briggs, 475 U.S. 335
> (1986); Anderson v. Creighton, 483 U.S. 635 (1987).
> [891 F.2d 1087, 1091 (3d Cir. 1989)]

Defendant Kudlacik was performing a discretionary function and did not clearly violate

established statutory or constitutional rights. In fact, Defendant Kudlacik followed the

appropriate police procedures that were designed to protect the established statutory and

constitutional rights of those arrested (D-27, Complaint and Warrant; Expert Report of Glenn M.

Miller, page 30 to 33). After determining that he had probable cause to charge and arrest

Plaintiff, he went through the proper procedure to acquire an arrest warrant from the municipal

judge (D-27). After the judge determined an arrest warrant was appropriate, a warrant for

Plaintiff's arrest was issued. Defendant Kudlacik then executed the warrant. As such, Defendant

70

Kudlacik lawfully arrested Plaintiff and is entitled to qualified immunity when he arrested Plaintiff.

### TENTH SEPARATE DEFENSE

The conduct of these Defendants in the matter at bar was "objectively reasonable" under the Fourth Amendment and New Jersey Constitution as previously stated herein under Defendants' Second Separate Defense. Plaintiff was charged and arrested after Defendant Kudlacik determined that there was probable cause to do so. Thus, the arrest was objectively reasonable because it was supported by probable cause. As such, Plaintiff's Fourth and Fourteenth Amendment rights were not violated.

### ELEVENTH SEPARATE DEFENSE

Any injuries or damages allegedly sustained by Plaintiff were caused solely through the acts of omission or commission of Plaintiff.

### TWELTH SEPARATE DEFENSE

At all times relevant hereto, Defendants acted within the scope of their lawful authority or apparent authority. Defendant Kudlacik, as a police Defendant with the Wallington Police Department, followed the appropriate police procedures that were designed to protect the established statutory and constitutional rights of those arrested (D-27, Complaint and Warrant; Expert Report of Glenn M. Miller, page 30 to 33). After determining that he had probable cause to charge and arrest Plaintiff, he went through the proper procedure to acquire an arrest warrant from the municipal judge. After the judge determined an arrest warrant was appropriate, the warrant was issued for Plaintiff's arrest. Defendant Kudlacik then executed the warrant. As such, Defendant Kudlacik acted within his authority in arresting Plaintiff.

### THIRTEENTH SEPARATE DEFENSE

Plaintiff's demand for punitive damages is barred since the Defendants actions were never willful, malicious or knowingly outside the scope of their office.

## FOURTEENTH SEPARATE DEFENSE

These Defendants did not unlawfully retaliate against Plaintiff. Defendant Kudlacik had probable cause to charge and arrest plaintiff, therefore his retaliation claims must fail. In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action. Thomas v. Indep. Twp., 463 F.3d 285, 296 (3d Cir. 2006). "[T]he key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" Id. at 296 quoting McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006).

Here, Plaintiff plead that when he "complained to municipal entities, Wallington firefighters, the State of New Jersey, government officials, media sources, and/or other citizens in the Borough of Wallington about the allocation and potential misappropriation of public resources" (Complaint at § 138) he was engaged in a protected constitutional activity, thus satisfying the first prong. Next, he plead that Defendants retaliated against him by charging him with the aforementioned crimes as part of a policy of retaliation against persons exercising their right to free speech, which, if true, would satisfy the second prong. However, while Plaintiff plead that the exercise of his right to free speech led to Defendants retaliating against him, the facts show that there is no connection between Plaintiff's speech and events that led up to his arrest after his accident. Accordingly, Plaintiff has not substantiated his claim that there is a

72

causal connection between his protected speech and the retaliation and the third prong is not satisfied.

The presence of probable cause should generally defeat a First Amendment retaliatory arrest claim. Nieves v. Bartlett, 139 S. Ct. 1715, 1726, 204 L.Ed.2d 1, 14 (2019). The analysis here is similar to that of a malicious prosecution claim. The Court in Nieves, generally followed the precedent set forth in Hartman v. Moore. In Hartman, a respondent chief executive Defendant brought an action against co-respondent postal inspectors for allegedly engineering the chief executive Defendant's criminal prosecution for his criticism of the United State Postal Service in violation of the First Amendment. The Court ultimately held that some evidence had to link the inspectors to the prosecutor, and the connection to be alleged and shown, was the absence of probable cause. See generally, Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695, 164 L.Ed.2d 441 (2006). Absent such a showing, a retaliatory prosecution claim fails. But if the plaintiff establishes the absence of probable cause then the plaintiff must show that the retaliation was a substantial or motivating factor behind the arrest, and, if that showing is made, the defendant can prevail only by showing that the arrest would have been initiated without respect to retaliation. Id. at 547 U. S., at 265-266, 126 S. Ct. 1695, 164 L. Ed. 2d 441.

"Thus, Hartman requires plaintiffs in retaliatory prosecution cases to show more than the subjective animus of an Defendant and a subsequent injury; plaintiffs must also prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause." Nieves v. Bartlett, 139 S. Ct. 1715, 1722-23, 204 L.Ed.2d 1, 10-11 (2019).

As a threshold matter, Plaintiff was charged and arrested after Defendant Kudlacik determined that there was probable cause to do so, thus the arrest was objectively reasonable

because it was supported by probable cause (D-10, Kudlacik Interrogatory Number 21; Expert Report of Glenn M. Miller, page 18 to 22). Next, the record is void of any evidence that Defendant Kudlacik held any subjective animus towards Plaintiff. As such, Plaintiff cannot establish a causal connection between any alleged animus and the charging of Plaintiff with insurance fraud and forging public documents. Without this connection, there is no evidence that the prosecution was retaliation for his constitutionally protected speech. Defendant Kudlacik was unaware that Plaintiff was outspoken about what he perceived to be corrupt acts by Borough officials. Defendant Kudlacik was also not aware of any alleged animus between Plaintiff and Defendant Kudlacik, the object of much of Plaintiff's ire. Further, Plaintiff has not shown that there was a connection between Defendant Kudlacik and Defendant Baginski, who was alleged motivated to retaliate against Plaintiff. Defendant Kudlacik has probable cause to charge and arrest Plaintiff based on the evidence before him and Plaintiff has not proven that it was objectively unreasonable to press the charges as is required by Hartman.

# SECTION 10- CONCLUSION

10. CONCLUSION

1. MISCELLANEOUS:  None.

2. TRIAL COUNSEL:

Plaintiff's trial counsel:

Jason A. Rindosh, Esq.
Bedi Rindosh
1605 John Street, Suite #305
Fort Lee, NJ 07024

Defendant Borough of Wallington/Kudlacik's trial counsel:

David F. Pfund, Esq.
Mary C. McDonnell, Esq.
Pfund McDonnell, P.C.
139 Prospect Street, 2nd Floor
Ridgewood, NJ 07450

Christopher C. Botta, Esq.
BOTTA ANGELI, LLC
50 South Franklin Turnpike
Ramsey, NJ 07446

Defendant Baginski's trial counsel:

3. JURY TRIALS:

Not later than _____

    1.    Each party shall submit to the District Judge and to opposing counsel a trial brief in accordance with Local Civil Rule 7.2(b) with citations to authorities and arguments in support of its position on all disputed issues of law. THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE.  In the event a brief is not submitted, the delinquent's party pleading may be stricken.

    2.    Any hypothetical questions to be put to an expert witness on direct examination shall be submitted to the District Judge and to opposing counsel.

    3.    Each party shall submit to the District Judge and to opposing counsel proposed voir dire.

4.      Plaintiff shall <u>submit to opposing counsel</u>, proposed jury instructions. Each instruction shall be on a <u>separate</u> sheet of <u>legal sized paper</u> and shall be numbered in sequence. Each instruction shall include citations to authorities, if any.

Within 7 days of the above, opposing counsel shall, on the face of the instructions submitted by plaintiff, set forth any objections to the proposed jury instruction and/or proposed counter-instructions.

4.  NON-JURY TRIALS:

Not later than _____

1.      Each party shall submit <u>to the District Judge and to opposing counsel</u> a trial brief in accordance with Local Civil Rule 7.2(b) with citations to authorities and arguments in support of its position on all disputed issues of law. THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE. In the event a brief is not submitted, the delinquent party's pleading may be stricken.

2.      Any hypothetical questions to be put to an expert witness on direct examination shall be submitted <u>to the District Judge and to opposing counsel</u>.

3.      Proposed Findings of Fact of Conclusions of Law shall be submitted <u>to the District Judge and to opposing counsel after the close of evidence</u>. These shall include annotations to trial transcripts and exhibits.

5.  BIFURCATION:  Plaintiff does not request bifurcation of liability and damages, but requests to file a motion for punitive damages under Section 1983 in the event the findings of the jury as to the willful, malicious, and intent of Defendant Kudlacik and Defendant Baginski's conduct.

6.  ESTIMATED LENGTH OF TRIAL

_____ days for liability and

_____ days for damages.

7.  TRIAL DATE: _____

77

AMENDMENTS TO THIS PRETRIAL ORDER SHALL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.  THE COURT MAY FROM TIME TO TIME SCHEDULE CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.


/s/ Jason A. Rindosh, Esq.
Jason A. Rindosh, Esq.
*Attorney for Plaintiff*


/s/ Mary C. McDonnell, Esq.
Pfund McDonnell, P.C.
*Attorney for Defendants Borough of
Wallington and Shawn Kudlacik*


/s/ Christopher C. Botta, Esq.
Christopher C. Botta, Esq.
*Attorney for Defendant Witold Baginski*


s/Cathy L. Waldor 6/9/20
HON. CATHY L. WALDOR
United States Magistrate Judge