<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOSEPH FEHL, <br><br> *Plaintiff,* <br><br> v. <br><br> BOROUGH OF WALLINGTON, WITOLD BAGINSKI, *in his individual and official capacity as Business Administrator of Wallington*, SEAN KUDLACIK, BERGEN COUNTY PROSECUTOR'S OFFICE, and JOHN AND JANE DOES 1-10, <br><br> *Defendants.* | Civil Action No. 17-11462 (KSH) (CLW) <br><br><br><br> <u>**OPINION**</u> |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.     Introduction**

        Plaintiff Joseph Fehl has brought this civil rights action against the Borough of

Wallington (the "Borough") and two individual defendants: Witold Baginski ("Baginski"), the

Borough's former business administrator, and Sean Kudlacik ("Kudlacik"), a captain with the

Borough's police department.  Defendants have moved for summary judgment.  (D.E. 44, 45.)

The Court held oral argument on September 13, 2021.  For the reasons set forth below,

defendants' motions will be granted.

**II.     Background**

        This lawsuit arises from Fehl's 2014 arrest and subsequent acquittal in 2018 on charges

of insurance fraud and tampering with public records.  In July 2014 Fehl, then a volunteer EMT

and firefighter in the Borough, reported that he had been struck and injured by a hit-and-run

driver while attempting to respond to an emergency call. Afterwards, he initiated a worker's

compensation claim on that basis by filling out a form called a "first report of injury" ("FROI").
When the Wallington Police Department, in an investigation handled predominately by
Kudlacik, concluded that there had been no hit-and-run, Fehl was charged and arrested, made
bail, was indicted, and ultimately was tried and acquitted by a jury. Fehl asserts that the criminal
proceedings were the product of a scheme between Kudlacik and Baginski, the latter of whom
Fehl contends he had repeatedly and publicly criticized over the years. Fehl contends that in
exchange for targeting him, Kudlacik was promoted to captain.

Following discovery, defendants have moved for summary judgment. Notwithstanding
the voluminous records both sides point to in support of their respective positions, the governing
law makes clear that the central issue is whether Fehl's arrest and prosecution were based on
probable cause. For that reason, the events leading up to and following that arrest and the
information known to Kudlacik are set forth in detail.

Beginning in 2009, Fehl served as both a volunteer firefighter and a volunteer EMT for
defendant Borough of Wallington. (D.E. 38, FPTO § 3, Stipulated Facts ¶¶ 1-2.) At all times
relevant, Baginski was the borough administrator and borough clerk for Wallington. (D.E. 44-1,
Baginski R. 56.1 Stmt. ¶ 2.)[1] Kudlacik was a detective lieutenant with Wallington's police
department at the time the complaint was filed. (D.E. 45-3, Wallington/Kudlacik R. 56.1 Stmt.
¶ 4.)

In the early morning hours of July 3, 2014, Fehl and two friends were at one of the
Borough's firehouses when Fehl left to get potato chips. (*Id.* ¶¶ 8-9.) As he was returning, he

---

[1] Unless otherwise noted, references to the parties' L. Civ. R. 56.1 statements are to facts that are undisputed and/or admitted.

got a page to respond to an EMS call.  Fehl went into the firehouse and started back to his

personal truck to respond to the call.  (*Id.* ¶ 10; *see also* D.E. 53-2, Pl.'s Response ¶ 10.)

Before Fehl reached his truck he lost consciousness, and when he awoke he called 911

and reported that a car had hit him and taken off while he was attempting to respond to the EMS

call.  (Wallington/Kudlacik R. 56.1 Stmt. ¶ 13; D.E. 45-4, McDonnell Cert., Ex. B (Tr. of 911

call).)  Fehl then called Douglas Krause, his EMS lieutenant and friend, and told him he'd been

hit by a car.  (Wallington/Kudlacik R. 56.1 Stmt. ¶ 15.)  The first person to arrive on the scene

was Wallington police officer Kasper Zielinski; when he arrived, Fehl was approximately 20 feet

from his truck.  (*Id.* ¶ 14.)  Krause also came to the scene.  (*See id.* ¶ 34.)

EMS and paramedics responded.  (*Id.* ¶ 18.)  Their report, which noted Fehl's complaints

of pain and that he had dried blood on the top of his head but was alert and oriented, states: "Pt

reportedly struck by passing vehicle after he exited his vehicle. [P]t has no further recollection of

incident and was found a distance from his vehicle." (McDonnell Cert., Ex. D.) [2]  Similarly, a

report by the Wallington Fire Department emergency squad states that Fehl "was found on the

ground in the street after being struck by a vehicle" and "dragged approx 40 feet."  (McDonnell

Cert., Ex. C.)   Fehl was taken to Hackensack University Medical Center where he remained

until July 6, 2014.  (Wallington/Kudlacik R. 56.1 Stmt. ¶ 19.)

---

[2] Fehl denies telling the paramedics that he was struck by a vehicle after exiting his vehicle,
citing several pages from his August 5, 2014 interview by Kudlacik (discussed *infra*) for the
proposition that he testified that that "he does not have an exact recollection what he said at the
scene of his injury." (D.E. 53-2, Pl.'s Response ¶ 18.)  However, he also concedes that he
reported to numerous people, including EMS and hospital personnel, that he was hit by a car
while going to his truck to respond to an EMS call.  (Wallington/Kudlacik R. 56.1 Stmt. ¶ 22;
Pl.'s Response ¶ 22.)

The Wallington Police Department investigated the incident.  (*Id.* ¶ 23.)  Zielinski began the investigation, and Kudlacik continued it.  (*Id.* ¶¶ 24, 26.)  Initially the focus was finding the car that purportedly hit Fehl; later on the focus shifted to insurance fraud.  (*Id.* ¶ 26; Pl.'s Response ¶ 26.)  According to the police incident report, Fehl told Zielinski at the scene that while he was attempting to respond to a squad call, "a dark colored small compact car sped around the corner from Parkrow onto Adamson street, striking him and pushing him more than 20 feet down the road" and then it fled "down Stein avenue toward Main Avenue after the strike."  (McDonnell Cert., Ex. E.)  According to the report, when Zielinski pressed for more detail, Fehl "retracted the initial description and would only state that he was unconscious for a bit and did not know what the car looked like."  (*Id.*)  The incident report also noted the absence of "physical debris, glass, or skid marks that would be consistent with a crash."  (*Id.*)

Neighbors in the area were canvassed for potential leads and video footage, and ultimately footage was secured from two cameras in the area.  (Wallington/Kudlacik R. 56.1 Stmt. ¶¶ 27, 29.)  The footage showed the intersection of Park Row and Adamson and, according to the incident report,  did not show a car turning onto the street where Fehl was found during the time period he asserted a car struck him.  (*Id.* ¶¶ 30-31; McDonnell Cert., Ex. E.)

Corey Mustac and John Orme, the two friends who had been in the firehouse with Fehl before the incident, gave statements later on the day of the incident.  (Wallington/Kudlacik R. 56.1 Stmt. ¶ 47; McDonnell Cert., Ex. K.)  They both confirmed that they had been at the firehouse with Fehl and that he left to respond to a call, but added no information about the circumstances of the incident.  (McDonnell Cert., Ex. K.)  On July 21, 2014, Kudlacik interviewed Mike Chermak (one of the responding EMS personnel) and Krause.

(Wallington/Kudlacik R. 56.1 Stmt. ¶ 33.)  What Chermak said is not part of the summary judgment record.

Fehl testified at his deposition that several days after he was discharged from the hospital, Krause told him in a telephone call that he had to go to Baginski's office and fill out paperwork. (Rindosh Cert., Ex. 34, at 89-90.)  At Borough Hall, Fehl filled out a FROI, the form that initiated the process of seeking worker's compensation benefits, which he said Baginski gave him.  (Wallington/Kudlacik R. 56.1 Stmt. ¶ 35; McDonnell Cert., Ex. F; Rindosh Cert., Ex. 34, at 90.)  In the box next to "[h]ow injury or illness/abnormal health condition occurred," Fehl handwrote "hit by car responding to EMS call."  (McDonnell Cert., Ex. F.)  Next to "type of injury," he wrote "muscle contusion and nerve," and below that entry that his "right leg" had been affected.  (*Id.*)

The handwritten information from the FROI form was later typed by Dorothy Siek, then the Borough's tax collector/treasurer who handled worker's compensation claims, into an online version that she submitted electronically.  (Wallington/Kudlacik R. 56.1 Stmt. ¶¶ 36-37.)  Part of her input task was to type in the "wage rate" for volunteers, set annually by the state.  (*Id.* ¶ 40; *see also* McDonnell Cert., Ex. F, at BR0127, Box 18.)  According to Siek, if someone was hurt at work, she would fill out the FROI form electronically from her computer, but if she was absent, she left blank forms to be filled out.  (Wallington/Kudlacik R. 56.1 Stmt. ¶¶ 38-39.)

As part of his duties, Baginski was responsible for ensuring that employees and volunteers injured on the job submitted the proper paperwork in a timely matter to the Borough's worker's compensation administrator.  (D.E. 44-2, Baginski R. 56.1 Stmt. ¶ 3.)  Fehl's supervisor, David Kazcor, was also required to submit a supervisor's report, standard for a

worker's compensation claim, which he did on July 23, 2014.  (Wallington/Kudlacik R. 56.1

Stmt. ¶¶ 42, 44; McDonnell Cert., Ex. H.)

On July 22, 2014, Kudlacik interviewed Krause, who said he got a "frantic" call from

Fehl after the incident:

> A. And he was frantic and he said that he was hit by a car and I was trying to say
> you know where are you and he said at the firehouse and I said which one you
> know? He said Park Row Firehouse and I said Joe are you lying to me and he
> goes "no. I was hit by a car." He was all frantic and I could you know see he's
> like very upset.
> Q. Right.
> A. I never heard him like you know in this kind of motion before something
> happens so before I went to the Locust Avenue call I said let me swing by the
> firehouse to see if this really had happened.
> Q. Okay.
> A. Um so I just when I turned onto from Park Row onto Adamson I saw Officer
> Zielinski.
> Q. Okay.
> A. There with Joe on the ground.

(D.E. 53-4, Rindosh Cert., Ex. 14, at 4-5.)[3]  Kudlacik asked Krause if he knew whether Zielinski

was already at the scene when Fehl called him, and Krause responded that he thought he was

called first and didn't know what the situation was.  He continued: "I didn't know that the police

had already would be responding the police would be there.  I was just going to see if he was

actually telling me the truth.  I wasn't going to call in on the radio and say I just got a report

because. . . . I don't want to . . . sound like you know."  (*Id.* at 5.)  Krause went on to describe his

arrival on the scene, including that Fehl was four car lengths down from his own truck and his

glasses were two or three cars further down, and that he was bleeding from the head and

complained of pain "everywhere," including his legs.  (*Id.* at 5-6.)  Krause said Fehl "might"

---

[3] Language from the transcript of this interview is reproduced without any corrections.

have had an abrasion on his hand and that the paramedics said they couldn't see any "upper

injuries" and in their checks of him, "[e]verything came back good." (*Id.* at 6-7.)

When Kudlacik asked about his conversation with Fehl at the scene, Krause responded:

> A.  What happened? He said he was hit by a car.  What kind of car? A black car.
> Um you know.  Joe what happened? Like is this really happening? Yeah this
> somebody hit me with a car.  He was kind of out of it.  He didn't really know
> too much was going on [inaudible].

(*Id.* at 7.)  After some discussion of how long it took Fehl to respond to the EMS call when he

heard the tone, Krause later elaborated on Fehl's statements about the alleged accident:

> Q.  What did he say exactly?
> A.  The last thing he remembered was he saw a car whipping around the corner; a
> black car.
> Q.  What car? What corner?
> A.  Around Adamson.  Around Park Row onto Adamson.  . . . I don't know if it
> was coming down the hill or going up the hill per say up the block.  . . . I don't
> know if it was going east or west.
> Q.  Okay.
> A.  But at some point it had made a sharp turn and he said that he knew he was
> going to get hit he said.  He goes there was nothing that he could do.  He
> realized at that point.  And if that's the case that he did get hit all the way up
> there then I don't know how he got all the way down the block.  We were just
> trying to figure that out.  You know if he was either dragged or if he was on
> the hood of the car or.
> Q.  Dragged a block towards what?
> A.  Dragged four cars down to where we found him.
> Q.  Right.  He said he was dragged all the way down?
> A.  He said he didn't remember.
> Q.  He didn't remember?
> A.  So that's all I know.  I was on the scene and we were trying to you know say
> okay his car was over there.  He's down there.  His glasses are even further
> down you know.  How did this all happen? Cause you know we were
> obviously just tryin to [inaudible] for ourselves.
> Q.  Yeah. Sure.  Trying to gather.
> A.  Because you know is he really hurt? Did he get hit? . . . . How bad is his
> injuries?

(*Id.* at 9-10.) When asked about reports that Fehl had been hit and thrown 20 or 40 feet, Krause

responded that "[n]ormally if somebody was hit that hard they would be out of their shoes," and

that it would be "unusual" for someone with Fehl's injuries have been hit that way.  (*Id.* at 10-11.)  Krause also said that Fehl initially said the car was black, then changed it to "dark" rather than black specifically.  (*Id.* at 12.)

Krause further stated that he went to the hospital with Fehl, who seemed "out of it" initially and realized in the ambulance that he'd left his two friends in the firehouse; Krause said he "found it very weird that he didn't tell us the whole time, 'Hey listen go get my friends in the firehouse.'" (*Id.* at 12-13.)  Krause stated that Fehl's legs "definitely appeared injured" but there was no debris, glass, or anything else in the road, and no marks on Fehl's pants; "[h]e had shorts on there was nothing [inaudible]" other than a scrape to the knee.  (*Id.* at 13-15.)

Kudlacik returned to the topic of Fehl's injuries, asking Krause if, in his experience, those injuries were "consistent with being struck by a car and being launch or dragged 20 feet":

A. Yes and no.  Yes with the leg injury of being hit by a car.
Q. Uhum.
A. I don't know how he was dragged, if he was thrown, if he definitely wasn't thrown because then he would probably not be talking to us if he thrown that distance.  So he he only thing I can think of him being on the hood of the car after he was hit on the road.
Q. Right.
A. Fall off.  There's nothing on the back or head that can show he fell off of got you know hit or something or.
Q. Right.
A. So it's kind of like a you know at that time of night I don't think you know when he was telling me the situation as it was going on, I didn't think he would have misguided us of what was going on. You know? I was saying cause Joe what really hit you? Did this really happen? Because we've had, you know, we know that I've been friends with him for a while and some of his stories are a little different.  They're a little farfetched sometimes with things that have happened.
Q. What do you mean farfetched?
A. Just like you know with everything he exaggerates you know his businesses or his personal life with things you know?
Q. Yea.
A. This, that it's always to the extreme.
Q. Yea.

> A. Up and beyond of what the truth really is and it's hard to try to get. That's why it's hard to get the truth from him at points and that's why I was very you know Joe did this happen? You were hit by a car? Are you sure? Nobody came beat you up? This really happened?
>
> Q. Did he fall? Maybe he fell?
>
> A. Did you fall? Were you drinking? What's going on was?
>
> Q. So . . . you kind of question from what you're telling me you kind of question his credibility?
>
> A. Yea I yea. It's almost all the time you question is credibility just because of past experiences with him.

(*Id.* at 15-16.) When Krause was at the hospital with Fehl, he "kept questioning [Fehl] more about it," "[t]rying to pry information out to figure out" whether "this really happen[ed]," and he became "more skeptical" after Fehl "came back with a clear bill of health." (*Id.* at 17.)

According to Krause, the next time he saw Fehl was the following Sunday, the day Fehl was discharged, when Fehl came to the emergency squad building. (*Id.* at 18-19.) Krause told Fehl he "can't be here" because he "was hurt under workman's you know this is a workplace, you were hurt at the workplace, you can't be at the workplace," and "you know that. I know that we all know that." (*Id.* at 19.) According to Krause, Fehl was wearing two leg braces and claimed to have "severe nerve damage" but no broken bones, a type of injury Krause hadn't seen from car accidents. (*Id.*) Krause said they were all joking that Fehl was "milking this one out," though he acknowledged that Fehl claimed to be "in a lot of pain." (*Id.*)

Kudlacik returned to the topic of Krause's skepticism about Fehl's credibility, which Krause repeated, though he commented that Fehl "seemed very out of it. He really didn't you know . . . what happened." (*Id.* at 22.) He did "kn[o]w enough" to change his initial "black car" description to a "dark" car, which was a "red flag" to Krause. (*Id.*) The interview with Kudlacik continued:

> Q. Did he tell you that he was launched or boosted 20 40 feet?
>
> A. He said he didn't remember anything. The last thing he said he remembered was the car turning the corner very fast.

9

Q. From Park Row onto Adamson?

A. From Park Row onto Adamson.  He didn't specify which direction it was coming from.

Q. Okay.

A. He just said he looked to his left and saw the car . . . and said you know like gonna get hit and that's the last thing he said he remembered so you know personally I think there was a little bit of down time from if that whole if the whole scenario played out the right way that if he did he did get hit by the car blah blah there was a lapse of time from the second tone there was a timeframe that lapsed to the third tone to the time he actually called me. There so there's I think he might've been unconscious from whatever actually happened.  If he did leave at that time and call at that time there was a lapse of time.  I think either whatever did happen he was briefly unconscious because he didn't really remember you know too much.  He wasn't telling me you know.

Q. And he could've been unconscious from a . . . number of things?

A. [Inaudible]

Q. You said like you said earlier you know he might of gotten into a fight he might've fell.

A. Yea.

Q. He might've it could've been anything. You know [we're] not going to jump to conclusions but I mean I'll it is what it is.  This is what you know and this is what you're willing to provide and you know nothing else.

A. [Inaudible] I don't I don't know anything more than that.

(*Id.* at 22-23.)  Krause told Kudlacik that "[e]verybody has their own speculation around the

firehouse about what could've happened" and "what really happened," and that he didn't "know

what happened" but felt like he was "sticking up for" Fehl.  (*Id.* at 24.)  He continued:

A. You know like no if you were there you would've seen like it didn't look like he was lying to us.

Q. Yea.

A. It looked like if you know he was genuinely injury genuinely, hurt genuinely seemed like he didn't know what happened.

Q. Right.

A. He didn't know what hit em.  He didn't know what you know.

Q. Yea.

A. You know he just it didn't seem like it was one of his falsified you know injuries that that you know one time I was having a heart attack you know okay you're not really having a heart attack stop bullshittin us, you know.

Q. Oh he said he had a heart attack one time?

A. This was years and years ago.

(*Id.* at 24-25.)  This, Krause continued, was why he drew the perceptions he did, though on this occasion both he and his partner concluded that Fehl was indeed hurt and didn't remember what happened.  (*Id.* at 25.)[4]  Finally, Krause told Kudlacik that the paramedics seemed skeptical and said it was a "miracle" that Fehl was talking to them if that's what really happened.  (*Id.*)

On August 5, 2014, Kudlacik interviewed Fehl at the police station. (Wallington/Kudlacik R. 56.1 Stmt. ¶ 48.)  After advising Fehl of his *Miranda* rights and getting a written waiver, Kudlacik questioned him about the events of July 3, 2014.  (*Id.* ¶ 49; McDonnell Cert., Ex. N, O.)  According to the transcript, the interview began at 3:41 p.m. and concluded at 4:04 p.m. (McDonnell Cert., Ex. O, at 1, 25.)  Fehl said that in responding to the squad call, "I walked outside and as I walked out somebody came flying around the corner and that was it.  That's all I remember."  (*Id.* at 4.)  When asked what corner, he responded "Park Row."  (*Id.*)  Kudlacik asked:

> Q. . . . Alright um now what happened after it came around the corner? I mean did where did it . . . did it strike you? Did it not strike you?
> A. I don't you know what I don't I just don't remember getting.  I don't know if I went up or if it dragged me.  I just know that it was it just clipped me.  So I don't know you know what I'm saying? I don't know.
> Q. Got it.
> A. If it actually took me down the block or not.
> Q. Okay and then what did you do right after . . . you got um hit?
> A. [Inaudible] You know what, I don't even remember. I just remember I know I called the desk to say I got hit.  That was it.
> Q. Okay.
> A. But I don't know how long after I got it.  So I don't know.
> Q. Okay.  Alright.  Um and who came there?  The paramedics? The squad members?
> A. The paramedics.  The squad members.  Kasper.
> Q. Is there anything that you um recall telling any of the officers or any of the squad members about the color of the car?
> A. It was a dark colored car that's all I think I remember saying to them.
> Q. A dark colored car?

---

[4] Krause suggested that Kudlacik not call the partner for questioning because he was in corrections academy.

A.   Yea.

(*Id.* at 4-5.) Kudlacik then told Fehl that in trying to find the car fitting Fehl's description, the

police had "some problems" that "actually . . . opened up another window of investigation,"

which was why Fehl was brought in.  (*Id.* at 5-6.)  Kudlacik told Fehl to "be honest," and asked

whether it was "possible that you could've fell and not realized it when you went across the

street" and whether he was drinking.  (*Id.* at 6.)  Fehl denied drinking.  He also denied having

"money problems."  (*Id.* at 7.)  When asked about why he changed his initial description of the

car from "black" to "dark," Fehl answered: "Like I said I really.  I don't remember anything after

that.  I don't remember what I said to him"; and "It's three or four weeks later now so I really

don't remember too much so."  (*Id.* at 7-8.)  Later, Kudlacik asked:

> Q.   Is there any way possible that you could've tripped and wiped out and got
>        unconscious and woke up and not realized what happened?
> A.   I don't.  It could be.  I don't know.
> Q.   It could be?
> A.   There was a car coming around.  So I don't know if the car hit me.  I could
>        have fell.  I don't know.  Like I said I just know that the car went zooming by.
>        So I don't know.
> . . . .
> Q.   . . . So basically um . . . is it possible that you may have been like running out
>        to you know get out to this call.  You may have wiped out came through and
>        thought you may got basically cause you're all beat up that you got hit by a
>        car?
> A.   It could be.  It could be.  I'm not saying yes.  I'm not saying no.  You know?

(*Id.* at 9-10.)

When Kudlacik told Fehl that video footage gave no support to Fehl's hit-and-run story,

Fehl acknowledged that he had seen the video footage a few weeks earlier in the police chief's

office. (*Id.* at 12.)  Pointing out that video footage showed Fehl "running down the bay" at one

point, Kudlacik asked again if Fehl "could've wiped out"; Fehl acknowledged he could have.

(*Id.* at 14.)

> A.  I really thought I got hit by a car.  I'm being honest with you.  I'm not gonna lie to you.
> Q.  You thought you got hit by a car?
> A.  Yea.
> Q.  Okay.  But it's possible . . . you didn't get hit by a car?
> A.  I don't like I said I don't know.
> Q.  What if I told you that no car turned that corner at all when you were there?  No[t] even one.
> A.  Then if that's the case then I must've fuckin fallen.  (Laughs)

(*Id.* at 18.)  Fehl acknowledged that he could have been disoriented and thought he saw a car when none was there, perhaps because "of the injuries.  I mean I was really hurt." (*Id.* at 21.)

> Q.  … I'm saying you did not get hit by a car.  Is that a safe statement?
> A.  I could probably say yes because you know what now that we're sittin here talking and we're doing this. . . . I just I really thought I got hit by a car.  I'm being honest with you.

(*Id.* at 22-23.)  Kudlacik turned to Fehl's worker's compensation claim:

> Q.  Did you go through ah you went through Bergen Risk or no.
> A.  No. I'm doing suing.[5]  I'm not doing anything.  I didn't ask for nothing.
> Q.  Okay but ah
> A.  I wasn't I wasn't doing Bergen Risk.  I wasn't doing any of that because I figured I be going right back to work.  I'm still, I'm not I'm not physically working.  I not physically working.  I got guys that work for me that cut lawns every day.
> Q.  Right.
> A.  So I didn't lose no money. . . . So there was no reason to go through Bergen Risk.

(*Id.* at 23-24.)  Despite this, Fehl acknowledged filling out paperwork with the Borough. (*Id.* at 25.)  Fehl went on: "Since . . . we're tapin and everything I heard the Borough Administrator is worried because he thinks I'm gonna sue because I'm sue happy because I sued Hasbrouck Heights Fire Department.  I'm not sue happy.  I'm not suing anybody." (*Id.* at 24.)

---

[5] In the transcript at Exhibit O, the word "not" is handwritten after "I'm."  The source of this addition is unclear.

The order of events after the interview concluded is disputed.  Relying on Kudlacik's deposition testimony and the complaint-warrant itself, defendants contend that Kudlacik left the interview and consulted with the Bergen County Prosecutor's Office, had the complaint-warrant faxed to the available municipal court judge, and presented the case by telephone, after which the judge determined that there was probable cause to arrest and set bail.  (Wallington/Kudlacik R. 56.1 Stmt. ¶¶ 50-52.)  The complaint-warrant, which lists the charges against Fehl, has information stamped on it indicating "telephonic authorization by the Honorable Casmir Sondey at 8-5-14 at 1621 AM/PM."  (McDonnell Cert., Ex. P.)  The document is signed by Kudlacik and Judge Sondey, the latter of whom checked a box stating that "Probable cause IS found for the issuance of this complaint," followed by a bail amount of $2,000 with a 10% option.  (*Id.*)  Fehl, citing his deposition testimony, contends that Kudlacik arrested him immediately after taking his statement and called the judge only to set bail.  (Pl.'s Response ¶¶ 50-51.)

Fehl posted bail and was released the same day.  By letter dated August 6, 2014, Bergen Risk Managers, the Borough's worker's compensation administrator, notified Fehl that his worker's compensation claim had been denied and no benefits would be paid.  (McDonnell Cert., Ex. J.)

On March 17, 2015, a Bergen County grand jury handed up an indictment charging Fehl with insurance fraud, N.J.S.A. § 2C:21-4.6, and tampering with public records or information, N.J.S.A. § 2C:28-7a.  (*Id.* ¶ 54; McDonnell Cert., Ex. R.)  In January 2018 the case came to trial and Fehl was acquitted.  (*Id.* ¶ 55; McDonnell Cert. Ex. S.)

On November 9, 2017, Fehl filed a nine-count complaint against the Borough, Baginski, Kudlacik, and the Bergen County Prosecutor's Office ("BCPO").  (D.E. 1, Compl.)  He alleged the following claims: false arrest, asserted under the New Jersey Civil Rights Act (NJCRA),

N.J.S.A. § 10:6-2 *et seq.* (count I); false arrest, under 42 U.S.C. § 1983 (count II); malicious prosecution, under the NJCRA (count III); malicious prosecution, under § 1983 (count IV); policy of inadequate training or supervision, under § 1983 (count V); abuse of process, under § 1983 (count VI); free speech retaliation, under § 1983 (count VII); free speech retaliation in violation of the New Jersey Constitution, under the NJCRA (count VIII); and municipal liability, under § 1983 (count IX, mislabeled in the complaint as count VIII).

The Borough, Baginski, and Kudlacik filed an answer denying liability and asserted crossclaims for indemnification and contribution against the BCPO. (D.E. 7.) The parties subsequently stipulated to the dismissal of all claims and crossclaims against the BCPO, resulting in the dismissal of count V in its entirety. (D.E. 25, 27.) The remaining defendants moved for summary judgment, arguing their entitlement to qualified immunity as well as to summary judgment on the substance of the claims. Recognizing the threshold nature of qualified immunity, the Court directed the parties to re-file their motions directed to the qualified immunity issue specifically.

Although the re-filed motions do address qualified immunity, they continue to include argument on the substance of the claims. The Borough and Kudlacik argue that Kudlacik did not violate any clearly established right belonging to Fehl. More specifically, they contend that Fehl's arrest and prosecution were supported by probable cause, defeating his false arrest, malicious prosecution, abuse of process, and First Amendment retaliation claims. Additionally, as to the abuse of process claim, they argue in their reply that Fehl adduced no evidence that Kudlacik had any improper motive behind his actions. According to the Borough, count IX cannot survive summary judgment because Fehl fails to articulate a basis for municipal liability. (D.E. 45-1, Wallington/Kudlacik Moving Br.; D.E. 57, Wallington/Kudlacik Reply Br.)

Fehl argues that Kudlacik testified falsely before the grand jury.[6]  He further argues that his evidence establishes that a reasonable jury could conclude that Kudlacik was engaged in a conspiracy to violate his First Amendment rights and that it is a question for a jury about whether probable cause existed for Kudlacik to arrest him. As to the abuse of process claim, Fehl argues that Kudlacik gave false testimony in the grand jury in a successful effort to garner Baginski's support for a promotion to police captain.  Finally, Fehl asserts that the Borough is liable for Baginski's actions as a policymaker and because he was a supervisor who ratified the actions of a subordinate, Kudlacik. (D.E. 53, Fehl Opp. Br.)

Baginski has also moved separately for summary judgment.  He argues that he is entitled to qualified immunity because Fehl has not established that he violated a constitutional or statutory right, or that he had individual or supervisory involvement in the challenged events.  As to Fehl's free speech retaliation claims, Baginski also argues that the subjects about which Fehl alleges to have spoken out about – which included Baginski's handling of an insurance claim for dive suits after Superstorm Sandy and Fehl's failure to get a contract from the Borough in 2012 for hydroseeding of a town field – were matters of private concern and not protected speech, and that Fehl has offered no evidence of retaliation connected to that speech.  Finally, he argues that there is no evidence to support Fehl's allegations of a conspiracy with Kudlacik.  (D.E. 44-1, Baginski Moving Br.; D.E. 58, Baginski Reply Br.)

---

[6] Fehl's briefing uses the term "good faith immunity" instead of "qualified immunity," though he relies on case law relevant to qualified immunity.  "Good faith immunity" is a type of statutory immunity under the New Jersey Tort Claims Act.  *See* N.J.S.A. § 59:3-3.  When applicable, it provides a defense to liability.  Qualified immunity, on the other hand, provides for immunity to suit.  *Lozano v. New Jersey*, 9 F.4th 239, 244 (3d Cir. 2021).  Fehl does not assert his claims under the NJTCA; he asserts them under the NJCRA and § 1983.  Accordingly, this opinion uses the term "qualified immunity."

Fehl opposes on the ground that Baginski had a "malicious, specific intent" to harm him that manifested itself through a scheme first to compel Fehl to submit a FROI, then to tell the third-party claims administrator not to pay on the claim because it was under investigation, then initiate that investigation, conspiring with Kudlacik to pursue an improper arrest and prosecution. Fehl contends that Baginski is not entitled to qualified immunity because he had direct, personal involvement in the challenged events and acted in an objectively unreasonable manner.  (D.E. 49, Fehl Opp. Br. to Baginski.)

## III.   Standard of Review

Summary judgment is proper where the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A factual dispute qualifies as "genuine" if the evidence would permit a reasonable jury to find for the non-movant.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018). And a fact is "material" if it "might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  "[I]n opposing summary judgment, the nonmoving party must 'do more than simply show there is some metaphysical doubt as to the material facts.'"  *Mearin v. Greene*, 555 F. App'x 156, 159 (3d Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

The facts are to be viewed in the "light most favorable to the non-moving party, who is entitled to every reasonable inference that can be drawn from the record."  *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020) (quoting *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010)) (internal quotation marks omitted).  The Court may not weigh evidence or determine credibility, but instead assesses "whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party."  *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (quoting *Reedy*, 615 F.3d at 210) (internal quotation marks omitted).

17

Where the moving party is the defendant, the burden is on it to demonstrate that the plaintiff "has failed to establish one or more essential elements of [his] case." *Burton*, 707 F.3d at 425.  Such a showing would warrant summary judgment because a "complete failure of proof concerning an essential element" of a claim "necessarily renders all other facts immaterial, and thus there can be no genuine [dispute] as to any material fact" and "judgment as a matter of law becomes appropriate." *In re Nat. Pool Constr., Inc.*, 598 F. App'x 841, 845 (3d Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

In opposing the motion, the non-moving party "may not rest upon the mere allegations or denials of his pleadings but, instead, must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice." *Jutrowski*, 904 F.3d at 288-89 (quoting *D.E. v. Central Dauphin School Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)) (internal quotation marks omitted).

## IV.   Discussion

### A.   Kudlacik

Kudlacik has sought summary judgment on all claims against him on the basis of qualified immunity, which "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *accord Thomas v. Tice*, 948 F.3d 133, 141 (3d Cir. 2020).  *See also Lozano*, 9 F.4th at 245 ("A police officer is entitled to qualified immunity under § 1983 unless the plaintiff shows that the officer violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" (citation omitted)). The doctrine aims to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment,

distraction, and liability when they perform their duties reasonably," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), and affords "'ample room for mistaken judgments' by shielding 'all but the plainly incompetent or those who knowingly violate the law.'" *Olson v. Ako*, 724 F. App'x 160, 164 (3d Cir. 2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

"The qualified immunity analysis is a two-step process, which a court may address in either order according to its discretion." *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 986 (3d Cir. 2014). The Court decides "whether the facts, taken in the light most favorable to [plaintiff], establish that the [defendants'] conduct 'violated a constitutional right.'" *Id.* (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). It also determines "whether that right was 'clearly established' at the time of the challenged conduct." *Id.* "'To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Thomas*, 948 F.3d at 141 (quoting *Reichle*, 566 U.S. at 664). The same test applies to both Fehl's § 1983 and NJCRA claims. *Lozano*, 9 F.4th at 245.

The claims against Kudlacik are readily addressed under the first step of the analysis. To succeed, Fehl's claims against Kudlacik require him to show that a person acting under color of law deprived him of a constitutional right or right otherwise protected by federal law. *Thomas*, 948 F.3d at 138.[7] He has not supplied a factual basis for a reasonable jury to conclude that he suffered such a deprivation of rights.

---

[7] In their briefing, the parties made no distinction between the claims brought under § 1983 and the NJCRA, and at oral argument, Fehl's attorney confirmed that for purposes of this case, the analysis under federal law applies equally to the claims asserted under the NJCRA. (9/13/21 Tr. 39:8-18.) *See generally Lozano*, 9 F.4th 239.

### 1. False Arrest

Fehl's first two claims challenge the legality of his arrest.  Arrests, as seizures under the Fourth Amendment, must be reasonable under the circumstances.  *District of Columbia v. Wesby*, 138 S. Ct. 577, 585 (2018).  A warrantless arrest "'is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.'"  *Wright v. City of Phila.*, 409 F.3d 595, 601 (3d Cir. 2005) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  A false arrest claim under § 1983 requires (1) an arrest, (2) that was made without probable cause.  *Harvard*, 973 F.3d at 199.  False arrest claims "necessarily fail" if probable cause existed for any of the charged offenses, *id.*, or, for that matter, if the officer had probable cause to arrest for any offense, *Wesby*, 138 S. Ct. at 585 n.2.

Probable cause does not "demand[] proof of guilt beyond a reasonable doubt." *Dempsey*, 834 F.3d at 467.  Instead, it exists if there a "'fair probability' that the person committed the crime at issue." *Id.* (quoting *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000)).  That is, there is probable cause to arrest "'when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.'" *Id.* (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)).  The probable cause standard is a "'fluid concept'" that "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity,'" *Wesby*, 138 S. Ct. at 586 (citation omitted), and it "does not require that officers correctly resolve conflicting evidence or that their determinations of credibility were, in retrospect, accurate," *Dempsey*, 834 F.3d at 467 (citation omitted).  The officer must consider "plainly exculpatory" evidence in addition to inculpatory evidence, even if "substantial

inculpatory evidence," on its own, suggests the existence of probable cause. *Harvard*, 973 F.3d at 200 (quoting *Wilson*, 212 F.3d at 790) (internal quotation marks omitted).

As a totality-of-the-circumstances evaluation, the inquiry is fact-sensitive and often appropriate for jury determination. *See Dempsey*, 834 F.3d at 468. But where, as here, the evidence, when viewed in the nonmovant's favor, "'reasonably would not support a contrary factual finding,'" summary judgment is appropriate. *Id.* (citation omitted).

Before that totality of the circumstances test is applied, a discussion of the facts surrounding the arrest is relevant here. Had Fehl been arrested pursuant to a duly issued warrant, a different analysis would apply. To succeed on a claim for false arrest made pursuant to a warrant, a plaintiff must show by a preponderance of the evidence "(1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 786-87 (internal quotation marks and citation omitted).

This involves examining the information the officer supplied to the judge to ensure it includes "all information 'any reasonable person would know that a judge would want to know' in making a probable cause determination" and to ensure that the officer followed proper procedure. *Dempsey*, 834 F.3d at 469 (quoting *Reedy*, 615 F.3d at 213). "If [proper procedure] was not [followed], the court itself must engage that procedure and determine whether probable cause existed in spite of that failure," which involves identifying any facts that were improperly asserted or omitted, determining whether the omissions or misrepresentations were reckless, excising or inserting information accordingly, and assessing whether the reconstructed record would establish probable cause. *Id.* at 470. If it would, this defeats the claim because even

absent the omissions or misrepresentations, the arrest would have been supported by probable cause.

Here, there is a factual dispute as to when Kudlacik called the municipal judge—before or after Fehl was under arrest—and there is no record of what he told the judge on that call. Taking the facts in the light most favorable to Fehl, the call was made after the arrest, and/or addressed only the subject of bail.  Even assuming the call was made beforehand, and even if the judge did make a probable cause determination before Kudlacik placed Fehl under arrest, the record before the Court does not permit the required "literal, word-by-word reconstruction[]" of the affidavit or other record Kudlacik placed before the judge.  *Dempsey*, 834 F.3d at 470.  What defendants refer to as the "warrant application" contains no information about Kudlacik's investigation.  (Wallington/Kudlacik Reply Br. 14 (citing McDonnell Cert., Ex. P).)  Kudlacik testified that he didn't "recall what I told the judge, but I gave him the fact pattern of what I had."  (Rindosh Cert., Ex. 3, Kudlacik Dep. Tr. 148:5-6.)  Later, in response to specific questions from attorneys for both sides, he testified that he didn't talk to the judge about Krause or Chermak's statements and that the judge didn't have the video footage. He testified that he did say there was no evidence of a car striking Fehl, that he reviewed surveillance, and that there was no physical evidence of a car accident or pedestrian motor vehicle accident. (*Id.* at 176:4-177:16.)  While offering some insight into Kudlacik's conversation with the judge, this record does not permit the analysis the Third Circuit requires before the *Wilson* standard allows a warrant to defeat the probable cause element of a false arrest claim.

Kudlacik's argument that probable cause should be presumed because he vetted the charges with the prosecutor's office fares no better.  Although a such a presumption would arise if a supervising prosecutor reviewed and approved the warrant, *see Olson*, 724 F. App'x at 166

n.5, Kudlacik's testimony does not indicate what he told the BCPO or when and he does not

point to any evidence indicating that a supervising prosecutor approved the warrant; instead, he

testified that while he vetted the charge through the BCPO, he made the decision to arrest Fehl.

(Kudlacik Dep. Tr. 45:22-24.)

Accordingly, the totality of the circumstances approach to assessing the existence of

probable cause, rather than employing any presumption of probable cause, is the appropriate

course in evaluating Fehl's false arrest claims here.  *See Noviho v. Lancaster Cnty.*, 683 F. App'x

160, 164 (3d Cir. 2017).

The probable cause assessment must also be made in the context of the requirements of

the laws under which Fehl was charged.  The first charge against him was insurance fraud in

violation of N.J.S.A. § 2C:21-4.6(a), which provides in pertinent part as follows:

> A person is guilty of the crime of insurance fraud if that person knowingly makes,
> or causes to be made, a false, fictitious, fraudulent, or misleading statement of
> material fact in, or omits a material fact from, or causes a material fact to be
> omitted from, any record, bill, claim or other document, in writing, electronically,
> orally or in any other form, that a person attempts to submit, submits, causes to be
> submitted, or attempts to cause to be submitted as part of, in support of or
> opposition to or in connection with: (1) a claim for payment, reimbursement or
> other benefit pursuant to an insurance policy, or from an insurance company or
> the "Unsatisfied Claim and Judgment Fund Law," P.L.1952, c. 174 (C.39:6-61 et
> seq.) . . . .

*Id.*  He was also charged with third-degree tampering with public records or information in

violation of N.J.S.A. § 2C:28-7, which provides:

> a. Offense defined. A person commits an offense if he:
>
> (1) Knowingly makes a false entry in, or false alteration of, any record,
>     document or thing belonging to, or received or kept by, the government
>     for information or record, or required by law to be kept by others for
>     information of the government;
>
> (2) Makes, presents, offers for filing, or uses any record, document or thing
>     knowing it to be false, and with purpose that it be taken as a genuine part
>     of information or records referred to in paragraph (1); or

(3) Purposely and unlawfully destroys, conceals, removes, mutilates, or otherwise impairs the verity or availability of any such record, document or thing.

b. Grading. An offense under subsection a. is a disorderly persons offense unless the actor's purpose is to defraud or injure anyone, in which case the offense is a crime of the third degree.

*Id.*

Turning to the facts adduced, it is undisputed that Fehl wrote on the FROI form that he had been hit by a car while responding to a call and that he indicated on that injury report that he was, in fact, injured.  At the time of the arrest, Kudlacik also had before him information from Zielinski that there was no physical evidence of a hit-and-run at the scene; no debris, no glass, and no skid marks.  Kudlacik also was aware of Zielinski's observation that Fehl had changed his story when pressed for more details.

Additionally, he had Krause's interview, in which Krause repeatedly expressed doubts about Fehl's credibility in general and about the incident in issue.  While ultimately Krause indicated that he believed that Fehl had been hurt and wasn't sure how it happened, he also said that Fehl did not appear seriously injured and certainly not injured in a manner that, in his experience, was consistent with the hit-and-run scenario Fehl described to Krause and others. Krause also indicated that the paramedics (who would have had firsthand exposure to Fehl's injuries) had expressed skepticism about Fehl's version. He told Kudlacik that Fehl came to the firehouse the very day he was released from the hospital, and the firefighters joked when he showed up in leg braces and crutches that Fehl was "milking it."

When Kudlacik interviewed him, armed with this knowledge, Fehl set forth his hit-and-run version of the incident with detail before conceding that he was not sure what happened. Near the end of the interview – after Kudlacik stressed the need for Fehl to be honest about what

happened and expressed doubts about Fehl's version of events in light of the police investigation – Fehl denied "doing Bergen Risk" because he expected to go right back to work, had people working for him and had lost no money, and therefore there was "no reason to go through Bergen Risk" – statements that could reasonably indicate that Fehl knew Bergen Risk was claims administrator for worker's compensation claims and the purpose of filling out the FROI form. Under the circumstances, it was reasonable for Kudlacik to conclude that that there was a "fair probability" that Fehl committed the charged offenses with the requisite knowledge and intent.

Fehl argues that he was in fact injured and that Kudlacik did not understand that only the existence of injury was relevant, not how it happened, unless it happened because he was intoxicated. The subject of whether Fehl had been drinking came up more than once in Kudlacik's interview, and Kudlacik was not required to accept Fehl's denials or correctly assess his truthfulness. *Dempsey*, 834 F.3d at 467 (probable cause standard does "not require that officers correctly resolve conflicting evidence or that their determinations of credibility were, in retrospect, accurate"). Nor was he required, particularly in light of the numerous questions about Fehl's credibility that came up during the course of the investigation, to believe Fehl's explanations of whether, or how extensively, he was injured. *Olson*, 724 F. App'x at 167 (probable cause does not demand that "'officers . . . rule out a suspect's innocent explanation for suspicious facts'" (quoting *Wesby*, 138 S. Ct. at 588)). Similarly, while Krause did tell Kudlacik that he believed Fehl was injured and dazed, his interview as a whole defeats Fehl's assertion that "Krause's statement did not provide any evidence that Plaintiff knowingly made any false

statements or provided false information at any point" (Pl.'s Opp. Br. 11) – to the contrary, what Krause told Kudlacik provided ample basis for him to doubt Fehl's credibility.[8]

The Q&A from Kudlacik's interview with Fehl establishes that Fehl first asserted in dramatic terms, claiming "somebody came flying around the corner" – a version of the incident that he subsequently retreated from on grounds that he actually couldn't remember what happened – hardly logical or convincing. Indeed, what Fehl laid out in a meandering, and at times inconsistent, fashion supports the skepticism Krause and Zielinski expressed to Kudlacik. That Fehl still gave Kudlacik, a month later, his hit-and-run account of the incident – after he had seen the footage and knew about the lack of physical evidence at the scene – before professing ignorance of what happened and conceding he may have fallen is by no means exculpatory and if anything reinforced the skepticism of the other witnesses.

Evaluating probable cause at the summary judgment stage does not require the Court to exclude from the analysis facts unfavorable to this plaintiff that were nonetheless before the charging officer. *Dempsey*, 834 F.3d at 468. To the contrary, the Court "view[s] *all* such facts

---

[8] Fehl's assertion that Kudlacik "failed to realize" that Krause told him that Fehl had seen the car coming from the opposite direction (D.E. 53-3, ¶ 152) glosses over significant content in the interview. Krause twice told Kudlacik that Fehl had said the car came from Park Row onto Adamson, a statement consistent with what other reports reflect. One time in the course of Krause's interview, he said Fehl said he looked "left" – which Fehl claims meant toward Stein, rather than Park Row – and saw an approaching car. This stray remark is hardly "plainly exculpatory," particularly given the lack of physical evidence of a collision at the scene and the commonsense observation that a car coming from the other direction still would have been captured on the video footage the police reviewed albeit after, rather than before, the incident. Indeed, the only possible exculpatory relevance of Krause's reference to a car coming from the "left" was raised at Kudlacik's deposition – that a car came from the direction of Stein, hit Fehl, and turned around before ever being captured on the video. In response to that theory Kudlacik pointed out that Zielinski came from that direction and presumably would have seen such a car. (Rindosh Cert., Ex. 3, at 119:7-25.) In any event, facts cannot be considered in isolation; the probable cause determination examines the *totality* of the circumstances, *Wesby*, 138 S. Ct. at 588, and here Kudlacik had sufficient information before him to reasonably conclude that probable cause existed.

and assess[es] whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a 'fair probability' that a crime occurred." *Id.* The Court is satisfied that Kudlacik had enough information by the time his interview with Fehl was over to conclude there was a fair probability that a crime had occurred, and that no reasonable jury could find otherwise. As such, the false arrest claim against Kudlacik must fail. So too do Fehl's assertions that the investigation was initiated and pursued for an improper purpose fail: if the circumstances, viewed objectively, justify the arrest, it "was reasonable '*whatever* the subjective intent' motivating the relevant officials." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)).

### 2.  Malicious Prosecution

The malicious prosecution claims also fail. "To prevail on a malicious prosecution claim, a plaintiff must demonstrate that: '(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.'" *Harvard*, 973 F.3d at 203 (alteration in original) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)). "Under prong three, a showing of probable cause is a complete defense." *Costino v. Anderson*, 786 F. App'x 344, 347 (3d Cir. 2019) (citing *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016)).

For purposes of a malicious prosecution claim, a grand jury indictment creates a presumption of probable cause. *Id.* A plaintiff may rebut the presumption "only by showing that the indictments resulted from 'fraud, perjury or other corrupt means.'" *Id.* (quoting *Rose v.*

*Bartle*, 871 F.2d 331, 353 (3d Cir. 1989)).  Fehl was indicted, and to rebut the resulting

presumption of probable cause he argues that Kudlacik offered false and misleading testimony

when he testified before the grand jury as the prosecutor's sole witness. He also contends that

Kudlacik "fail[ed] to disclose material exculpatory evidence" in the form of "testimony and

statements of the firsthand witnesses to [his] injuries," which he asserts "corroborated that [he]

was unconscious and badly injured when they found him."  (Pl.'s Opp. Br. 19-20.)

To begin with, even assuming the information Fehl refers to is exculpatory, which is

unclear, there is no obligation to present exculpatory evidence to grand juries. *Costino*, 786 F.

App'x at 348.  Moreover, the Court is not persuaded that the specific testimony that Fehl

characterizes as false or misleading (Pl's Opp. Br. 18) actually is.  To the contrary, the

challenged statements are either accurate or reflect at most careless or minor errors that could not

possibly have affected whether the grand jury decided to indict.  First, Fehl *did* state to the 911

operator, first responders, and others that he had been hit by a car; this is supported not only by

various record evidence, but also his own admission in his motion papers.  (*See*

Wallington/Kudlacik R. 56.1 Stmt. ¶ 22; Pl.'s Response ¶ 22.)[9]  Similarly, the transcript of

Kudlacik's interview with Fehl supports Kudlacik's statements to the grand jury that Fehl had

initially stuck to his hit-and-run story in the face of questioning, and later that he ultimately

---

[9] The suggestion that Kudlacik testified to the grand jury that Fehl claimed to have been struck while going *from* his car rather than *to* it, fails to account for the context of the testimony as a whole, which makes clear that the incident occurred in the course of Fehl responding to an emergency call.  (Rindosh Cert., Ex. 37, at 5:16-6:7.)  Additionally, the paramedics' report did state that Fehl was "reportedly struck by [a] passing vehicle after he exited his vehicle." (McDonnell Cert., Ex. D.)  Thus, even accepting Fehl's interpretation of what Kudlacik said, which is somewhat strained, he fails to explain why this error (assuming it was one) could have had any effect on the grand jury's decision to indict.

agreed with Kudlacik that he probably fell; given the full transcript of the interview Fehl has not shown how the testimony is either false or misleading.

Kudlacik answered affirmatively when the prosecutor asked if Fehl had injuries when officers arrived, but Fehl takes issue with Kudlacik's statement that he had a "cut to the head," offering it as false and misleading.  But this description appears in the fire department emergency squad report, the EMS report, and Krause's interview transcript.  (*See* McDonnell Cert., Ex. D, E; Rindosh Cert., Ex. 14.)  Next, Kudlacik's testimony about looking for car speeding around the corner was made in response to a question from the prosecutor that specifically asked him what he was looking for on the tapes.  That context establishes that Kudlacik was describing a step in his investigation, not testifying about the relevant legal issue for the grand jury's consideration.

Finally, Kudlacik did not testify that Fehl submitted a claim to Bergen Risk (a statement Fehl asserts was false because Baginski made the submission).  Rather, Kudlacik testified that Fehl filed a "report" with Bergen Risk—which he did, by filling out the FROI report and giving it back to Baginski.  After that, the report ended up with Dorothy Siek, the employee who inputted all such forms and who submitted it to Bergen Risk.  Fehl did make a report to Bergen Risk; that Kudlacik omitted the administrative steps after Fehl turned it in at Borough Hall and/or how it got to Bergen Risk hardly rises to the level of "fraud, perjury or other corrupt means."  Similarly, while Kudlacik did describe Bergen Risk as an insurer – albeit incorrectly, because it is the third-party administrator for the Borough, which is self-insured through a joint insurance fund – he went on to properly explain that a report made to Bergen Risk began the process of having the medical bills paid after an employee was injured on the job.  In short, the challenge to Kudlacik's grand jury testimony amounts to hair-splitting.  Fehl has not established

any basis to rebut the presumption of probable cause triggered by his indictment on both charges, and Kudlacik is entitled to summary judgment on the malicious prosecution claim against him.

### 3. Free Speech Retaliation

A First Amendment retaliation claim requires a public employee to show that: "(1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Dougherty*, 772 F.3d at 986. *See also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (articulating requirements for claim).

In retaliatory prosecution claims, proving the link between the retaliatory animus and the plaintiff's injury is "usually more complex" because the retaliatory action (prosecution) is not actually carried out by the official alleged to have a malicious motive. *Nieves*, 139 S. Ct. at 1723 (citation omitted). Therefore, a threshold requirement to prove a retaliatory prosecution claim is that the plaintiff prove the "absence of probable cause for the underlying criminal charge." *Id.* (citing *Hartman v. Moore*, 547 U.S. 250, 265-66 (2006)). *See also id.* ("Thus, *Hartman* requires plaintiffs in retaliatory prosecution cases to show more than the subjective animus of an officer and a subsequent injury; plaintiffs must also prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause."). *Nieves* extended that requirement to retaliatory arrest claims. *Id.* at 1724.[10] Only if a plaintiff shows the

---

[10] *Nieves* recognized a narrow exception to the rule that "probable cause should generally defeat a retaliatory arrest claim": "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 139 S. Ct. at 1727. In such circumstances, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* There is no argument for and no factual record that would permit applying the exception here.

absence of probable cause does the analysis continue: then the plaintiff must also show that the retaliation was a substantial or motivating factor behind the arrest, and to escape liability the defendant must show that the arrest would have been initiated without respect to retaliation. *Id.* at 1724-25 (citations omitted).

Here, as set forth *supra*, Fehl's arrest and prosecution (neither of which was carried out by Baginski, who Fehl alleges had the malicious motive) were supported by probable cause, which under *Hartman* and *Nieves* defeats his free speech retaliation claims. At oral argument, Fehl's attorney clarified that the retaliation claims against Kudlacik are asserted as conspiracy claims, rather than direct liability claims. A conspiracy claim under § 1983 requires a plaintiff to prove that persons acting under color of state law "'reached an understanding to deprive him of his constitutional rights.'" *Harvard*, 973 F.3d at 208 (quoting *Jutrowski*, 904 F.3d at 293-94). It requires a factual basis to support the existence of such an agreement, as well as concerted action. *Jutrowski*, 904 F.3d at 295. Significantly, it also requires an underlying constitutional violation. *Rink v. Ne. Educ. Intermediate Unit 19*, 717 F. App'x 126, 141 (3d Cir. 2017); *Norcross v. Town of Hammonton*, 2007 WL 2085366, at *6 (D.N.J. July 17, 2007) (Kugler, J.). The Court's conclusion that Fehl has not established a constitutional violation sufficiently to survive summary judgment also defeats his conspiracy claim. Additionally, the "agreement" Fehl claims to have existed between Kudlacik and Baginski involved Kudlacik's promotion as a "reward" for helping Baginski, which, as discussed *infra*, is not a reasonable inference to draw from Baginski's testimony and the circumstances of Kudlacik's promotion.

### 4. Abuse of Process

An abuse of process claim requires "an ulterior motive and some further act after the issuance of process representing the perversion of the legitimate use of process." *Simone v.*

*Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1037 (3d Cir. 1988) (quoting *Fielder Agency v. Eldan Constr. Corp.*, 152 N.J. Super. 344, 348 (Law Div. 1977)).  Bad motives or malicious intent that lead to the institution of process are insufficient; the plaintiff must show "some coercive or illegitimate use of the judicial process."  *Id.*

Fehl argues (D.E. 53, at 30-31) that Kudlacik's improper use of process was providing false and misleading testimony to the grand jury.  As explained with respect to the malicious prosecution claim, this argument lacks a factual foundation sufficient to withstand summary judgment.

Fehl also contends that Kudlacik had an "ulterior motive" to assist Baginski so he could be promoted, pointing to deposition testimony that he interprets as an admission from Baginski that Kudlacik's promotion was a "reward."  No reasonable jury could fairly infer from Baginski's stray comment in his deposition that he was referring to promoting Kudlacik in exchange for targeting Fehl:

> Q.  Do you know who Shawn Kudlacik is?
> A.  Lieutenant Kudlacik?
> Q.  Yes.
> A.  Yes.
> Q.  Captain Kudlacik now.
> A.  **Now, that was his reward.**
> Q.  How long have you known Captain Kudlacik?
> A.  Probably around 20 years.
> Q.  Did you know him through work only first or did you know him personally before he worked for the town?
> A.  I don't recall.
> Q.  Do you talk with Shawn regularly?
> A.  No, sir.
> Q.  Did you – was there a point where you would talk to him regularly on the cellphone?
> A.  No, sir.
> Q.  In person?
> A.  Not any more than hello, good-bye.

(Rindosh Cert., Ex. 36, at 12:5-23 (emphasis added).)   The only other reference to a "reward" is

similarly unhelpful:

> Q. . . . Shawn Kudlacik, how does Shawn Kudlacik become captain?
> A. I couldn't recall exactly.
> Q. Did they – was it a reward to him in any way?
> A. A what?
> Q. A reward.
> Ms. McDonnell:  Objection.
> Mr. Botta:  Objection to the form of the question. I don't even know – what?
>     Award for his good, hard work? I don't know.  Do you have any idea what
>     he's asking?
> [Baginski]:  A reward?
> Q. Did you ever - - in your whole life in Wallington, was there ever two captains
>     before?
> A. No.
> Q. So Captain Kudlacik is the first time they had two captains, right?
> A. Yes.
> Q. Does Wallington need two captains?
>  . . . .
> Q. In your opinion?
> A. Why? My opinion doesn't count.
> . . . .
> Q. Do you know if they had to redo the table of organizations to make that
>     position?
> A. Absolutely.
> Q. Okay.  Was this meeting where it was reorganized, January 2nd?
> A. No, I don't believe so. I don't see anything here.  The table of reorganization
>     would have to be done through an ordinance.

(*Id.* at 77:10-78:18.)

That the Borough never previously had two police captains and several members of the

town council voted against the promotion is not evidence that Kudlacik got the promotion in

exchange for targeting Fehl or, significantly, that Baginski was in a position to effectuate any

police promotions.  To the contrary, the very same news article Fehl relies on to draw the

inference that Kudlacik's promotion was unusual shows that the promotion, *which came more*

*than two years after Kudlacik's investigation and Fehl's arrest*, happened only after action by

the town's governing body, which did not include Baginski, to change the organizational table

and later to promote Kudlacik to the newly created position.  (Rindosh Cert., Ex. 26.)  Summary judgment is warranted on the abuse of process claim.

### B.  Baginski

It is undisputed that Baginski did not participate in Fehl's arrest or prosecution, and a defendant's liability under § 1983 "must be predicated on his direct and personal involvement" in the constitutional violation.  *Jutrowski*, 904 F.3d at 289.  *See also Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995) (imposing direct liability requires defendant to have (1) participated in violating his rights, (2) directed others to violated them, or, as a supervisor, (3) had knowledge of and acquiesced in his subordinates' violations).  Even assuming *arguendo* that Baginski actuated the investigation and that the notation in Bergen Risk's claim documents that Baginski placed a hold on the claim is sufficient support for such involvement, all of those mechanisms for imposing liability depend on the existence of a constitutional violation in the first instance, which Fehl has not established so as to survive summary judgment.

To the extent Fehl purports to have asserted his claims against Baginski as conspiracy claims, they likewise must fail.  *Rink*, 717 F. App'x at 141 (affirming summary judgment for defendants on conspiracy claim where plaintiff "failed to demonstrate that the evidentiary record before the Court allows for a reasonable inference that he was deprived of a federal constitutional or statutory right, nor for a reasonable inference that any of the [d]efendants made an agreement or plan to deprive [him] of such a right").  The existence of probable cause for Fehl's arrest and prosecution dooms Fehl's efforts to cast a malignant light on what Baginski did in the course of his duties as borough administrator.

### C.  Borough

Finally, Fehl has asserted a claim for municipal liability against the Borough.  It is well-established that "a municipality can be found liable under § 1983 only when the municipality

itself causes the constitutional violation." *Vargas v. City of Phila.*, 783 F.3d 962, 974 (3d Cir. 2015).  For a municipality to be liable for failing to preserve a plaintiff's constitutional rights, the plaintiff must show that "(1) [he] possessed a constitutional right of which [he] was deprived; (2) the municipality had a policy; (3) the policy 'amount[ed] to deliberate indifference' to the plaintiff's constitutional right; and (4) the policy was the 'moving force behind the constitutional violation.'" *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-91 (1989)).  Fehl's failure to establish a constitutional violation defeats the municipal liability claim.  *Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 238 (3d Cir. 2013) ("[T]o establish municipal liability under § 1983, [plaintiffs] must show that they were deprived of 'rights, privileges, or immunities secured by the Constitution and laws[.]'").  Succinctly, "if there is no violation in the first place, there can be no derivative municipal claim." *Id.* at 238 n.15.

## V.   Conclusion

For the reasons set forth above, the motions for summary judgment will be granted.  An appropriate order will issue.


Dated:  September 30, 2021                          /s/ Katharine S. Hayden
                                                    Katharine S. Hayden, U.S.D.J.

35